| | | |
|---|---|---|
| **IN RE:** | ) | Case No. 1:09-bk-07158-RNO |
| | ) | Chapter 11 |
| AUTOHAUS ACQUISITION, INC., | ) | |
| **d/b/a** VICTORY VOLKSWAGEN, | ) | |
| **d/b/a** VICTORY MITSUBISHI **d/b/a** | ) | |
| VICTORY AUDI, | ) | |
| | ) | |
| **Debtor.** | ) | |
| ==============================| ) | |
| **IN RE:** | ) | Case No. 1:09-bk-07161-RNO |
| | ) | Chapter 11 |
| | ) | |
| **THREE ARROWS ENTERPRISES,** | ) | Bankruptcy Courtroom No. 1 |
| **INC. d/b/a BLACK TIE MOTOR CAR,** | ) | Ronald Reagan Federal Building |
| | ) | 228 Walnut Street |
| | ) | Harrisburg, PA 17101 |
| **Debtor.** | ) | |
| | ) | October 7, 2009 |
| | ) | 1:21 P.M. |

TRANSCRIPT OF MOTION TO USE CASH COLLATERAL AND PAY PREPETITION
PAYROLL (# 10).
BEFORE HONORABLE ROBERT N. OPEL, II
UNITED STATES BANKRUPTCY JUDGE

**APPEARANCES:**

For the Debtor:         Cunningham and Chernicoff
                        By:  ROBERT CHERNICOFF, ESQ.
                             MARC W. WITZIG, ESQ.
                        2320 North Second Street
                        P.O. Box 60457
                        Harrisburg, Pennsylvania 17106-0457

For Susquehanna Bank:   Barley Snyder, LLC
                        By:  GEORGE C. WARNER, ESQ.
                             GEORGE J. SHOOP, ESQ.
                        126 East King Street
                        Lancaster, PA 17602

**AUDIO OPERATOR:**         DANEISHA DUNBAR-YANCEY

**TRANSCRIPTION SERVICE:**  **TRANSCRIPTS PLUS, INC.**
                        **435 Riverview Circle**
                        **New Hope, Pennsylvania 18938**
                        **Telephone: 215-862-1115**
                        **Facsimile: 215-862-6639**
                        **e-mail CourtTranscripts@aol.com**

        Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

INDEX

| WITNESSES FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | |
|---|---|---|---|---|---|
| NICHOLAS REINHART | | | | | |
| By Mr. Chernicoff | 12 | | 76 | | |
| By Mr. Warner | | 51 | | 81 | |
| | | | | | |
| MICHAEL CAFFREY | | | | | |
| By Mr. Witzig | 82 | | | | |
| By Mr. Warner | | 88 | | | |

| WITNESSES FOR SUSQUEHANNA BANK | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|
| JOANNE COLEMAN | | | | | |
| By Mr. Warner | 93 | | | | |
| By Mr. Chernicoff | | 106 | | | |
| | | | | | |
| PATRICK COWAN | | | | | |
| By Mr. Warner | 112/122 | | | | |
| By Mr. Chernicoff | | 128 | | | 119 |

| DEBTORS' EXHIBITS: | | Marked | Received |
|---|---|---|---|
| D-1 | Asset purchase agreement | 13 | 51 |
| D-2 | Asset purchase agreement, amended | 13 | 51 |
| D-3 | Inventory | 24 | 51 |
| D-4 | Real estate | 28 | 51 |
| D-5 | Cash budget | 41 | 51 |

| SUSQUEHANNA BANK'S EXHIBITS | | Marked | Received |
|---|---|---|---|
| B-1 | Audits | 95 | 129 |
| B-2 | 9/3/09 Audit | 108 | 129 |
| B-3 | Letter | 127 | |

1          THE COURT:  Good afternoon, everyone.  Please be
2   seated.
3          MULTIPLE SPEAKERS:  Thank you, Your Honor.
4          THE COURT: Why don't we --
5          MR. CHERNICOFF:  Good morning, Your Honor.
6          THE COURT:  Good morning.
7          MR. CHERNICOFF:  Afternoon, I'm sorry.
8          THE COURT:  Why don't we begin with entries of
9   appearance?
10          MR. CHERNICOFF:  Good afternoon, Your Honor.  Robert
11  Chernicoff for both debtors Autohaus Acquisition and Three
12  Arrows.  With me today is Marc Witzig, also representing the
13  debtors.
14          MR. SHOOP:  Your Honor, good afternoon.  George Shoop
15  from Barley Snyder representing Susquehanna Bank.  And my
16  partner, George Warner, also representing Susquehanna Bank.
17          THE COURT:  These are the preliminary hearings on the
18  cash collateral matters.  Do you gentlemen have any objection
19  to a consolidated record in the two matters?
20          MR. CHERNICOFF:  I don't believe so, Your Honor.
21          THE COURT:  Mr. Shoop?
22          MR. SHOOP:  No objection, Your Honor.
23          THE COURT:  Okay.  And are there any preliminary
24  stipulations?  Any areas of agreement that I can take?
25          MR. CHERNICOFF: First, Your Honor, before we go too

1  far.  I apologize for not having a jacket but I can't get it
2  over my shoulder.
3          THE COURT:  Nothing to apologize for, and I know
4  you're rehabbing, so that's --
5          MR. CHERNICOFF:  We haven't specifically -- I don't
6  know -- we had provided a vehicle list to the bank.  We're
7  prepared -- if they're willing to stipulate that those are the
8  vehicles on the lot, that would save time.
9          MR. SHOOP:  We can't stipulate.
10          MR. CHERNICOFF:  Okay, then that's fine.
11          THE COURT:  Very well.
12          MR. CHERNICOFF:  That's fine.
13          THE COURT:  Do you want to proceed, Mr. Chernicoff?
14          MR. CHERNICOFF:  Yes, Your Honor.  Preliminarily, a
15  couple of housekeeping items.  There's a gentleman here from
16  the bank by the name of Michael Caffrey.  We did not subpoena
17  him, but we'd like him to be directed to remain because we may
18  call him as on cross.
19          MR. SHOOP:  We have no objection, Your Honor.
20          MR. CHERNICOFF:  Okay.
21          THE COURT:  Thank you, appreciate it.
22          MR. CHERNICOFF:  What I would like also preliminarily
23  to point out to Your Honor from the pleadings filed by the bank
24  as part of its presentation with respect to their objection to
25  the use of cash, they attach various loan document involving

1 Autohaus acquisition, and they state in their pleadings that

2 the closing dates on those was approximately April, 2008, I

3 believe. I'm looking for them.

4 Shuffling documents with one hand is not easy, Your

5 Honor. So I apologize.

6 That will become relevant because we intend to ask

7 Your Honor to note -- take notice of a UCC filing which also --

8 which has a date of July of 2009, which is relevant because --

9 there it is. It is -- I'm sorry. Dated May -- one is dated

10 April 16, that's Paragraph 8 of the bank's motion for relief

11 from stay. And the other is Paragraph 9, which is May 2nd,

12 2008, with respect to -- and I have copies to -- with respect

13 to their two loan documents, which we don't dispute. We are

14 prepared to present to Your Honor UCC1s -- a UCC filed in the

15 Autohaus Acquisition named as a debtor with Susquehanna Bank as

16 a secured party showing a filing date of June 22, 2009. The

17 reason that's relevant is because it's within the preference

18 period. And, therefore, we believe that it's entirely possible

19 that Susquehanna Bank is not secured. They've perfected many

20 months later within the preference period no additional

21 consideration, no additional loans.

22 Therefore, we believe they don't have standing to

23 even object to the use of cash for Autohaus.

24 THE COURT: Well, wasn't it the debtors' motion to

25 use cash collateral? Didn't you suggest that Susquehanna has a

1  secured position?

2          MR. CHERNICOFF:  No, I actually recited in it, Your

3  Honor, the fact that they were probably not secured.  But I

4  filed it anyway -- we filed it anyway as -- in an abundance of

5  caution, expecting a motion from the bank to prohibit the use

6  of cash collateral.  So, therefore, we filed that as an

7  abundance of caution.

8          And I believe I recite in our motion for use of cash

9  collateral the history.

10          MR. SHOOP:  At your convenience, Your Honor, I'd like

11  to be able to respond to that.

12          THE COURT:  Would you just give me one second, just

13  -- and I'm slow with a computer as -- it will reveal itself if

14  you haven't already -- I'd just like to read the motion very

15  quickly.

16                          (Pause)

17          THE COURT:  I do see in Paragraph 4 the debtors'

18  motion that in order to purported secure the loans, "The debtor

19  may have granted a lien security interest for the bank and all

20  motor vehicle units and" -- I guess it should have been

21  "proceeds from the sale of motor vehicle units by entry of a

22  floor plan loan and security agreement dated 4/16/08.:

23          Paragraph 5, "Notwithstanding the granting of the

24  security interest by virtue of such documents upon April 16th,

25  2008, a financing statement was not filed by the bank as to the

1 debtor until June 22, 2009. Debtor believes and, therefore,

2 avers the filing of the UCC loan on June 22, 2009 in an attempt

3 to perfect the lien as within the preference period set forth

4 in 547 of the Bankruptcy Code."

5          Mr. Shoop?

6          MR. SHOOP:  Your Honor, as part of the interim cash

7 collateral order and stipulation, the debtor -- well,

8 referencing, to the extent it exists and is perfected, the bank

9 was granted a -- confirmed a prepetition lien and security

10 interest in the collateral and was granted a replacement lien

11 to the extent of that collateral.

12          While we don't dispute the date of the filing of the

13 UCC that is referenced as to Autohaus Acquisition, but not as

14 to Three Arrows, I don't believe that there's a dispute as to

15 the timing of the filing of the UCC as to Three Arrows.  And,

16 therefore, I don't think it's disputed that that's an issue for

17 this hearing on the Three Arrows side.

18          The bottom line is there has not been a determination

19 that the filing or the position of the bank is, in fact, a

20 voidable preference.  Timing is one of several considerations.

21          But at this point, until there has been a

22 determination that this is a fraudulent conveyance, and given -

23 - or fraudulent preference -- a voidable preference, and to the

24 extent that they have granted the bank a replacement lien and

25 acknowledge it is confirmed and verified until such time as

8

1    it's proven otherwise, then I believe for this hearing, they

2    have established their burden on a voidable preference, and it

3    should be deemed to be secured for purposes of cash collateral

4    and adequate protection.

5              MR. CHERNICOFF:  The interim cash collateral says

6    only to the extent that the lien exists prepetition they're

7    granted a replacement lien.  If they don't have a lien

8    prepetition, they don't get a replacement lien, they don't get

9    a lien at all.  That was why it was worded that way.

10             And I would --

11             THE COURT:  Well, do you -- Mr. Chernicoff, do you

12   have any authority that absent a -- I guess I could break it

13   into parts.  But absent an order of his Court finding that

14   there was a voidable preference, what authority do I have to

15   treat Susquehanna as other than a secured creditor, even in the

16   Autohaus Acquisition matter?  I'm just -- I really --

17             MR. CHERNICOFF:  Your Honor --

18             THE COURT:  And it --

19             MR. CHERNICOFF:  --  you won't find any case law on

20   this because it kind of presupposes  if one doesn't have a

21   lien, one has no right to object to the use of cash collateral.

22             There are situations which occur where the UCCs don't

23   get filed at all.  Therefore, they're not a secured creditor.

24   They have no right to be involved with cash collateral, they

25   don't have a lien.

1    THE COURT:  But in that instance, wouldn't the debtor

2 be within its rights to just proceed to use the collateral --

3    MR. CHERNICOFF:  I --

4    THE COURT:  -- purported collateral?  There would be

5 no.  It wouldn't -- I don't see how it would fit within the

6 definition of cash collateral under 363.

7    MR. CHERNICOFF:  I --

8    THE COURT:  Here we have -- it would seem to me on

9 the face of it, Susquehanna's position fits within the

10 definition.  And now you're asking me to carve out an

11 exception, and I'm just looking for some authority for that

12 exception.

13    MR. CHERNICOFF:  Let's presuppose, Your Honor, that

14 once we file -- the debtor files its action under Section 547,

15 and Your Honor determines it's not a voidable preference -- and

16 that will take some time because that's an adversary

17 proceeding, et cetera.  At that point in time, we have a debtor

18 who's been using cash collateral, as it turns out, which we

19 assumed wasn't cash collateral at the beginning, and we have to

20 try and unravel the house of cards at that point in time.

21    I don't know that there's authority.  It's clear --

22 it's clear it was late filed.  They don't dispute that.  It's

23 clear it's within the preference period.  It's clear it will

24 give them more than they would receive as a Chapter 7 debtor

25 because there are other unsecured creditors.  There are

1 definitely unsecured creditors in this case.

2          So, at that point, they're not a secured creditor.

3 Why should they get any benefit of objecting to cash collateral

4 any more than the unsecured creditors do?  I -- I --

5          MR. SHOOP:  I believe, Your Honor, that the debtor

6 could have filed an emergency petition, an adversary action to

7 ask for some relief to establish the burden that they have to

8 show a voidable preference.  Rather than doing that, they've

9 chosen to go ahead and continue to assert the use of cash

10 collateral, provided us with an interim order, have, in fact,

11 been using cash collateral since we had our telephonic

12 preliminary discussion on this.  And it seems to me going

13 forward on the theory that we could just bypass the formal

14 burdens and a hearing on voidable preference and throw the bank

15 to the curb on the Autohaus side is improper, and could have

16 been handled through other procedures initiated by the debtor.

17          MR. CHERNICOFF:  Regardless of the procedure --

18          THE COURT:  I think -- here's perhaps a -- and I'm

19 known for oversimplifying things, gentlemen, and this may be

20 another illustration of that.  But I'm here on a preliminary

21 hearing on the debtors' motions to use -- for authority to use

22 cash collateral.  I think the standard at a preliminary hearing

23 is I may authorize such use, only if there's a reasonable

24 likelihood that the debtor will prevail at the final hearing.

25          I think I'm going to allow the case to proceed.  If I

1 find that the debtor has met its burden with respect to

2 adequate protection, then I don't see why I have to reach the

3 question of the bank's -- the question of whether or not the

4 bank's matter is -- whether it's -- the perfection of its

5 security interest is in any doubt.  I don't need to reach that.

6         So, why don't -- let's -- let me deal with what I

7 know that I have to address.

8         If I find that the debtor has not met its burden of

9 adequate protection with respect to Autohaus Acquisition, then

10 we'll revisit the other question.  All right?

11         MR. CHERNICOFF:  That's fine, Your Honor.  Thank you.

12 I merely wish to put -- have that on the record for --

13         THE COURT:  No, no, and I -- it goes -- it's

14 important to be clarified.  And it did cause me to refresh my

15 recollection as to wording of the motion, so that's fine.

16         MR. CHERNICOFF:  All right.  Given that, Your Honor,

17 what I'd like to do is call our -- as a witness Mr. Nicholas

18 Reinhart.

19         THE COURT:  Good afternoon.  Raise your right hand.

20         NICHOLAS REINHART, DEBTORS' WITNESS, SWORN

21         THE COURT:  Please be seated.

22                   DIRECT EXAMINATION

23 BY MR. CHERNICOFF:

24 Q    Good afternoon, Mr. Reinhart.  State your full name for

25 the record, please?

1  A    Nicholas J. Reinhart.

2  Q    And can you spell your last name?

3  A    R-E-I-N-H-A-R-T.

4  Q    Okay.  And where are you currently employed?

5  A    Three Arrows, Black Tie Motor Cars, 515 North Reading

6  Road, Ephrata, P-A.

7  Q    And Three Arrows is one of the debtors in this case, is it

8  not?

9  A    That's correct.

10 Q    Okay.  The other debtor is Autohaus Acquisition, Inc.

11 What's your connection with that debtor?

12 A    I was the -- I am the owner of Autohaus Acquisition.

13 Q    And do you perform any services or hold any offices?

14 A    President.

15 Q    What business is Autohaus Acquisition involved in?

16 A    Sale in new and used, parts and service of Volkswagens and

17 Mitsubishis.

18 Q    Okay.  And where is it located?

19 A    4150 Chambers Hill Road, Harrisburg, P-A.

20 Q    Okay.  How long has Autohaus Acquisition been in business?

21 A    Approximately nine years.

22 Q    And have you owned it that entire time?

23 A    Yes.

24 Q    What recently occurred with respect to the real estate

25 where Autohaus is located?

1  A    The real estate was sold to LCBC, and I believe that
2  stands for Lancaster County Bible Church.
3  Q    Okay.  And what is going on with respect to the other --
4  to the remaining assets of Autohaus Acquisition?
5  A    The franchise is under an extension agreement to Sutliff
6  Saturn of Harrisburg.
7  Q    Okay.
8          MR. CHERNICOFF:  If I may approach, Your Honor?
9          THE COURT:  Sure.
10                         (Pause)
11         MR. CHERNICOFF:  The first is an asset purchase
12  agreement, that will be Debtors' Exhibit 1.
13         THE COURT: Thank you.
14         MR. CHERNICOFF:  And the next one is the first
15  amendment of the asset purchase agreement, and that will be
16  Debtors' Exhibit 2.
17  BY MR. CHERNICOFF:
18  Q    Mr. Reinhart, I've handed you what's been marked for
19  identification as Debtor Exhibit Number 1, can you state what
20  that is?
21  A    It's an asset purchase agreement between Autohaus
22  Acquisition trading as Victory Volkswagen Mitsubishi and
23  Sutliff Saturn, Inc., a Pennsylvania corporation.
24  Q    And what's the subject matter of this agreement?
25  A    It's the sale of the franchise, the parts, and the fixed

1  assets of Volkswagen North America.

2  Q    And did you execute this on behalf of Autohaus

3  Acquisition?

4  A    Yes, I did

5  Q    And what's the date of the agreement?

6  A    June 29th, 2009.

7  Q    If you turn to Section 3 entitled, "Closing Date and

8  Place," which is approximately five pages in, what was the date

9  on which this agreement would terminate?

10 A    July 31st, 2009.

11 Q    Okay.  I have also handed you what's been marked as Debtor

12 Exhibit Number 2 for identification, could you explain what

13 that is?

14 A    It's a first amendment to the asset purchase agreement,

15 which sells Autohaus Acquisition to Sutliff Saturn on an

16 extension agreement to be sold by November 30th, or within five

17 days of the approval of Volkswagen.

18 Q    Okay.  And what does the agreement, Debtor Exhibit Number

19 1, provide for the purchase price of the assets?

20 A    450,000.

21 Q    And what's that for?  What component?

22 A    That's for the franchise itself.

23 Q    Okay.  Are there other sums being paid under the

24 agreement?

25 A    There are parts and fixed assets.

1 Q    What's being paid for the parts?

2 A    The current value of parts in the book value and the fixed

3 assets are 50 percent of whatever the current Volkswagen

4 Special Tool Program is.

5 Q    Do you have any idea what the parts are right now sitting

6 there?

7 A    60,000.

8 Q    Okay.  What happens with respect to the new cars?  The new

9 Volkswagens sitting on the lot?

10 A    Sutliff purchases all the new cars.

11 Q    At what price?

12 A    Exactly what I paid for the cars; invoice.

13 Q    Okay.  If -- and is Autohaus Acquisition currently

14 operating as a dealership?

15 A    We have one salesman sitting there in order to maintain

16 the franchise.

17 Q    Are you selling -- is Autohaus Acquisition selling many

18 vehicles?

19 A    No.

20 Q    Okay.  If you can't sell the vehicles off the lot, and you

21 can't sell them to Sutliff, how else could you sell them?

22 A    There's no way we can sell any new Volkswagens there.  But

23 the used cars, we moved to 515 North Reading Road.

24 Q    What would happen to the new cars if you don't sell them

25 to Sutliff?

1  A    Manufacturer takes them back.

2  Q    And what do you get at that point?

3  A    Invoice.

4  Q    Okay.  Is it an important component to Sutliff that they

5  get the new cars?

6  A    Inventory's fairly tight right now after the Cash for

7  Clunkers.

8  Q    So, they need vehicles?

9  A    Correct.

10  Q    Okay.  Excuse me.  And what has to be done in order for

11  Sutliff to close on this agreement?

12  A    Volkswagen has to approve them.

13  Q    Okay.  And how long does that process usually take?

14  A    60 to 75 days, from the time your final package is in.

15  Q    Is that time frame mandated by state law?

16  A    Yes, it is.

17  Q    Okay.  Are you acquainted with the Sutliff dealerships in

18  general?

19  A    Yes, I am.

20  Q    And where are they generally located?

21  A    They're throughout the Susquehanna Valley.  They have

22  approximately five or six Saturn stores.  I believe they're the

23  largest Chevrolet dealer in central Pennsylvania.

24  Q    Okay.  Do you anticipate Sutliff having any trouble

25  getting approved by Volkswagen?

1 A    Not at all.

2          MR. WARNER:  Objection, Your Honor; foundation.

3          THE COURT:  Sustained.

4 BY MR. CHERNICOFF:

5 Q    What does it generally take for a purchaser to be approved

6 by -- a manufacturer such as Volkswagen to be approved as a

7 dealer?

8 A    Um --

9          MR. WARNER:  Your Honor, I have the same objection in

10 terms of foundation.

11          MR. CHERNICOFF:  I'm trying to lay the foundation.

12          THE COURT:  Overruled.

13 A    They -- they like to see cash, credit, and character,

14 which are considered the three C's.  It's also, under the Board

15 of Motor Vehicles controlled by the State, that no one shall

16 reasonably be withheld being approved as a dealer unless

17 there's a felony charge or something like that.

18 Q    Okay.  Do you believe that Sutliff will have any trouble

19 being approved by Volkswagen?

20          MR. WARNER:  Objection, Your Honor.

21          THE COURT:  Overruled.

22 A    No.

23 Q    Now, you've already stated that Three Arrows Enterprises,

24 that you're an employee.  What other connection do you have

25 with Three Arrows?

1  A    President.  I'm the President.

2  Q    Okay.  How long has Three Arrows been in business?

3  A    Approximately one year.

4  Q    And what's the nature of its business?

5  A    Selling used cars.

6  Q    Okay.  And where is it located?

7  A    515 North Reading Road, Ephrata.

8  Q    Okay.  How long has Three Arrows been in business?  I'm

9  sorry.

10 A    One year.

11 Q    And what kind of volume does Three Arrows do in the way of

12 business?

13 A    Probably about 27 cars a month.

14 Q    What is -- do you have any idea what that represents in

15 dollars?

16 A    Probably about $100,000 gross profit.

17 Q    And what do you mean by gross profit?

18 A    You would purchase a car for 10,000, sell it for 13, and

19 $3,000 gross profit.

20 Q    Okay.  So, in addition to the gross profit, it would be

21 the selling price -- the cost of it, rather?

22 A    Yes.

23 Q    Okay.  Now, explain how Three Arrows purchases its

24 vehicles.  How it's purchased it in the past, the recent past.

25 A    Goes to Manheim Auto Auction, buys them privately or takes

1  sometimes cars on consignment.

2  Q    Okay.  Were there a number of cars purchased on

3  consignment?

4  A    Yes.

5  Q    And approximately how many?

6  A    36.

7  Q    Okay.  How recently did that occur?

8  A    Between January and June of this year.

9  Q    Okay.  And by consignment, explain how that happened.  How

10 that works.

11 A    The customer brings the car to the showroom.  We put it in

12 the showroom, we sell it, and we pay the customer the money

13 that they wanted for the car, and we keep the profit.

14 Q    Okay.  Now, Three Arrows has what's called floor plan

15 financing, does it not?

16 A    That's correct.

17 Q    And who is that with?

18 A    Susquehanna Bank.

19 Q    Okay.  Explain what floor plan financing is.

20 A    You buy a vehicle and whatever you pay for the vehicle,

21 you send a paper -- I have never done it.  But from what I

22 understand, you send a paper to the bank, and they make a

23 deposit into your account of that amount of money.

24 Q    What do you mean you've never done it?

25 A    I've never done the transaction.  I don't know exactly how

1 it's done.  But I understand it's done through the computer.

2 Q    You physically don't do it?

3 A    No, I don't.

4 Q    Okay.  You've done floor plan financing with other

5 entities, though, other lenders?

6 A    That's correct.

7 Q    Okay.  And that's your understanding of how that should

8 work?

9 A    Yes.

10 Q    Okay.  With respect to the consignment vehicles, are those

11 typically floor planned?

12 A    No.

13 Q    In other words, you don't get -- typically you wouldn't

14 get any money from Susquehanna Bank in this case?

15 A    No.

16 Q    What occurred with the consignment vehicles in this case,

17 though?

18 A    They were floor planned.

19 Q    Okay.  When you obtain a vehicle on consignment, when do

20 you typically pay the owner for that vehicle?

21 A    Approximately five days after the money clears out of the

22 bank.

23 Q    What do you mean by money clears out of the bank?

24 A    Well, we either get a wire transfer in, or they give us a

25 check.

1 Q    Do you mean when you, in turn, sell the vehicle?

2 A    Correct.

3 Q    Okay.  So, when you sell to a retail customer, that's when

4 you pay the consignment?

5 A    Correct.

6 Q    The seller.  Okay.  And in the case of these vehicles that

7 were also floor planned, you should have paid your -- I'm

8 sorry.  Three Arrows should have paid the floor plan amount, is

9 that correct?

10 A    Yes.

11 Q    Does it appear that that occurred?

12 A    Not sure exactly.  I believe some were, some weren't.

13 We've hired an outside accountant to come in.

14 Q    Okay.  How long has it -- how long has this outside

15 accountant been working?

16 A    He was engaged last week, he was in the store one day, one

17 day at your office, and that's it.

18 Q    Okay.  So, you really don't have a complete explanation as

19 to why the bank may not have been paid on some of these

20 vehicles?

21 A    No, I don't.

22 Q    Okay.  When did you become aware of the alleged out of

23 trust amount?

24 A    I believe it was sometime in the beginning of September,

25 possibly a Wednesday or Thursday.

1  Q    How did you become aware of it?

2  A    My corporate controller, John Eckberg (phonetic) came to

3  me and said that we had a money situation problem.

4  Q    Okay.  As the President of Three Arrows and of Autohaus

5  Acquisition, you do review the books and records, do you not?

6  A    The last records that were constructed were year end

7  statements, 12/31/08.

8  Q    Okay.  Have you asked Mr. Eckberg for records?

9  A    Many times.

10  Q    Okay.

11        THE COURT:  Mr. Reinhart, do you mind if I just take

12  a step backwards.  When you said you gross about a $100,000,

13  what period of time are we speaking about?

14        THE WITNESS:  One month.

15        THE COURT:  Thanks.

16  BY MR. CHERNICOFF:

17  Q    How much -- when Autohaus was in full operations, how much

18  did it gross -- gross sale?

19  A    Gross sales or gross profits?

20  Q    Gross profit, I'm sorry.

21  A    Somewhere around $200,000 a month.

22  Q    Okay.  And how many units would that represent?

23  A    60.

24  Q    Okay.  Now, these consignment vehicles, what type of

25  vehicles were they generally?

1  A     Mercedes Benz, BMWs, Audis, Toyotas.

2  Q     Were a substantial number of them luxury vehicles?

3  A     95 percent were luxury vehicles.

4  Q     What's the average amount that you would have to pay for a

5  vehicle of that type to the consignor?

6  A     Approximately 70,000.

7  Q     Okay.  So, for example, if vehicles weren't paid to the

8  bank, that would run up a considerable amount quickly, would it

9  not?

10  A     About 700,000.

11  Q     Okay.  What do you believe, with respect to Three Arrows,

12  as to its profitability?

13  A     It's profitable.

14  Q     What leads you to say that?

15  A     Well, if you take the rent factor and the overhead, and

16  the gross profit that's generated.

17  Q     How many years have you been in the automobile business

18  entirely?

19  A     38.

20  Q     Okay.  As an owner the entire time?

21  A     20.

22  Q     Okay.  What do you believe as to the profitability of

23  Autohaus when it was fully operating?

24  A     My accountant prepared a tax statement, it showed $124,000

25  profit at the end of the year for '08.

1  Q    Okay.

2            THE COURT:  Was that figure 124,000?

3            THE WITNESS:  124,000 over a 12-month period, yes.

4  BY MR. CHERNICOFF:

5  Q    And that's what you were led to believe?

6  A    Correct.

7  Q    Okay.  Nonetheless, the bank has told you that they

8  believe that you owe them a considerable amount of money?

9  A    That's correct.

10 Q    Okay.

11                          (Pause)

12        MR. CHERNICOFF:  Excuse me, Your Honor.  I'm fumbling

13 with it one handed.

14        THE COURT:  I think I'm repeating your --

15                        (Laughter)

16        MR. CHERNICOFF: Okay.  If I may approach, Your Honor?

17        THE COURT:  Sure.

18 BY MR. CHERNICOFF:

19 Q    Mr. Reinhart, I'm handing you what was marked as Debtor

20 Exhibit Number 3 and ask if you can identify it?

21 A    It's the inventory at Three Arrows and Autohaus

22 Acquisition.

23 Q    Okay.  Was this prepared at your direction?

24 A    Yes.

25 Q    Okay.  And the first page has on it various vehicles, and

1  it says, "Physically here."  What do you mean by "physically
2  here?"

3  A     Touched it.

4  Q     You know it's there on the lot.

5  A     Yes.

6  Q     Okay.  And turning to the second page -- and this is a
7  combination of Three Arrows and Autohaus, is it not?

8  A     That's correct.

9  Q     Okay.  And on Three Arrows -- on the first page, rather,
10 how much is shown as the inventory amount/

11 A     $243,735.

12 Q     Okay.  And then the next group of vehicles are VW used,
13 and how much are those?

14 A     $558,608.

15 Q     555,000, correct?

16 A     Yes.

17 Q     Okay.  And then the next group is Autohaus new, how much
18 is that?

19 A     $453,434.78.

20 Q     Okay.  And what's the total of all those vehicles?

21 A     $1,510,145.34.

22 Q     And if you add for the used and the new for Volkswagen and
23 Autohaus, approximately how much is that?

24 A     I'm sorry, can you repeat that?

25 Q     All right.  If you add the 555,608 for the Autohaus used,

 1  and the 453 for the Autohaus new, how much is that total?

 2  A    I don't have --

 3  Q    Ballpark.

 4           THE COURT:  Do you understand the question, sir?

 5           THE WITNESS:  Yes.  Yes.

 6  A    About a million dollars roughly.

 7  Q    And -- okay.  Now, if you look at the second page, it

 8  shows the value of the Black Tie floor plan at 603,000.  Any

 9  idea where that number came from?

10  A    No, I don't.

11  Q    Okay.  If you look at the vehicles on the first page for

12  Black Tie or Three Arrows, does that list all of the vehicles

13  for Three Arrows, or do you think there's more?

14  A    There's possibly more.

15  Q    Okay.  Okay.

16           THE COURT:  The exhibit I was handed has two staples

17  pages, then it has two more loose pages.

18           MR. CHERNICOFF:  There should be one loose page only,

19  Your Honor.  I'm sorry, I grabbed two of them.

20           THE COURT:  Very well, I just --

21           MR. CHERNICOFF:  Okay.  And we'll get to the next

22  one.

23  BY MR. CHERNICOFF:

24  Q    Okay.  But you believe at a minimum, there's over

25  $1,240,000 in vehicles?

1  A    Yes, I do.

2  Q    Okay.  Now, the last page, it says Three Arrows

3  Enterprises.  Are these additional vehicles owned by Three

4  Arrows?

5  A    I don't have that page.

6  Q    That's what happened, I gave it to the Judge.

7                         (Pause)

8  Q    Do you see that page?

9  A    Yes.

10 Q    Are those additional vehicles?

11 A    Yes.

12 Q    And how much are those total?

13 A    Yes.

14 Q    And how much -- how much are those totaled?

15 A    $13,599,000.

16 Q    Why are these on a separate list?

17 A    They were traded in or were not floor planned because of

18 the value of the vehicle according to Susquehanna's floor plan.

19 Q    What do you mean by that, because of the value?

20 A    Three Arrows has a limit, they can't put a car on floor

21 plan under $8,000.

22 Q    Okay.

23                         (Pause)

24         MR. CHERNICOFF:  If I may approach, Your Honor?

25         THE COURT:  Yes, sir.

1  BY MR. CHERNICOFF:

2  Q    Mr. Reinhart, I've handed you what we're going to mark as

3  Debtor Exhibit Number 4 for identification purposes.  I ask if

4  you can identify Debtor Exhibit Number 4, please?

5  A    That's my current real estate that I own.

6  Q    And who prepared this?

7  A    Myself and my son.

8  Q    Okay.  And do you believe it's accurate as of the date

9  stated on there?

10 A    I believe it's accurate with the appraisals, but the

11 balances will be less because we didn't have the current sheet

12 of what was owed on it.  So, the balances may be less.

13 Q    The mortgage balances?

14 A    Yes.

15 Q    Okay.  And what's the date of this analysis?

16 A    October 1st.

17 Q    2009?

18 A    Correct.

19 Q    Okay.  Let's go to the property which you own

20 individually.  450 Herzog Valley Road.  What is that property?

21 A    That's my personal residence.

22 Q    And you own that with your wife, Denise?

23 A    Yes.

24 Q    Okay.  And with respect to all the current market values

25 on there, why do you believe these values are accurate?

1   A    Can we start at the top one?

2   Q    Well, let's start with the top one then.  Let's back up.

3   A    515 North Reading Road, an appraisal was done by

4   Susquehanna Bank on November 19th of 2008, with the current

5   market value of about 3,700,000.  We only put down three five.

6        4902 --

7   Q    Let's do them one at a time.  Who owns that property?

8   A    DB&E Enterprises.

9   Q    And who owns DB&E Enterprises?

10  A    Myself and my two sons.

11  Q    Okay.  And what's the current mortgage you believe on that

12  property, approximately?

13  A    Approximately 1,574,000.

14  Q    Okay.  What's the next one?

15  A    4902 Louise Drive, Mechanicsburg.

16  Q    Let's back up.  What's at 515 North Reading Road, Ephrata?

17  A    (No verbal response)

18  Q    What's located there?

19  A    That's Three Arrows --

20  Q    The dealership?

21  A    -- Black Tie Motors, yes.

22  Q    Okay.  4902 Louise Drive, and where was that located?  In

23  what town?

24  A    Mechanicsburg, P-A.

25  Q    And what's on that property?

1  A    It's an All First building bank that was bought out by me

2  when All First left the banking business.

3  Q    Okay.  And who owns that property?

4  A    BPC Partners.

5  Q    Okay.  Who owns BPC Partners?

6  A    Denise Reinhart and Nicholas Reinhart.

7  Q    Okay.  And what do you believe the current value of that

8  property is?

9  A    250,000.

10 Q    Are there any purchase money financing mortgages on that

11 property?

12 A    I believe there's a mortgage on it for $19,000, but

13 there's also a blanket mortgage covering it.

14 Q    Blanket mortgage in favor of whom?

15 A    Susquehanna Bank.

16 Q    Okay.  And going back to 515 North Reading Road, that

17 first mortgage is held by Susquehanna Bank, is it not?

18 A    That's correct.

19 Q    Okay.  Is the blanket mortgage on that property also?

20 A    Yes.

21 Q    Okay.  The blanket mortgage is to secure the floor plan.

22 A    Yes.

23 Q    Okay.  All right.  What's the next parcel?

24 A    6475 Carlisle Pike, 6.45 acres.

25 Q    And what's located on that parcel?

1  A    Pardon me?

2  Q    What's located there?

3  A    It's a vacant piece of property, vacant lot.

4  Q    And what's the surrounding properties?

5  A    Wegman's is across the street, Kohl's is across the

6  street, Lawrence Chevrolet is next door to it.  It's on a

7  corner at a red light.

8  Q    Is it a high volume area?

9  A    Wegman's is there and Chili's, yes.

10  Q    Okay.  All right.  And who owns that property?

11  A    BPC Partners.

12  Q    And you've already said who said that.  What do you

13  believe the value of that property is?

14  A     It was appraised by Susquehanna Bank approximately two

15  years ago for $4,400,000.

16  Q    Okay.  And Susquehanna Bank holds the first mortgage?

17  A    That's correct.

18  Q    And is the blanket mortgage also on that one?

19  A    Correct.

20  Q    Okay.  What's the next parcel?

21  A    6625 Carlisle Pike.

22  Q    And who owns that?

23  A    Myself.

24  Q    It says Reinhart Properties, is that yourself?

25  A    That's correct.

1  Q    Okay.  And what do you believe the value -- I'm sorry.

2  What's on that property?

3  A    It's a half acre ground with a ranch house.

4  Q    Okay.  And what do you believe the value of that property

5  is?

6  A    $400,000.

7  Q    And why do you believe that?

8  A    It's contiguous with the next piece of property below it.

9  It was like the little piece of the puzzle that had to be

10  bought in order to make the ground one whole piece.

11  Q    The next piece being 6629?

12  A    Correct.

13  Q    Okay.  And the mortgage on that is held by Susquehanna

14  Bank?

15  A    That's correct.

16  Q    Okay.  And that's approximately $233,000, is it not?

17  A    Yes.

18  Q    Okay.  What's the next parcel that you have an interest

19  in?

20  A    6629 Carlisle Pike, 13.9 acres owned by BPC Partners.

21  Q    And what's there?

22  A    13.9 acres of ground that's fully developed with retention

23  basin storms drains, and sewer installed.

24  Q    And what's around it?

25  A    Sutliff Saturn, Sun Motor Cars, which is Mercedes Benz,

1  BMW, Audi, Porsche, the Acura Store across the street, Bobby

2  Rahal Acura, Bobby Rahal Toyota.

3          THE COURT:  Do you know how the property is zone,

4  sir?

5          THE WITNESS:  Zoned industrial with -- and we have a

6  variance to move to a car dealership.  There's a variance in

7  place.

8          THE COURT:  Thanks.

9  BY MR. CHERNICOFF:

10 Q    What did you intend to do with this parcel?

11 A    When I had purchased it, I had intended to put three

12 dealerships there and the manufacturer reneged on giving the

13 money to the dealer.  They were going to give $2 million to

14 build an Audi building and they decided not to do it, so I

15 didn't bother putting it up.

16         I did have the ground under agreement, a section of

17 it, approximately six acres.

18 Q    Okay.

19 A    The current market value appraised on November 19th, 2008

20 is $6,900,000.

21 Q    And who holds the first mortgage on that?

22 A    Susquehanna.

23 Q    And how much are they owed?

24 A    $2,622,893 approximately.

25 Q    How much -- I'm sorry.  Susquehanna Bank's blanket

1 mortgage also on it?

2 A    Yes.

3 Q    Okay.  What's the next parcel?

4 A    5018 Township Line Road, Drexel Hill.

5 Q    And what's on that parcel?

6 A    Nissan dealership.

7 Q    Okay.  Drexel Hill is in the Philadelphia area, is it not?

8 A    Delaware County.

9 Q    Who owns that parcel?

10 A    SNL Trading.

11 Q    Okay.  And who owns SNL Trading?

12 A    Nicholas J. Reinhart.

13 Q    Okay.  Yourself?

14 A    Correct.

15 Q    Okay.  How much is that property worth?

16 A    $3.5 million.

17 Q    What leads you to believe that?

18 A    An appraisal that was done by Susquehanna Bank.

19 Q    Approximately when?

20 A    I believe it was November 19th, 2008.  I'm not positive.

21 Q    Okay.  And Susquehanna Bank holds the first mortgage on

22 that parcel?

23 A    Correct.

24 Q    And how much is that mortgage debt?

25 A    2,271,000.

1  Q    Okay.  And does Susquehanna Bank also have the blanket

2  mortgage on that parcel?

3  A    I'm not sure.

4  Q    Okay.  Wasn't that one of those granted recently for the

5  cash collateral interim order?

6  A    I believe it -- the papers I signed, yes.

7  Q    Okay.  All right.  What's the next parcel?

8  A    That's my house, 450 Herzog Valley Road.

9  Q    Okay.  And how much do you believe that's worth?

10  A    It was appraised by Penn Liberty for 1,800,000.

11  Q    And when was that appraisal?

12  A    Approximately a year and a half ago.

13  Q    Okay.  And who holds the mortgages on that property?

14  A    Sovereign Bank has the first mortgage, Penn Liberty has

15  the second.

16  Q    And how much are those mortgages?

17  A    About $1,440,000.

18  Q    For Sovereign.  How much is Penn Liberty?

19  A    Oh, I'm sorry.  The Sovereign Bank is 448, the Penn

20  Liberty is 702.

21  Q    Okay.  What's the next property?

22  A    6924 South Harbor Circle, Sailfish Point, Stuart, Florida.

23  Q    Okay.  Who owns that property?

24  A    Nicholas and Denise Reinhart.

25  Q    And how much is that worth?

1  A    In today's current market, 1.5 million.

2  Q    The Florida market is not good then, I gather?

3  A    It was appraised a year and a half ago at 3.9 million.

4  Q    Okay.  And who holds the mortgages on that?

5  A    Commerce Bank and Riverside Bank, first mortgage,

6  2,475,000, and the second mortgage, 296,000.

7  Q    Okay.  Susquehanna Bank does not have a blanket lien on

8  that property, does it?

9  A    No, they don't.

10  Q    Do they have a blanket lien on your residence in Denver,

11  Pennsylvania?

12  A    Yes, they do.

13  Q    Okay.  All right.  What's the last parcel?

14  A    22 Canadochly Circle, York, P-A.

15  Q    And what's on that property?

16  A    Three bedroom rancher.

17  Q    And who owns that?

18  A    NR Realty.

19  Q    And who's NR Realty, who owns that?

20  A    Nick Reinhart.  Nicholas Reinhart.

21  Q    And what's that property worth?

22  A    250,000.

23  Q    What do you base that upon?

24  A    The appraised value and that I draw about 1,980 a month

25  rent off of it.

TRANSCRIPTS PLUS, INC.
PHONE 215-862-1115 • FAX 215-862-6639 • E-MAIL CourtTranscripts@aol.com

1  Q    Okay.  And when was the appraisal done?

2  A    Two years ago.

3  Q    Who holds the mortgage on that?

4  A    There's a blanket mortgage through Susquehanna on it.

5  Q    Okay.  That's the mortgage for the floor plan?

6  A    Yes.

7  Q    Okay.  Okay.  All tolled, what do you believe the total

8  value, current market value of all these parcels is?

9  A    22,500,000.

10  Q    And what do you believe the mortgage balances

11  approximately are?

12  A    Some are around twelve million eight hundred and fifty

13  some thousand.

14  Q    Now, based upon the current market in Stuart, Florida, do

15  you believe there's any equity in that property?

16  A    None at all.

17  Q    Okay.  And of the other properties, is it fair to say that

18  Susquehanna Bank has the blanket lien on all of those?

19  A    That's correct.

20  Q    And how much equity is there in those properties?

21  A    Uh, probably $10 million.

22  Q    Do you have any idea of the total amount that you owe to

23  Susquehanna Bank is owed by Three Arrows?

24  A    No, I don't, not exactly.

25  Q    Okay.  How about the amount you believe is owed by

1  Autohaus Acquisition to Susquehanna Bank?

2  A    Can you --

3  Q    How much do you believe Autohaus Acquisition owes

4  Susquehanna Bank, if you know?

5  A    I don't know.

6  Q    Okay.  Why don't you know?

7  A    Well, I'd have to have a calculator to subtract the floor

8  plan that I have here, minus the floor plan that's on the

9  ground and do the calculations.

10 Q    What I'm asking is the total debt at all.  Any idea,

11 ballpark?  If you don't know, that's fine.

12 A    $3,500,000, I believe that's what it is.

13 Q    Okay.  But you're not sure.

14 A    No.

15      THE COURT:  And are you saying that figure for both

16 entities, sir?

17      THE WITNESS:  That's just one entity, Judge.

18      THE COURT:  Which one?

19 BY MR. CHERNICOFF:

20 Q    That's the maximum you could borrow.

21 A    On the floor plan, I believe.

22 Q    But that's not what you currently have borrowed --

23 Autohaus has borrowed?

24 A    No.

25 Q    Is it?

1  A     I'm sorry, Bob?

2  Q     The maximum amount of the original line for Autohaus was

3  $3,500,000, correct?

4  A     Yes.

5  Q     Okay.  Have you -- has Autohaus borrowed $3,500,000?

6  A     No.

7  Q     Okay.  So, that's not the total outstanding?

8  A     No.

9  Q     Okay.

10        MR. CHERNICOFF:  Your Honor, I would state, while we

11  do not necessarily agree with the amount, in the objection that

12  Susquehanna Bank filed, they attached their motion to lift the

13  stay.  And they have the total amount owed as slightly in

14  excess of $2,100,000, it's Paragraph 10 of their lift stay

15  motion.

16        And then similarly, Paragraph 13 of their lift stay

17  motion -- of Susquehanna Bank's lift stay motion sets forth a

18  little more than $900,000 owed by Three Arrows.

19        And for today's purposes, we can't dispute that.  We

20  just can't necessarily agree.

21  BY MR. CHERNICOFF:

22  Q     With respect to these real estate parcels, are you

23  attempting to sell any of them?

24  A     Yes, I am.

25  Q     Which ones?

1 A    There's an offer I have right now on 4902 Louise Drive,

2 it's for $150,000.  It's been on the market for three years.

3 It's appraised for more than that, but I haven't had any

4 takers.

5 Q    Okay.  Any other parcels for sale?

6 A    6625 Carlisle Pike, 6475 and 6629 Carlisle Pike are all

7 for sale.

8 Q    Are they --

9 A    And that Florida house is also for sale.

10 Q    Are they -- the parcels up on Carlisle Pike, are they

11 listed for at or above the value, would you believe?

12 A    They're listed at the value, but I had given the realtor

13 instructions to bring all offers to me.

14 Q    Okay.  How about the Stuart, Florida property, what's that

15 listed for?

16 A    $2,900,000.

17 Q    How long has that been listed?

18 A    One year.

19 Q    How long have the Carlisle Pike properties been listed?

20 A    We had an agreement on the Carlisle property that just

21 ended -- I believe it was January or February of this year with

22 CarMax, and they relaxed their option.  Other than that,

23 they've been for sale for approximately three years.

24 Q    Okay.

25 A    The one property on 6475 Carlisle Pike in '07, one acre

1 was sold to Lawrence Chevrolet for, I believe, 900,000.

2 Q    Okay.

3        MR. CHERNICOFF:  May I approach, Your Honor?

4        THE COURT:  Yes, sir.

5        MR. CHERNICOFF:  Your Honor, I'm going to hand you

6 what will be identified as Debtor Exhibit Number 5.

7 BY MR. CHERNICOFF:

8 Q    I'll ask you to identify what's been marked as Debtor

9 Exhibit Number 5?  Say what it is.

10 A    It's a cash budget.

11 Q    For which entity?

12 A    Three Arrows.

13 Q    Okay.  From what period of time?

14 A    From 10/16 to 10/30/2009.

15 Q    Now, those are your disbursement dates for payroll.

16 What's it say at the top.

17 A    30 day cash.

18 Q    Right.  Okay.  The initial items on there, your payroll,

19 are all these employee -- are all these people employees of

20 Three Arrows?

21 A    Right now they are, yes.

22 Q    And what do you mean by right now they are?

23 A    A few people will be leaving now that the Volkswagen Store

24 is pretty much closed up with the books and stuff.

25 Q    Okay.  So, this would be the interim budget for the next

1  30 days, but you believe it's going to go down?

2  A    That's correct.

3  Q    Okay.  And what's the total with payroll taxes and

4  worker's comp insurance, et cetera, the total employment

5  related costs?

6  A    $73,996.

7  Q    Okay.  And what's the next item on there?

8  A    It would be advertising --

9  Q    Above the advertising.

10 A    Floor plan interest expense.

11 Q    Who does that get paid to?

12 A    Susquehanna Bank.

13 Q    And how much is that?

14 A    Twelve hundred dollars.

15 Q    Okay.  What are the next items?

16 A    Lead generators and Internet marketing.

17 Q    Okay.

18 A    Web sites, advertising in Auto Trader magazine.

19 Q    How does the lead generators work?

20 A    People go on the computer, fill out their application, and

21 then they're electronically generated to a computer, we pick

22 the names off, call the people up, and they come in and buy a

23 car.

24 Q    And does that generally assist you in -- I'm sorry --

25 assist Three Arrows in obtaining sales?

1 A    To the point that we no longer use radio or newspaper

2 advertising, yes.

3 Q    So, you believe that these are good expenditures for the

4 operations?

5 A    Necessary ones, yes.

6 Q    All right.  And the next items are miscellaneous overhead

7 items?

8 A    Computer service, office supplies, payroll service.

9 Q    Okay.  And what are the next items?

10 A    Outside consultants, John Mattione (phonetic); attorney,

11 Andrew Gibbs, accountant; Robert Chernicoff, attorney.

12 Q    We always like to see that.  Go to the second page.  What

13 are the next items on the budget?

14 A    Insurance.

15 Q    What's the nature of the insurance?

16 A    Building insurance, garageman's liability, dealer tags

17 through Universal Underwriters.

18 Q    On the vehicles, too?

19 A    Yes.

20 Q    Okay.  And what's the life insurance about?

21 A    That's a policy on me that is assigned to Susquehanna

22 Bank.

23 Q    And what are the next items?

24 A    Utility.  PP&L, UGI, D&E Phone Company, Broadview, which

25 is the long distance service, sewer charge, water, trash

1 removal.

2 Q    Okay.  And then the next item is rent.  Who is the rent

3 paid to?

4 A    Susquehanna Bank.

5 Q    That pays Susquehanna Bank on the mortgage on the -- that

6 parcel?

7 A    That's correct.

8 Q    Is there anything in excess of what's owed to Susquehanna

9 Bank monthly that goes to you or any of your entities?

10 A    I can't answer that correctly, Bob.  I -- they changed one

11 of the payments to interest and principal.  I haven't looked at

12 them, I'm not sure.

13 Q    Okay.  But nothing is going directly to you?

14 A    No.

15 Q    Okay.  Or to any of your entities?

16 A    No.

17 Q    Okay.  And then the remaining items are fuel and

18 maintenance for the vehicles themselves.

19 A    Yeah, and the maintenance to repair the vehicles'

20 inventory, if somebody comes in and buys the car, and they find

21 something broke with it, we have to get it fixed before the

22 people will buy it.

23 Q    Okay.  Now, what's the total amount of all these expenses?

24 A    $123,628.

25 Q    Okay.  And if you take out the attorneys and accountants,

1  that would bring it down to 110,000 approximately, wouldn't it?

2  A    That's correct.

3  Q    And you believe you can sell at least $100,000 worth.

4  A    That's correct.

5  Q    Okay.  Now, on top of that $100,000, for every vehicle you

6  sell, you're also paying Susquehanna Bank, are you not?

7  A    That's correct.

8  Q    What are you paying Susquehanna Bank?

9  A    The interest of the floor plan.

10 Q    So, the amount that you borrowed from Susquehanna Bank

11 would get repaid when you sell?

12 A    Sell the car, correct.

13 Q    Okay.  And it's your intention to do that?

14 A    Yes.

15 Q    Okay.  Now, this actually -- if you only have $100,000

16 gross profit, you're actually showing a slight loss for the

17 month, aren't you?

18 A    Yes.

19 Q    How would you handle that loss?

20 A    Probably halfway into the 30 days, we may cut more people.

21 Because as the season -- it's a seasonal business.  The closer

22 you get to Christmas, the less people you need.

23 Q    Okay.  So, you anticipate that ultimately your budget will

24 be less than $100,000 per month.

25 A    Yes.

1  Q    Okay.

2                        (Pause)

3  Q    Mr. Reinhart, I've handed you -- I believe we're up to

4  Debtor Exhibit Number 6.

5             THE COURT:  Number 6.

6             MR. CHERNICOFF:  Yes, thank you.

7  BY MR. CHERNICOFF:

8  Q    Okay.  Now, Mr. Reinhart, I've handed you what's been

9  marked for identification as Debtor Exhibit Number 6 and ask if

10 you can identify it.

11 A    It's a 30-day cash budget for Autohaus Acquisition in

12 Harrisburg.

13 Q    All right.  And what are the expenses on this one?

14 A    Carol Blass (phonetic) is a bookkeeper, Kevin Conaway is

15 the only salesman sitting there.  The employment taxes and the

16 floor plan interest is misquoted.  It's -- that's so far this

17 year.  It's not -- it's probably around $900, it's not $8,400.

18 Q    Is there rent that's owed on that parcel?

19 A    Pardon me?

20 Q    Do you owe rent for that parcel?

21 A    Yes, I do, 5,000 a month.

22 Q    Okay.  So, if you lower it, you need approximately $8,000

23 for Autohaus for the month.

24 A    Well, this will be the last week for Carol Blass and Kevin

25 Conaway if I can close the store up.

1  Q    And that's what you'd like to do.

2  A    Yes.

3  Q    Okay.  And does that also mean you don't have to pay rent

4  anymore?

5  A    Exactly.

6  Q    All right.  Now, you said earlier -- you testified earlier

7  that the property where Autohaus is located was sold.

8  A    That's correct.

9  Q    Who owned that property originally?

10 A    BPC Partners.

11 Q    And that, you've testified, is owned by you?

12 A    And my wife.

13 Q    And your wife.  And as a result of that sale, is there

14 some money being held in escrow?

15 A    Yes.

16 Q    How much is that?

17 A    Approximately 140,000.

18 Q    And what's the purpose of the escrow?

19 A    The church that I sold it to had an escrow put up that

20 when they want me out of there, I would leave because they've

21 demolished the building.  And that was a security deposit, so

22 to speak, that I would leave when I had to -- when they were

23 ready for me to.

24 Q    So, if you leave, what happens to the money?

25 A    It would be refunded.

1 Q    Who would get that money?

2 A    Right now, I believe -- and I'm not sure, I didn't see the

3 papers.  I believe Susquehanna Bank is requesting that money

4 from the date of the sale.

5 Q    Did Susquehanna Bank have a lien on that parcel?

6 A    No, that -- for 500,000.

7 Q    Okay.  Did they receive any other proceeds from that sale?

8 A    500,000.

9 Q    They did get 500,000?

10 A    Yes, they got 501 or 502,000.

11 Q    So, it's not clear if they'll get the $140,000 or not.

12 A    There's -- they have instructed the attorneys that the

13 money's to come to them.

14 Q    Okay.  What caused you to have to file these two entities

15 into bankruptcy?

16 A    Pardon me, sir?

17 Q    What caused you to have to file these entities into

18 bankruptcy?

19 A    No cash.  We had anticipated the sale of the Volkswagen

20 Store picking up approximately $700,000 there on the real

21 estate, and the franchise about five fifty to $600,000.  But

22 that was going to be strictly a cash infusion.  I had no idea

23 that we were out of trust.

24 Q    Okay.  Susquehanna's floor plan only allows cars to be

25 floor planned from $8,000 up.  Unfortunately the marketplace

1  today is not 8,000 and up, it's about $3,500 and up.  So, you

2  need quite a bit of cash in order to buy the cars with your

3  money to resell them.

4  Q    And at this point, what you're saying is you don't have

5  the cash necessarily -- immediately -- you didn't have the cash

6  to make those purchases.

7  A    Correct.

8  Q    Okay.  And assuming that the dealerships are out of trust,

9  do you personally receive any of that money?

10 A    None.

11 Q    How much are you paid?

12 A    Maybe 100,000, 110,000 a year.

13 Q    And you take no other monies out, per se, for draws or

14 anything?

15 A    Maybe another forty or 50,000, maybe a total of one sixty

16 for the year.

17 Q    Okay.  Are any relatives employed by the debtor?

18 A    My two sons are.

19 Q    And which debtor employs them?

20 A    They were employed by Autohaus Harrisburg.

21 Q    Where are they employed now?

22 A    Black Tie Motor Cars.

23 Q    Three Arrows.

24 A    Three Arrows.

25 Q    Okay.  And what do they do for these -- for Three Arrows?

1  A    One buys cars, sells cars.  The other one is a salesman.

2  Q    And that's reflected on the budget for Three Arrows, is it

3  not?

4  A    That's correct.

5  Q    Okay.  Going forward, if the Court permits you to continue

6  to use cash collateral, do you believe that you can pay the

7  floor plan amounts?

8  A    Yes.

9  Q    And what do you believe you can do with respect to the

10 debtors' expenses?

11 A    Pay the expenses.

12 Q    What are you intending with respect to Autohaus to do with

13 the dealership?  What's your intentions at this point?

14 A    To sell it to Sutliff.

15 Q    Okay.  And you believe that's the best to maximize the

16 return for creditors.

17 A    That's correct.

18 Q    Okay.  And what do you intend to do with respect to Three

19 Arrows?

20 A    Keep it running.

21 Q    Okay.  You believe you can operate profitably?

22 A    Yes.

23 Q    And you believe you can propose a plan of reorganization

24 to pay your creditors?

25 A    Absolutely.

1  Q     Okay.

2         MR. CHERNICOFF:  At this point, Your Honor, I'd like

3  to move for admission of Exhibits 1 through, I believe, 6 of

4  the debtor.

5         THE COURT:  Any objections?

6         MR. WARNER:  No objections, Your Honor.

7         THE COURT:  All right.  1 through 6 are admitted,

8  thank you.

9         MR. CHERNICOFF:  Nothing further on direct, Your

10 Honor.

11        THE COURT:  Cross examine.

12        MR. WARNER:  Yes, Your Honor.  Can I have just one

13 minute before I do that?

14        THE COURT: Surely.

15                      (Pause)

16        MR. WARNER:  All right.  Thank you, Your Honor.

17                CROSS EXAMINATION

18 BY MR. WARNER:

19 Q    Mr. Reinhart, I'd like you to go back to Debtors' Exhibit

20 Number 2, which is the first amendment to the asset purchase

21 agreement.  Do you have that?

22 A    Yes.

23 Q    And if you'd look at Section 3.1, it talks about the

24 closing date, do you see that, or 3.1.1?

25 A    That's correct.

1  Q    And it talk about all conditions precedent to closing must

2  be satisfied on or before closing date before closing shall

3  occur, correct?

4  A    Correct.

5  Q    Do you know what all of those conditions are?

6  A    Approval by Volkswagen is the last one that's standing in

7  its way.

8  Q    And as far as you're concerned, is that the only one

9  that's standing in the way?

10 A    As far as I know.

11 Q    All right.  Sir, if you'd go back to Debtors' Exhibit

12 Number 1, which is the basic asset purchase agreement, do you

13 have that?

14 A    Yes.

15 Q    And if you'd go several pages in at the top of the page,

16 it's Paragraph Number 7, conditions of closing.

17 A    Yes.

18 Q    Would you agree with me that 7.1 indicates what conditions

19 must be met by Autohaus before Sutliff is required to go ahead

20 with closing.

21 A    Yes.

22 Q    And is it your position that every one of these conditions

23 that are identified, beginning at 7.1.1 through 7.1.9 have been

24 met other than the approval by Volkswagen?

25 A    May I have a minute to read them?

1  Q     Sure.

2          MR. CHERNICOFF:  I'll -- Your Honor, before he

3  answers, I'll object to the form of the question.  Because,

4  frankly, if you read these conditions, some of them can only

5  occur on the closing date before --

6          MR. WARNER:  Well, Your Honor, I think the witness is

7  capable of answering that.  He told me as far as he was

8  concerned, the only thing that needs to happen is Volkswagen

9  approval.

10         MR. CHERNICOFF:  Your Honor, again, that's -- I don't

11 want say sophistry, but it assumes certain things.  If you read

12 7.1.1 for example, it's -- all items are true and correct as of

13 the closing date.  That's a standard representation and

14 warranty.

15         THE COURT:  I'm going to overrule the objection.  I'm

16 really not sure how much weight I'm going to give to the

17 response.  I think it's more of a legal conclusion than

18 anything else, but I'll allow it for cross examination.

19         And take your time to review those, sir.  And if you

20 need the question repeated, we can do that.

21                         (Pause)

22 A     I'm not an attorney.  But as far as I can read here,

23 7.1.5, "All obligations with respect that there exists a liens

24 or encumbrances against any of the acquired assets shall have

25 been satisfied in full."

1          I don't know how that would happen considering I owe

2    the bank money.  I'm not sure about that.  The pending and

3    threatened litigation, including the actions surrounding before

4    the Court, I'm not sure about that.  Like I said, I'm not an

5    attorney, I don't know.

6    Q    So, you recognize that 7.1.7 at least raises an issue with

7    respect to what litigation there may be against you or against

8    any of the -- or against Autohaus, is that correct?

9    A    That's correct.

10                           (Pause)

11   Q    Are you aware of any litigation against Autohaus, other

12   than what we're involved here right now with Susquehanna Bank?

13   A    Yes.

14   Q    And what litigation are you aware of other than the

15   litigation involving Susquehanna Bank?

16   A    The lawsuit with Bellco Credit Union.

17   Q    Pardon?

18   A    A lawsuit with Bellco Credit Union.

19   Q    What's that involve?

20   A    There were some fraudulent credit applications put in that

21   are being investigated right now, and our insurance company's

22   on notice, and they reserved $250,000 in their insurance

23   reserve account for it.

24   Q    And that's litigation that's been brought against

25   Autohaus, the entity?

1  A    Yes.

2  Q    Is there any other litigation you're aware of against

3  Autohaus?

4  A    Not that I'm aware of.

5  Q    Was there -- was there litigation initiated against

6  Autohaus in the Court of Common Pleas of Philadelphia County in

7  this past summer in July of 2009?

8  A    Andrew Mogalanski (phonetic), yes.

9  Q    Is that litigation that does involve Autohaus?

10  A    Yes, it does.

11  Q    And what are the natures of the -- nature of the

12  allegations against Autohaus in that action?

13  A    I closed up his store -- a Mitsubishi store and he said

14  that I charged him too much money, the allegations are.

15  Q    And how did Autohaus get involved in that?

16  A    Autohaus took his new Mitsubishis and brought them up

17  there and sold them from store.

18  Q    So, is this an instance in which Autohaus was selling

19  consignment -- the vehicles on consignment?

20  A    No.  Actually Mike Caffrey switched them from his floor

21  plan to my floor plan.

22  Q    Who did that?

23  A    Mike Caffrey from Susquehanna Bank, opened up a floor plan

24  so I could take his new cars and put them on my floor plan.

25  Q    You're saying that the bank agreed to take cars that were

1 owned by Mogalanski?

2 A    That's correct.

3 Q    And put them on Susquehanna's floor plan?

4 A    That's correct.

5 Q    Did you own those vehicles at that time?

6 A    I did not own them then.  But when they were put on my

7 floor plan, I owned them then.

8 Q    And how did you accomplish ownership at that point?

9 A    By paying RAP Industries, who is IFEX by paying the floor

10 plan off.  Because they were floor planned with Susquehanna,

11 and I paid -- I extended my floor plan line to take his cars,

12 and Mike Caffrey extended, I believe, 200 and some thousand

13 dollars.  I'm not sure exactly.

14 Q    Was the bank from your -- did you make the bank aware of

15 the fact of where you had gotten these vehicles and who owned

16 the vehicles at the point that you were making this

17 transaction?

18 A    The bank was fully aware of it.

19 Q    In any event, there is litigation pending against

20 Autohaus, Inc. as a result of this whole transaction between

21 yourself and either IFEX and Mogalanski?

22 A    That's correct.

23 Q    Do you have any idea of what the dollar value is of that

24 litigation?

25 A    No, I don't.

1  Q    From your perspective, is that going to create a problem

2  come time of closing, that pending litigation?

3  A    I don't believe so.

4  Q    Let's go back to 7.1.5, which you identified as possibly

5  another issue.   Do you recognize that under your agreement or

6  under the Autohaus agreement with Sutliff, any liens or

7  encumbrances against any assets that are to be purchased would

8  have to be removed or taken care of before closing could go

9  through?

10 A    Yes.

11 Q    Now, what assets are you anticipating of Autohaus that are

12 going to be transferred as part of this deal with Sutliff?

13 A    The franchise, the parts, some signs.

14 Q    What about any autos?

15 A    And the automobiles will be purchased.

16 Q    All right.   Now, would that include the automobiles that

17 were identified on Debtors' Exhibit Number 3 as Autohaus

18 Acquisition new?

19 A    Yes.

20 Q    If you could look at that then, please, Debtors' Exhibit

21 Number 3, Page 2?

22 A    Yes.

23 Q    The block about midway down through the page indicates,

24 "Autohaus Acquisition, Inc., Victory VW-New Line."  Did I read

25 that correctly?

1  A    Yes.

2  Q    There's about 18 vehicles identified there?

3  A    That's correct.

4  Q    And is it those vehicles that -- at least as you

5  anticipate the deal going through, would be transferred to

6  Sutliff?

7  A    That's correct.

8  Q    Now, at the time that Autohaus transfers these vehicles,

9  these 18 or so vehicles to Sutliff, is it your intention to pay

10 the bank for the amount of the floor plan?

11 A    The bank is usually at the settlement collecting the

12 check.

13 Q    Now, do you have any idea of what the actual outstanding

14 amount is of Autohaus Acquisition with respect to this floor

15 plan that's represented by the new vehicles?

16 A    No, I don't.

17 Q    If I told you that the amount outstanding was $620,000, do

18 you have any basis to disagree with that?

19 A    No, I don't.

20 Q    We'll come back to that.  All right.  Now, we were talking

21 a few moments ago about instances in which -- one instance, at

22 least, in which you had vehicles on consignment at Autohaus.

23 Do you have other individuals or folks for whom you sell

24 vehicles on consignment?

25 A    Occasionally.

1  Q    Let's go back to the Mogalanski.  How many vehicles were

2  involved in that transaction?

3  A    36.

4  Q    When you say for others occasionally, in a given year, how

5  many vehicles do you have on consignment?

6  A    Possibly 10.

7  Q    On occasions, did you floor plan these other vehicles?

8  A    I have no knowledge of that.

9  Q    One way or the other?

10  A    I have no knowledge.

11  Q    Well, my point is, may it have happened and you don't --

12  you're saying you don't know?

13  A    Possibly.

14        MR. CHERNICOFF:  Objection; asked and answered.

15        THE COURT:  Overruled.  Are you saying, sir, that --

16        THE WITNESS:  I didn't have any --

17        THE COURT:  -- you don't know one way or the other?

18        THE WITNESS:  I don't know one way or another.

19  BY MR. WARNER:

20  Q    Now, you agree with me that floor planning a vehicle

21  that's on consignment that you don't own would be in violation

22  of the floor plan agreement with Susquehanna, correct?

23  A    Yes, I do.

24  Q    All right.  Let's look at Debtors' Exhibit Number 3, we

25  were talking about that in a moment ago, let's stay on Page 1.

1  At the top of Page 1, you identify the vehicles that you saw,

2  as you say, "physically here," that are under floor plan for

3  Three Arrows Enterprises, Black Tie Motor Cars, correct?

4  A     Yes.

5  Q     And for the vehicles that you were, as you said, able to

6  touch, you came up with a floor plan value of $243,735,

7  correct?

8  A     Yes.

9  Q     We saw on the bottom of Page 2 that you have a figure for

10 value of Black Tie floor plan on the ground at Ephrata at

11 $603,275, correct?

12 A     Yes.

13 Q     And you have no explanation for the differential between

14 those two numbers?

15 A     No, I don't.

16 Q     Now, going back to the number under Three Arrows, the

17 243,735, do you know what Three Arrows -- or how far into the

18 line of credit or the floor plan line of credit Three Arrows is

19 at this point?

20 A     No, I do not.

21 Q     If I were to tell you that the number is $899,999, would

22 you have any reason to disagree with that?

23 A     None at all.

24 Q     Do you have any explanation as to where the differential

25 went?  That is the difference between the $243,000 worth of

1  cars you have on the lot and the 899 -- $999,000 of line of

2  credit dollars that were taken from Susquehanna?

3  A    No, I do not.

4  Q    All right.  If you could look at the block for Autohaus

5  Acquisition, which starts on Page 1 and carries over to Page 2,

6  your calculation is that vehicles that you could touch, you

7  could see and touch, the value of those under the floor plan

8  was $555,608, correct?

9  A    Yes.

10 Q    Do you know how far into the line of credit Autohaus

11 Acquisition is for the used line of vehicles?

12 A    I believe the line was 1,500,000.

13 Q    Do you have an understanding that that line was maxed out?

14 A    Yes.

15 Q    All right.  So, while the amount owed under the line --

16 the floor plan line of credit is a million five, the only

17 vehicles that are actually on the lot are $555,608, correct?

18 A    Yes.

19 Q    Do you have any explanation as to where the differential

20 went from there, between the 1.5 that was borrowed and the

21 $555,608 that are on the lot?

22 A    No, I do not.

23        THE COURT:  And -- and I apologize --

24 Q    Let's go down to Autohaus Acquisition, Inc. --

25        THE COURT:   I just ask, so I make sure that I'm not

1  getting lost because we don't want the finder of fact to be

2  lost.  The $1.5 million, are we talking about used car floor

3  plan financing for Autohaus?

4           THE WITNESS:  Yes.

5           THE COURT:  And you're saying that that's fully --

6  you believe that's fully drawn, or you're not use?

7           THE WITNESS:  It's fully drawn, but there's $555,000

8  worth of cars sitting there.

9           THE COURT:  Thank you.

10          THE WITNESS:  So, that's roughly 950,000 missing.

11          THE COURT:  Appreciate it.  I'm sorry for the

12  interruption.  I've just -- I've learned, though, it's better

13  that I try to -- try to stay with you.

14          MR. WARNER:  I apologize, Your Honor.

15  BY MR. WARNER:

16  Q    Sir, let's just move on to the third block here.  Autohaus

17  Acquisition, the new line.  And, again, just the same drill

18  we'll go through here.  The value of the cars on floor plan

19  that you are actually able to see or touch was $453,434,

20  correct?

21  A    Correct.

22  Q    Do you know how far into the line or how far down on the

23  line Autohaus Acquisition had drawn for the new line?

24  A    I believe we said earlier around 610,000.

25  Q    Actually I said six twenty, but a few dollars here or

1  there.  Do you have any explanation for the differential

2  between the $620,000 drawn on the line and the $453,000 of cars

3  that are actually on the lot?

4  A    No, I do not.

5  Q    You would agree with me, would you not, that the

6  differential that we just talked about for each of these three

7  could be added up, and that would be the amount that these

8  three entities are out of trust with respect to Autohaus?

9  A    (No verbal response)

10  Q    With respect to Susquehanna Bank.

11  A    That's correct.

12  Q    Okay.  Now, are you aware of any type of trend with

13  respect to the out of trust situation?  By that, I mean as to

14  when this occurred?

15  A    No, I'm not.

16  Q    Have you seen, either of your own accord or provided to

17  you by counsel, lists of the audits performed by Susquehanna

18  Bank?

19  A    No, I have not.

20  Q    Are you aware of the fact that the amount out of trust

21  increased from three audit dates at the beginning of September,

22  the middle of September, and the end of September?

23        MR. CHERNICOFF:  Objection, Your Honor.  There's no

24  foundation for that.

25        THE COURT:  Sustained.

1  BY MR. WARNER:

2  Q    Do you have any understanding of your own that the amount

3  of out of trust increased from the beginning of September until

4  the end of September?

5  A    No.

6  Q    Do you have any understanding of your own that the amount

7  of out of trust increased from the beginning of September until

8  the middle of September?

9  A    No.

10  Q    Do you have any understanding on your own that the amount

11  of out of trust increased from the beginning of September until

12  the end of September?

13  A    No.

14  Q    Now, Mr. Reinhart, you were aware of the fact that there

15  were conferences last week in connection with this action,

16  correct?

17  A    Yes.

18  Q    And you were aware of the fact that there was a

19  stipulation for an interim use of --

20          MR. CHERNICOFF:  Conferences between whom, Your

21  Honor?

22          MR. WARNER:  The Court and counsel.

23          MR. CHERNICOFF:  There were no conferences, Your

24  Honor.  We had a phone hearing.

25          MR. WARNER:  A hearing.

1          THE COURT:  Could you rephrase the question, sir?

2    I'm not sure that I'm following you.

3    BY MR. WARNER:

4    Q    Were you aware of the fact that there was some sort of

5    proceeding in this bankruptcy matter last week that involved

6    the Court and counsel?

7    A    Yes.

8    Q    Were you aware of the fact that there was a stipulation

9    entered for the interim use of cash collateral?

10   A    Yes.

11   Q    Did you review that stipulation?

12   A    Yes.

13   Q    Were you aware of the fact that one of the obligations was

14   that before 5 o'clock yesterday afternoon, the debtor, which in

15   the stipulation I'm looking at is Three Arrows, was to provide

16   to the bank a complete accounting of the out of trust sales

17   that have occurred --

18   A    Yes.

19   Q    --  before the date of the stipulation?

20   A    Yes.

21   Q    As far as you know, did Three Arrows provide to the bank

22   by 5 o'clock yesterday afternoon an accounting of the out of

23   trust sales that occurred before the stipulation?

24   A    I sent it to Mr. Chernicoff who, I believe, forwarded it

25   on.

1  Q    You sent what to Mr. Chernicoff?

2  A    I e-mailed Mr. Chernicoff the list of vehicles that were

3  sold.

4  Q    What about the usage of the proceeds?

5  A    The proceeds are sitting in the bank right now.

6  Q    For out of trust sales prior to the stipulation?

7  A    No, from the time we had the conversation til now.

8  Whatever cars were sold, the money is sitting there.

9  Q    But that --

10 A    There may be four cars sold.

11 Q    Okay.  You're only talking about with respect to cars that

12 have been sold since when?

13 A    I don't remember the date.

14 Q    Within the past week or two weeks?

15 A    Past week.

16 Q    Have you provided any accounting for the sales from the

17 beginning of September, let's say?

18 A    No, I haven't.

19 Q    Have you provided any accounting of the use of the

20 proceeds for the vehicles that have been sold since the

21 beginning of September?

22 A    No, I haven't.

23 Q    And if I took that any earlier than September, have you

24 provided either any accounting of sales or accounting of use of

25 proceeds?

1  A     No.

2  Q     And that's true with respect to Three Arrows, is that also

3  true with respect to Autohaus?

4  A     That's correct.

5  Q     Now, going back for just one more moment to the litigation

6  in Philadelphia County, are you aware of any allegations being

7  made by IFEX that you, in fact, still owe money to them for the

8  sale of these vehicles, these consigned vehicles?

9          MR. CHERNICOFF:  Objection to the form of question.

10 What is meant by "you?"

11 Q     You as President of either Black Tie Motors --

12         MR. CHERNICOFF:  Personally?  Okay.

13 Q     In your capacity as President of Black Tie Motors, do you

14 have any awareness of the allegations being made by IFEX Global

15 that vehicles were sold -- that the vehicles that were given on

16 consignment were sold and that monies were not paid to IFEX?

17 A     No.

18 Q     Have you ever reviewed the complaint?

19 A     I disagree with the complaint because the money that was

20 taken from the cars was used to close his Mitsubishi Store, but

21 that's -- that's a whole different case.

22 Q     Well, did you, during the time of operation --

23         MR. CHERNICOFF:  Objection, Your Honor.  This is way

24 beyond the scope of direct.

25         THE COURT:  Sustained.

1 BY MR. WARNER:

2 Q    Let's move on to the personal financial statement that you

3 provided us.  It's Debtors' Exhibit Number 4.  Do you have that

4 in front of you, sir?

5 A    Yes.

6 Q    The second piece of property identified, the 4902 Louise

7 Drive, you had indicated for purposes of this exhibit, and for

8 your calculations of current market value of $250,000, correct?

9 A    Yes.

10 Q    And if I understand what you told us during your direct

11 testimony, that's been up for sale for some period of time?

12 A    Three years.

13 Q    And the only thing you've gotten is an offer for $150,000?

14 A    That's correct.

15 Q    And if we look at the sort of combined parcels on Carlisle

16 Pike, they've been up for sale for approximately two years?

17 A    Yes, but it was under agreement until February of '09 when

18 CarMax canceled the agreement.  And we had sold -- there's a

19 total of 13.9 acres.  I sold them a total of six acres for

20 694,000 an acre, which was a -- for seven acres, I think it was

21 $4.3 million for the sale of it.

22 Q    You sold -- that'd be to Carfax?

23 A    To Carfax.  And as the industry in the car industry

24 turned, they backed out and did not go forward with it.

25             THE COURT:  So, you're saying you contracted to sell

1  it, but it did not close, is that correct?

2            THE WITNESS:  Exactly, yes.

3            THE COURT:  Thank you.

4            THE WITNESS:  They had it tied up for about a year in

5  zoning.

6  BY MR. WARNER:

7  Q    Other than that, there have been no offers to purchase any

8  portions except -- I think you said you had one acre that you

9  may have sold.  But other than that, no offers to purchase any

10 of these other tracts of land?

11 A    No, the -- the only other -- the one 5018 Township Line

12 Road that's a Nissan store, I derive an income off of that,

13 rent.

14 Q    And you recognize that it's -- well, for example, the

15 Carfax situation, it's a function of the economic times, which

16 is impacting the ability of this real estate to move.

17 A    Yes.

18 Q    And if we look at the Stuart, Florida property, you said

19 you had that appraised -- what is it, a year and a half ago, at

20 how much?

21 A    3.9 million.

22 Q    And in the span of a year and a half, the mark value of

23 that dropped from 3.9 to 1.5?

24 A    In the Florida market, yes.

25 Q    If we look at the Herzog Valley Road property, I think you

1 said the appraisal there was a year and a half old?

2 A    Yes.

3 Q    You don't have a more recent appraisal for the Herzog

4 Valley Road property?

5 A    No, I've had some developers approach me that want to --

6 there's 40 acres there.  They want to subdivide it up into two-

7 acre lots, sell off the lots.

8 Q    Well, you would agree with me, would you not, Mr.

9 Reinhart, that what you have calculated as the gross current

10 market value, that in the marketplace in terms of selling these

11 properties today or tomorrow would likely render a lot less

12 cash than this?

13 A    Probably 20 percent.

14 Q    Now, if I could direct your attention to Debtors' Exhibit

15 Number 5, the budget, do you have that in front of you?

16 A    Which exhibit is it?

17 Q    Debtors' Exhibit Number 5.

18 A    I'm sorry, I didn't write on it which they were.

19 Q    I'm sorry.  It's headed at the top "30 days cash

20 budget" --

21 A    Yes.

22 Q    -- "Three Arrows Enterprises, Inc."

23 A    Yes.

24 Q    And in the employee section, I think you talked about this

25 on direct.  There are -- your two sons are included in this for

1  a total of $3,500 per week?

2  A     That's correct.

3  Q     And you're also included in this for yourself, a total of

4  3,500 a week?

5  A     Correct.

6  Q     So, that's -- in terms of the 30 days' cash, 14,000 for

7  you, 14,000 for your son, so it's be a 28,000 going to your

8  family in terms of cash?

9  A     Yes.

10  Q     If we looked out at the outside consultant fees, Mr. Gibbs

11  -- you identified him as an accountant?

12  A     Yes.

13  Q     Was he initially involved as a potential -- either

14  purchaser or broker of a purchaser?

15  A     No, I hired him to come in to figure out what would happen

16  with the books?

17  Q     What about as a potential -- potential financing for the

18  property?

19  A     Possibly.

20  Q     Was he brought in for that?

21  A     Possibly.

22  Q     Before he was brought in to do forensic accounting of the

23  books?

24  A     No.  He was brought in for forensic accounting at first.

25  Q     And later, there were discussions about him being involved

1  in --

2  A    We talked about refinancing.

3  Q    I'm sorry.  We can only -- one of us talk at a time.  And

4  I'll try to stop and let you speak.  So, was it later than he

5  was engaged to look into the possibility of obtaining

6  financing?

7  A    Might be simultaneously.

8  Q    And if I can direct your attention to Page 2 of the

9  exhibit, you have a total 30-day cash budget of 123,000.  And

10 as your attorney pointed out, if you took out consulting fees,

11 that would bring it down to $110,000 for the 30 days?

12 A    That's correct.

13 Q    Now, what is -- you've told us -- explained a little bit

14 about gross profit.  But what is your gross profit in terms of

15 a percentage?

16 A    It varies.

17        THE COURT:  Which entity are we talking about?

18        MR. WARNER:  Well, this entity, Your Honor, Black

19 Tie.

20 A    It varies.

21 Q    From what to what?

22 A    Well, you could make $500 on a car, you could make $5,000

23 on a car.

24 Q    I appreciate that, but let's just say in the calendar year

25 of 2008, what was your average percentage of gross profit

1  margin?

2  A    I don't know.

3  Q    Would 10 percent sound about right?

4  A    No.

5  Q    Pardon?

6  A    No.

7  Q    You think it's higher than that?

8  A    I don't know.

9  Q    Well, in terms of the $100,000, that's what you would need

10 for gross profit, correct?

11 A    Correct.

12 Q    Because if you're going to keep the bank in trust, you

13 would have to return to the bank the cost of the cars, correct?

14 A    Correct.

15 Q    So, if you're talking about $100,000 gross profit, and

16 we'll talk about whatever percentage is, but just for

17 hypothetical purposes, if it's 10 percent, you're going to need

18 about a million dollars in sales to generate $100,000 in gross

19 profit.

20 A    Not necessarily.

21 Q    How do you figure?

22 A    Well, on a $3,000 car, I can make $3,000.  On a $30,000

23 car, I can make $500.  Everything's relative to the price.

24 Sometimes you make more money on a cheaper car.  Your return on

25 investment is usually more on a cheaper car than it is on a

1  more expensive car.

2  Q    Yeah, but not all of the cars are you going to make that

3  profit of --

4  A    No, you average about $3,000 a car.  Average.

5  Q    $3,000 a car?

6  A    Per car.

7  Q    So, that would require that you sell, what, 33 units in

8  the 30-day period to generate enough cash to -- no, that would

9  require a lot more than that, wouldn't it?

10 A    About 33 and a third cars.

11 Q    Pardon?

12 A    33 and a third.

13 Q    33 and a third cars you'd have to sell in the 30 days to

14 generate $100,000 of gross profit margin.

15 A    Gross profit, yes.

16         MR. WARNER:  If I could just have a moment, Your

17 Honor?

18         THE COURT:  Surely.

19                  (Pause)

20 BY MR. WARNER:

21 Q    Mr. Reinhart, I think the record will reflect that the

22 bankruptcy petition was filed on September 16th of this year,

23 2009, does that date sound familiar to you?

24 A    Yes.

25 Q    What cash did Autohaus have as of September 16th, 2009?

1  A    I do not know.

2  Q    What cash did Three Arrows have as of September 16th,

3  2009?

4  A    I do not know.

5  Q    What cash has been generated by Autohaus since September

6  16th, 2009?

7  A    I believe they sold one car.

8  Q    And how much cash was generated from that sale?

9  A    I don't remember.

10 Q    Where is that cash?

11 A    I believe it's in the bank.

12 Q    Has Three Arrows generated any cash since September 16,

13 2009?

14 A    I can't answer that, I'm not sure exactly.

15 Q    Appreciating that you don't know exactly, has it generated

16 cash?

17 A    Yes, it has.

18 Q    Where is that cash?

19 A    In the bank.

20 Q    In a bank, in an account --

21 A    In an account.

22 Q    -- held by who?

23 A    In an account.

24 Q    In the name of -- in one instance Autohaus, and the other

25 Three Arrows?

1  A    Yes.

2  Q    Which bank?

3  A    Susquehanna Bank and Sovereign.

4        MR. WARNER:  Thank you, Your Honor.  I have no other

5  questions at this time.

6        THE COURT:  And, sir, can you estimate how many

7  vehicles Three Arrows has sold since the petition date?

8        THE WITNESS:  Possibly six.

9        THE COURT:  Any redirect?

10       MR. CHERNICOFF:  Yes, Your Honor.  Thank you.

11                    REDIRECT EXAMINATION

12 BY MR. CHERNICOFF:

13 Q    Mr. Reinhart, you have in front of you, I believe,

14 Debtors' Exhibit Number 2, which is the amendment to the

15 agreement of sale.

16 A    Yes.

17 Q    Bear with me.

18                        (Pause)

19 Q    Can you turn to the second page?

20 A    Yes.

21 Q    All right.  And what is it -- what's Section 3.1.2

22 entitled?

23 A    "Bankruptcy conditions."

24 Q    All right.  Is it your intention to file a motion to sell

25 the Autohaus assets in this -- through this Court/

1  A    Yes.

2  Q    And is it your understanding that by doing so, it will

3  clear off all liens and claims?

4  A    I believe so.

5  Q    So, that would satisfy the condition of no material

6  litigation affecting the assets, wouldn't it?

7  A    Yes.

8          MR. WARNER:  Objection, Your Honor.  That's calling

9  for a legal conclusion.

10         THE COURT:  Sustained.

11 BY MR. CHERNICOFF:

12 Q    The litigation that was referenced by counsel for the

13 bank, none of those parties have judgments, do they?

14 A    No, they don't.

15 Q    Okay.  So, they have no liens on any of the assets of

16 Autohaus, do they?

17 A    No, they don't.

18 Q    Okay.  And there was much about the vehicles that were

19 brought up which were in a dealership owned by a -- and I'll

20 screw this name up -- Andrew Mogalanski?

21 A    Yes.

22 Q    Who asked you to take those vehicles?

23 A    I did it in combination with Mr. Mogalanski, Patrick Cowan

24 and Michael Caffrey.

25 Q    Okay.  And who's Michael Caffrey?

1 A    Senor Vice President of Commercial Lending for Susquehanna

2 Bank.

3 Q    So, Susquehanna Bank asked you to sell those vehicles?

4 A    Yes.

5 Q    So, they trusted you enough to sell vehicles from another

6 dealership?

7           MR. WARNER:  Objection, Your Honor.

8           THE COURT:  Overruled.

9 A    That's correct.  They extended the floor plan line also.

10 Q    They actually made a new loan to you to do that -- or

11 extended the amount of the loan so you could do that?

12 A    That's correct.

13 Q    Okay.  Now, there was a series of questions by counsel for

14 the bank about how much you owe on these lines of credit for

15 Three Arrows -- floor plan lines of credit for three hours on

16 Autohaus.  You don't know the exact amounts that you owe at

17 this point.

18 A    No, I don't.

19 Q    So, consequently, you don't know, if any, how much is out

20 of trust?

21 A    Correct.

22 Q    Okay.  And when you entered into the -- agreed to the

23 interim order and stipulation which was entered in this Court

24 as a result of the phone hearing with the Court, you thought

25 that you would be able to come up with an explanation as to if

1  it was out of trust, what happened to the money, didn't you?

2  A    Exactly.

3          MR. WARNER:  Your Honor, this is a fairly leading

4  question.

5          THE COURT:  Sustained.  Please don't lead.

6          MR. CHERNICOFF:  I'm sorry.  I'm trying to get

7  through this.

8  BY MR. CHERNICOFF:

9  Q    Why did you agree to provide an accounting as to what

10 happened with the alleged out of trust money?

11 A    I believed that it would be fairly easy to reconcile the

12 books with a professional accountant coming in.

13 Q    Okay.  And did you hire that accountant?

14 A    Yes, I did.

15 Q    And what has it turned out that it would take?  Has he

16 been able to effectuate that?

17 A    He spent one day there, spent a day at home with the

18 checking account, and he said that he needs a full 20 days to

19 put it together because there are no books for Three Arrows.

20 Q    Why are there no books for Three Arrows?

21 A    We had a major computer called ADP Computer System, at the

22 Volkswagen Store, which is approximately $8,000 a month in

23 order to pay for it, the usage, software, and support.  When we

24 shut the store down, the computer system gets shut down, too,

25 or it would be an ongoing carrying expense.  So, there was no

1   books there.  And we switched to an Auto Soft system, which is

2   a much simpler system, it's $695 a month, as opposed to 8,000.

3   Unfortunately, there's no entries in the Auto Soft system.  And

4   Mr. Gibbs was hired to recreate everything from start.

5   Q    Okay.  And at the time that you stipulated -- agreed to

6   the stipulation, which was entered, what was your knowledge as

7   to the state of the books of Three Arrows?

8   A    I thought they were being kept.  I was being told they

9   were being kept.

10  Q    And what have you asked Mr. Gibbs, who's the outside

11  accountant, to do now at this point?

12  A    Go page-by-page and dig out whatever happened.

13  Q    Whatever happened to?

14  A    The money, the cars, how it happened, when it happened.

15  Q    And, again, the values that you placed on Debtor Exhibit

16  Number 4, which is the list of real estate --

17  A    Correct.

18  Q    -- in large extent of the payment are based upon

19  appraisals done by Susquehanna Bank, are they not?

20  A    November 19th, 2009.

21  Q    You anticipated my next question.  And what was your

22  testimony on cross examination that you think the values may be

23  actually lower?

24  A    May be 20 percent, depending on the buyer.  If the person

25  wants the property, they'll pay more for it.  And if they don't

1 want it, they don't pay for it.  It's definitely a buyer's

2 market.

3           MR. CHERNICOFF:  Your Honor, nothing further on

4 redirect.  Depending upon -- because I'm not aware of who the

5 bank may call as their witnesses, we reserve the right to call

6 him for rebuttal.

7           THE COURT:  All right.  Any recross, Mr. Warner?

8           MR. WARNER:  Thank you, Your Honor.  Just a few

9 questions.

10                   RECROSS EXAMINATION

11 BY MR. WARNER:

12 Q    Mr. Reinhart, do you have any knowledge as to whether or

13 not Mr. Gibbs has been approved by this Court to act as an

14 accountant for you in this matter?

15 A    No, I don't.

16 Q    Do you have any knowledge as to whether or not Mr.

17 Mattione's been approved by this Court to act as your attorney

18 in this matter?

19 A    No, I don't.

20 Q    Yet you identified them as consultants and part of the

21 budget that you were submitting to the Court.

22 A    Yes.

23           MR. WARNER:  I have no other questions, Your Honor.

24           THE COURT:  You can step down, sir.  Thank you.

25           MR. REINHART:  Thank you.

1          THE COURT:  And would you lease the exhibits there, I

2   think?

3          MR. CHERNICOFF:  Leave the exhibits.

4          Your Honor, I hesitate to ask, but can I have a five-

5   minute recess?  I need to take some medication.

6          THE COURT:  Why don't we adjourn for 10 minutes until

7   3:20?

8          MR. CHERNICOFF:  Thank you.

9              (Recess 3:09 P.M./Reconvene 3:26 P.M.)

10         THE COURT:  Does the debtor have any further

11  witnesses, Mr. Chernicoff?

12         MR. CHERNICOFF:  Yes, we do, Your Honor.  Mr. Witzig

13  will take this one.

14         MR. WITZIG:  Your Honor, we call to the stand Mike

15  Caffrey.

16         THE COURT:  Good afternoon.

17           MICHAEL CAFFREY, DEBTORS' WITNESS, SWORN

18         THE COURT:  Please be seated.

19                        DIRECT EXAMINATION

20  BY MR. WITZIG:

21  Q    Good afternoon.

22  A    Hi.

23  Q    We have not met before.  My name is Mark Witzig.  I'm with

24  Cunningham and Chernicoff, PC.  We're bankruptcy counsel for

25  Three Arrows and Autohaus.

1          Would you please state your full name on the record?

2   A    Yes.  It's Michael C. Caffrey.

3   Q    Where are you employed?

4   A    Susquehanna Bank.

5   Q    What is your current position at Susquehanna Bank?

6   A    Senior Vice President and Relationship Manager.

7   Q    When did you achieve that position at Susquehanna Bank?

8   A    I was hired in 2003 as a Senior V.P. at the bank.

9   Q    Would you please briefly describe for us your job duties

10  as Senior Vice President and Relationships Manager?

11  A    Primary duties are developing business with commercial

12  relationships, typically larger relationships, and managing

13  those relationships to expand the relationships and cross sell

14  bank products.

15  Q    Were you present today throughout the testimony of

16  Nicholas Reinhart?

17  A    Yes, I was.

18  Q    Have you met him before today?

19  A    Oh, yes.

20  Q    It's the gentleman seated here to my left?

21  A    Yes, I know Nick, yes.

22  Q    How is it that you have become familiar with and met

23  Nicholas Reinhart?

24  A    Mr. Reinhart has been a customer of the bank for some

25  time.  I was introduced to him through another associate in

1  order to discuss floor plan lending with him.

2  Q    Do you recall approximately when that first occurred?

3  A    I believe it was January.   It was December or January of

4  -- December of 2007 or January of 2008.

5  Q    Sometime around when Penn State beat Texas A&M in the

6  Alamo Bowl.

7  A    There you go.

8                          (Laughter)

9  Q    Sometimes it helps to have other phenomena to latch onto.

10 Mr. Caffrey, are you familiar with Susquehanna Bank matters

11 involving the entity that we've referred to today as Autohaus?

12 A    Yes, I am.

13 Q    Are you generally familiar with the bank's matters with

14 the entity that we've referred to today as Three Arrows?

15 A    Yes, I am.

16 Q    And how it that you've become so familiar with those

17 matters?

18 A    I extended the -- got the loans approved for both entities

19 and have been the relationship manager since those loans were

20 closed.

21 Q    Does your performance as relationship manager also extend

22 to any other business entities in which Mr. Reinhart is

23 involved, such as BPC Partners or Reinhart Partners LP?

24 A    Yes, there are a number of different entities, including

25 BPC, SNL Trading, DB&E Enterprises, and there are others.

1 Q    In approximately the last four weeks, Mr. Caffrey, have

2 you had an opportunity to review the bank's records regarding

3 its credit facilities and collateral, and involving Autohaus,

4 Three Arrows, Mr. Reinhart, or those other entities that we've

5 mentioned?

6 A    Yes.

7 Q    Before you on that witness stand be exhibits utilized

8 already this afternoon.  Among them would be what's been marked

9 for identification purposes as Debtors' Exhibit Number 4, it's

10 one sheet of paper, eight and a half by 11 in size.  It's a

11 spreadsheet, do you have that handy?

12 A    Yes, I have that.

13 Q    All right.  Let me ask you a few questions based upon the

14 contents of that exhibit.  Now I understand this is probably

15 the first time you've seen that exhibit, correct?

16 A    This is an updated version of this exhibit.  I have seen

17 prior versions.  It's the real estate portion of Mr. Reinhart's

18 personal financial statement.

19 Q    All right.  This exhibit recites various pieces of

20 property in Lancaster County, Cumberland County, Delaware

21 County, and York County, Pennsylvania, correct?

22 A    Correct.

23 Q    All of those properties located in Pennsylvania, does

24 Susquehanna Bank have recorded mortgages encumbering those?

25 A    All of the Pennsylvania properties, we do have recorded

1 mortgages.

2 Q    Do you recall generally the testimony that Mr. Reinhart

3 gave this afternoon as concerns appraisals that were done in

4 connection with some of these Pennsylvania properties?

5 A    Yes, I do.

6 Q    Would you please tell us whether or not in or about 2007,

7 the bank received an appraisal concerning the property

8 identified as 6475 Carlisle Pike in Cumberland County,

9 Pennsylvania?

10 A    The date of the appraisal is August 27th, 2006.

11 Q    Let me repeat that to make sure I have it correct.  August

12 27th, 2006?

13 A    Correct.

14 Q    Would you please tell us whether or not in or about

15 calendar year 2007, Susquehanna Bank received an appraisal

16 concerning the property in York County that's been referenced

17 as 22 Canadochly Circle?

18 A    You know, I don't know if we actually received an

19 appraisal on that.  That was not a loan I was involved in

20 making, and I don't know if we have an appraisal or did that,

21 given the smaller dollar amount in another way.

22 Q    All right.  Now, I believe there's three other properties

23 in Pennsylvania referenced here on this Debtors' Exhibit Number

24 4.  Specifically 515 North Reading Road in Ephrata, 6629

25 Carlisle Pike in Cumberland County, and 5018 Township Line Road

1  in Delaware County.  Would you please tell us whether or not in

2  or about November, 2008, Susquehanna Bank received appraisals

3  regarding any or all of those properties?

4  A    Yes, we did.

5  Q    Have you seen all of these five appraisals about which

6  I've asked you questions already?

7  A    I have seen -- I think there were the four.

8  Q    All right.  You said you did not see York County.

9  A    Yes, correct.

10  Q    Okay.

11  A    But the other four yes, I have.

12  Q    All right.  As concerns those four appraisals, did

13  Susquehanna Bank ever dispute or reject the contents of those

14  appraisals, and specifically the expression of indicated market

15  value?

16  A    No, we did not.

17  Q    Do you -- would you please tell us whether or not the

18  indications of fair market value contained in those four

19  appraisals are consistent with the recitals made today by Mr.

20  Reinhart during his testimony?

21  A    They're close.  The Reading Road property had a slightly

22  different value, as my recollection, as did Carlisle Pike and

23  Township Road.  But it was not materially different.  And, in

24  fact, I believe one may be a little bit lower, the other two

25  might be actually a little bit higher.  But they're right in

1 the ballpark.

2          MR. WITZIG:  Your Honor, I have no further questions

3 of Mr. Caffrey on direct.

4          THE COURT:  Any cross?

5          MR. WARNER:  Yes, a few questions.

6                    CROSS EXAMINATION

7 BY MR. WARNER:

8 Q    Mr. Caffrey, in preparation for today's hearing, are you

9 aware of whether or not Susquehanna Bank examined the real

10 estate owned by Mr. Reinhart for purposes of determining

11 whether or not it provided adequate security?

12          MR. CHERNICOFF:  Objection; calls for a conclusion, a

13 legal conclusion.  "Adequate security" is a legal term.  That's

14 what we're here to decide today, Your Honor.

15          THE COURT:  I guess he's not been qualified as an

16 expert.  I'll sustain the objection.

17          MR. WARNER:  Your Honor, just so it's clear, I'm

18 asking whether this analysis was done by the bank.  I'm not

19 asking for his opinion on it, I'm asking whether or not the

20 analysis was done.

21          THE COURT:  Well, why don't you try to ask it

22 differently perhaps.

23 BY MR. WARNER:

24 Q    Mr. Caffrey, are you aware of any analyses done by

25 Susquehanna Bank of the real estate owned by Mr. Reinhart in

1  preparation for today's hearing?

2  A    Yes.

3  Q    Were you involved personally in those analyses?

4  A    I was involved in the discussions, yes.

5  Q    Could you explain for the Court the nature of that

6  analysis?

7  A    Well, we looked at the properties that are pledged as

8  collateral.  We also looked then at, you know, what realizable

9  value we felt might be attainable for those.  And we also

10  looked at the various liens that we had and lien positions, as

11  many of the properties are blanketed for a number of loans,

12  including other real estate loans and/or the floor plan loans

13  themselves.

14  Q    You had used two terms there, I just want to make sure

15  that we have a bit of a definition for it.  You talked about

16  market value.  And are you referring at that point to the

17  market value as contained within the appraisals that the bank

18  had?

19  A    Yes.

20         MR. WITZIG:  Objection, Your Honor.  I think he

21  referred to realizable value, not market value.

22         MR. WARNER:  Well, I thought he referred to both, so

23  I was going to ask him the next one.

24         THE COURT:  Overruled.

25  BY MR. WARNER:

1 Q    I recalled you used the phrase "attainable value."  But
2 what phrase did you use or terminology did you use for another
3 type of value?
4 A    What we were looking to do is make some sort of a
5 determination as to realizable value, what those properties may
6 be saleable for.
7 Q    And it may be evident from the word itself, but what do
8 you mean by the phrase "realizable value?"
9 A    If those properties were to be sold today, what might they
10 bring on the market.
11 Q    Now, although I think you indicated you were involved in
12 this process, was there someone that was actually the lead or
13 primarily in charge of this process?
14 A    I worked with Pat Cowan on going through those numbers.
15 Q    And is Mr. Cowan your superior or senior for the purposes
16 of this?
17 A    Meaning we work in different capacities at the bank.
18 Q    For purposes of this analysis, was that primarily his
19 task?
20 A    I would say yes.
21         MR. WARNER:  I have no other questions of this
22 witness, Your Honor.
23         THE COURT:  Any redirect?
24         MR. WITZIG:  Thank you, Your Honor.
25         THE COURT:  You may step down, thank you.

1          MR. CAFFREY:  Thank you.

2          MR. WITZIG:  Your Honor, if you so wish, we would be

3 agreeable to Mr. Caffrey being released of his obligation to

4 remain in the courtroom, as you previously directed.

5          MR. WARNER:  We appreciate that, but I don't think

6 he's going anywhere at the time.

7          THE COURT:  Very well.  No requirement by the Court

8 that you remain, but you're obviously welcome.

9          Does the debtor have any further witnesses?

10          MR. CHERNICOFF:  No, Your Honor, we do not.

11          THE COURT:  Debtors, I should say.

12          Before I turn to the bank, I'm just -- I'm mindful

13 that tomorrow on the Wilkes-Barre calendar, we have preliminary

14 hearings in the motions for relief from stay.  And I'm starting

15 to wonder if some of this record may or may not be germane to

16 the issues that I'll have in the relief from stay.  And I don't

17 know if -- I'm not trying to catch anyone flatfooted.  If you

18 gentlemen would care to address that briefly, or even to speak

19 among yourselves, and report back to me.  But before -- before

20 we conclude today, I think it would be -- I'm not one who likes

21 surprises.  I never particularly liked it as a counsel.  Every

22 time you try a case, you get surprised a bit, I suppose.  But

23 to the extent I could try to keep that to some minimum, I'll

24 try to do that with counsel.

25          So, any initial thoughts on the question of where

1 these -- to what degree these records are distinguishable or

2 the same?

3        MR. CHERNICOFF: Your Honor, I was going to make the

4 same observation. I think much of what you've heard today, at

5 least from our side, would be exactly the same as what you

6 would hear tomorrow. I think the records are pretty much

7 intertwined and one of the same.

8        MR. WITZIG: We would make an oral motion that it be

9 a combined motion for those two separate topics, Your Honor.

10 The debtors' motion for cash collateral and the bank's motions

11 for relief from the automatic stay.

12        MR. SHOOP: We -- Your Honor, we do concur that there

13 are many similarities in issues with regards to the testimony

14 here that would be germane to the testimony on the automatic

15 stay.

16        There are certain items that were deemed to be beyond

17 the scope of direct early on that were objected to and

18 sustained that we feel are, you know, germane to the automatic

19 stay motion, as well.

20        I guess the way to do it is that we go through our

21 case today, and would be -- depending on the outcome of what we

22 could bring in on this that we would want to reserve the right

23 to bring in under the automatic stay motion.

24        We feel that a lot of what could be put on the record

25 today need not be duplicated.

1          THE COURT:  Very well.

2          MR. WITZIG:  I detect that's --

3          THE COURT:  I didn't --

4          MR. WITZIG:  I detect that's consent, Your Honor,

5  with the reservation that the bank has the ability to offer in

6  its case in chief regarding the lift stay motions what it would

7  further want to be in the record, and we respect that and

8  concur.

9          MR. SHOOP:  Thank you.

10         THE COURT:  Why don't we proceed with the bank's

11  first witness?

12         MR. WARNER:  thank you, Your Honor.  Your Honor, at

13  this time, we're calling Joanne Coleman.

14         THE COURT:  Raise your right hand.

15      JOANNE COLEMAN, SUSQUEHANNA BANK'S WITNESS, SWORN

16                    DIRECT EXAMINATION

17  BY MR. WARNER:

18  Q    Ma'am, would you please state your full name and spell

19  your last name?

20  A    My full name is Joanne, that ends with an E, middle

21  initial E, last name is Coleman, C-O-L-E-M-A-N.

22  Q    Ms. Coleman, by whom are you employed?

23  A    Susquehanna Bank.

24  Q    And what is your position or title there?

25  A    My title is Fraud Prevention Specialist Floor Plans.

1  Q    And could you describe briefly for the Court what your

2  duties are generally in that position?

3  A    What I do is I go out and verify the vehicles that are

4  listed on a floor plan that we've advanced money for are at the

5  dealership or, if they're sold, I verify that we've received

6  payment.  If they're off the lot, we verify location.

7  Q    Okay.  In the course of your duties with Susquehanna Bank,

8  have you provided -- or have you been involved at all with the

9  credit extended to Autohaus, Inc?

10 A    Yes, in the capacity as a floor plan.

11 Q    And same question with respect to Three Arrows?

12 A    Correct.

13 Q    All right.  Perhaps it's apparent from what you do

14 generally, but could you tell us specifically what you've done

15 with respect to those two entities, Autohaus and Three Arrows?

16 A    Okay.  In the month of September, we did three audits.

17 The first one was September the 3rd, the second one was

18 September the 14th, and the last one was September the 28th and

19 29th.

20 Q    And can you just describe for the record briefly how it is

21 you conducted these audits?

22 A    Basically we have a list that we get off our computer

23 system and go out to the locations and verify the VIN on the

24 vehicle is on our list, and then note that it's there.  If it's

25 not, if it's sold, follow-up for payment or find -- or verify

1  the location of the vehicle.

2  Q    All right.  And were you personally involved in the

3  inspections on all three dates?

4  A    Yes, I was.

5  Q    All right.  Have you brought with you today any records of

6  the results of those inspections?

7  A    Yes, I brought my work papers, plus some recaps that we

8  do.

9  Q    All right.  I'm -- at this time I'm going to ask you to

10 provide me with a copy of those.  I'll provide it to the Court

11 and to counsel, and we'll mark them and have you describe them.

12                          (Pause)

13 Q    All right.  Ms. Coleman, the document -- the two-page

14 document that I've had marked as Bank 1, could you describe for

15 the Court what this document is?

16 A    What it is is it's an ongoing recap from the three audits,

17 what vehicles we were told were sold, breaking down Three

18 Arrows first, Autohaus new second, and Autohaus used third.  It

19 basically lists the vehicle, the description, and the amount

20 that it's floor planned for, the date it was sold, and the

21 floor plan -- the date that we did the floor plan.

22 Q    All right.  So, if we just start off with Three Arrows,

23 and we go through the dozen plus vehicles that are identified

24 there, and then you come up with a total amount of $656,264.40,

25 do you see that?

1  A     That is correct.

2  Q     Okay.  What does that figure represent?

3  A     That represents the vehicles that we were told from the

4  three floor plans in September that were sold.

5  Q     And what, if anything, was made with respect to proceeds

6  being paid from these sales to the banks?

7  A     No payments were received.

8  Q     Okay.  Now, if we go down and do the next segment,

9  Autohaus news -- new.  What's the total identified there for

10 Autohaus new?

11 A     $167,085.63.

12 Q     And what does that figure reflect, ma'am?

13 A     That reflects the vehicles that we were told that were

14 sold during those three floor plans

15 Q     And incidentally, when you say they were told, did you

16 look for the vehicles?

17 A     The vehicles were missing, so that would have prompted us

18 to ask where they were.  We were told that these were sold on

19 those given dates.

20 Q     And are -- as part of your duties, do you review the floor

21 plan loan agreement or arrangements before you go out and do

22 the inspection?

23 A     No, not for each time.  Usually when we have a new floor

24 plan, we do review them so that we're familiar with what the

25 payment schedules are.

1 Q    Okay.  And are you familiar with respect to the floor plan

2 agreements in place for Three Arrows and for Autohaus?

3 A    Fairly familiar.  I haven't reviewed them recently.

4 Q    Okay.  What were the payment obligations in terms of the

5 timing of payments after a vehicle that was on floor plan was

6 sold?

7 A    Traditionally we receive payments within five days.

8 Q    Okay.  And then moving on then, again, under the --

9 Autohaus, the 167,058.63, were any of these proceeds paid to

10 the bank?

11 A    No.

12 Q    All right.  If we go to the last block, Autohaus used,

13 what's the total figure there?

14 A    $909,097.

15 Q    And what does that figure represent?

16 A    That represents the vehicles that we were told that were

17 sold for those three previous floor plans.

18 Q    And, again, were they vehicles that you looked for and

19 couldn't find?

20 A    Correct.

21 Q    And that number reflects the value of the cars on the

22 floor plan?

23 A    Yes, it would be the amount that they were floor planned

24 for.

25 Q    And were any of those proceeds forwarded to Susquehanna

1 Bank?

2 A    No.

3 Q    Did you come up with a total calculation then of vehicles

4 that were under floor plan and vehicles that were missing or

5 apparently sold, and for which proceeds had not been paid to

6 the bank?

7 A    Yes.

8 Q    And what was that total figure?

9 A    $1,768,375.03.

10 Q    All right.  Now, after that calculation, you have some

11 other additional information.  Could you just explain what that

12 information is and how it's relevant?

13 A    The second --

14 Q    No, ma'am.  After that total of one million seven --

15 A    Oh.

16 Q    -- you have autos missing.

17 A    Yes.  There were some vehicles that were off the lot, but

18 we were told they were not sold.  Basically what we did was

19 verified with the shops where they were located.  In this case,

20 the first one was Red Run Exhaust.  We called them to verify it

21 was there, and Gotzi's (phonetic), we verified they were by

22 phone that they were there.

23     The three for Three Arrows, we did not know where

24 they were located, but we did see the title for the vehicles.

25 Q    So, in your calculating of the amount that was under floor

1  plan, but not paid, you didn't include these figures or these

2  calculations?

3  A    No, they were just general information for us.

4  Q    Okay.  All right.  Now, if I could direct your attention

5  to bank number two, could you describe generally what this

6  document reflects?

7  A    This is just a recap of the totals that were sold and not

8  remitted as of this morning, October 7th.

9  Q    Now, if we could start with audit date 9/03/09, what

10 happened on September 3, '09?

11 A    We would have audited both Autohaus locations, and Three

12 Arrows, with the finding that Autohaus new, as of that audit

13 date, has $143,045 worth of vehicles sold, but not paid.

14 Q    And Autohaus used?

15 A    Had $430,375 worth of vehicles sold, but not paid.

16 Q    And the total for Autohaus then?

17 A    $573,420.63.

18 Q    Now, if I could take you back, we were talking a moment

19 ago of not paid.  There was a time period for payment.

20 A    Yes.

21 Q    And does this reflect simply not paid or not paid after

22 the expiration of that time period?

23 A    This reflects not paid at any time.

24 Q    All right.  Was a similar audit done for Three Arrows?

25 A    Yes.

1  Q    And the number for Three Arrows?

2  A    Was $411,880.

3  Q    All right.  Now, it may be apparent, but just if you could

4  explain it, what does the grand total reflect then?

5  A    The grand total was the total of both Autohaus locations

6  and Three Arrows, that was the total that was missing that day

7  for that audit.

8  Q    Now, did you then go out and perform another audit on

9  September 14th?

10  A    That is correct.

11  Q    All right.  And can you explain -- not necessarily what

12  the numbers are, but what they represent when we see 167 there.

13  A    What it represents is more vehicles were missing between

14  the audit of 9/3 and what we found missing on the audit of

15  9/14.

16  Q    For new and for used, let's just go out -- well, was the

17  audit done for all three floor plans?  Autohaus new, Autohaus

18  used, and Three Arrows?

19  A    Yes, we always did the three together because of the

20  locations being commingled.

21  Q    When you say commingled, what do you mean?

22  A    There was a time when Autohaus was open at the Harrisburg

23  location sometimes 10 or 15, 20 of their cars from that floor

24  plan would be at the Three Arrows location.  So, it was easier

25  for us just to do the three of them together that we could go

1  to the Three Arrows location, and then verify those vehicles.

2  Q    And then what was the grand total then as of the time that

3  you did the audit on September 14th, '09?

4  A    The grand total was $1,514,000 -- I'm sorry --

5  $1,514,257.03.

6  Q    Now, it may be apparent, but what does that reflect as

7  happening between when you did the audit on September 3 and

8  when you did the audit on September 14th?

9  A    The amount being unpaid just increases, continues to

10 increase.

11 Q    By the differential of 985 from a million five?

12 A    Correct.

13 Q    Now, did you do yet another audit on September 18th, 2009?

14 A    September 28th.

15 Q    September 28th, I'm sorry, yes.

16 A    Yes, we did a third audit on September 28th.

17 Q    And you're aware of the fact that the bankruptcy petition

18 was filed on September 16th?

19 A    Yes.

20 Q    So, this was performed, as far as you understood, this

21 audit was done after the bankruptcy was filed here?

22 A    Correct.

23 Q    All right.  Did you do it for all three plans?

24 A    Yes.

25 Q    And what was the total figure as a result of the audit you

1 did on September 28th?

2 A    $1,720,462.03 unpaid.

3 Q    All right.  And, again, what -- reviewing this chart, what

4 did that reflect happened between September 14th and September

5 28th?

6 A    Approximately another $200,000 worth of vehicles were sold

7 and we were not paid.

8 Q    Now, we have the final line here of October 7, today, what

9 happened to cause a new line to be entered on this chart?

10 A    We were notified that there were some sales of vehicles,

11 so I added them on the sold but not paid list, and made the

12 adjustment.

13 Q    And bringing us to a grand total of what?

14 A    $1,780,360.03.

15 Q    All right.  Now, are you familiar with the term out of

16 trust?

17 A    Yes, I am.

18 Q    What does that term mean?

19 A    That means vehicle are sold and we have not been paid for

20 them.

21 Q    Is that term applicable to the grand total column?

22 A    Yes.

23 Q    And can you explain to the Court how or why it is that

24 that term is appropriately used under this category of grand

25 total?

**TRANSCRIPTS PLUS, INC.**
**PHONE 215-862-1115 ● FAX 215-862-6639 ● E-MAIL CourtTranscripts@aol.com**

Case 1:09-bk-07158-RNO    Doc 98    Filed 12/14/09    Entered 12/14/09 14:25:31    Desc
Main Document      Page 102 of 164

1 A    Basically we've done the audits.  We've been told the

2 vehicles have been sold, and we have seen some of the sales

3 documents to support that.  And no payments have been remitted

4 to us.  So, the customer is out of trust with his floor plan

5 agreement.

6 Q    Okay.  Now, could I direct your attention to Debtors'

7 Exhibit -- and are they still up there?

8 A    Yes.

9 Q    Debtors' Exhibit Number 3.

10 A    Okay, yes.

11 Q    Mr. Reinhart testified to this document as -- basically as

12 his inventory.  Have you seen this before today?

13 A    Yes, I did.

14 Q    All right.  When did you first see it?

15 A    Actually this morning at about 9 o'clock.

16 Q    All right.  Did you do any calculations with respect to

17 the inventory sheet?  Or vehicles on floor plan list prepared

18 by Mr. Reinhart?

19 A    Yes.  What I did was I verified it with my last floor plan

20 list to check to see that what he said was on the lot or off

21 the lot at a different verification -- or a different lot that

22 we had verified it.

23 Q    All right.  Let's start with that.  Did you find any

24 discrepancies on that analysis?

25 A    No, I did not.

1 Q    All right.  Did you, in the process of performing the work

2 that you've done with respect to these two entities, come up

3 with a number of how much is drawn down on the line -- the

4 floor plan line of credit for each of these three loans?

5 A    Yes.

6 Q    Okay.  Now, if -- again, referring to Debtors' Exhibit

7 Number 3, we see that Mr. Reinhart has calculated the value of

8 cars on floor plan still physically present as 243,735, do you

9 see that?

10 A    Yes.

11 Q    Did you calculate the amount that was actually drawn down

12 on the floor plan line of credit?

13 A    Yes.  The floor plan was used to $899,999.40.

14 Q    And how would you characterize the differential between

15 that number that is the draw down on the line of credit and the

16 value of the cars still on the lot?

17 A    That agrees with my list of cars that we were told that

18 were sold but unpaid.

19 Q    So, again, the use of the phrase out of trust?

20 A    Yes.

21 Q    All right.  Same discussion, but with respect to Autohaus

22 Acquisition used line, and if you go over to the top of Page 2,

23 you'll see that Mr. Reinhart has calculated that the value of

24 the cars on the floor plan is $555,608, do you see that?

25 A    Yes.

1  Q    Did you become aware of the extent of the drawdown on the

2  line of -- the floor plan line of credit for used line?

3  A    Yes, that was 1,500,000.

4  Q    So, the differential between the number reflected by

5  inventory on the lot and the number of the drawdown, that would

6  be out of trust?

7  A    That would be correct.

8  Q    All right.  Same set of questions with respect to Autohaus

9  Acquisition new line.  And you'll see Mr. Reinhart's

10 calculation of cars on the lot, floor plan value at 453,434.78,

11 do you see that?

12 A    Yes.

13 Q    Were you able to determine the amount of drawdown on the

14 floor plan line of credit?

15 A    Yes, it's actually $620,520.41.

16 Q    And the differential between the amount drawn down and the

17 amount of inventory on the lot, would that be the amount out of

18 trust?

19 A    Yes, that agrees with my list also.

20 Q    All right.  So, basically in terms of characterizing Mr.

21 Reinhart's list, how does that relate to your calculation of

22 the million seven that you calculated as being out of trust?

23 A    That is fairly correct.  There's one error at the bottom.

24 It says "Value of Black Tie floor plan."  He has it listed as

25 $603,275.78.  It really is actually $243,735.  And that's

1  supported by his own figure on the first page.

2  Q    And if we plug that value in, then that's how we get to

3  the 1.7 that you calculate?

4  A    That's correct.

5        THE COURT:  And I'm sorry, was that entry the value

6  of Black Tie floor plan on ground or --

7        THE WITNESS:  Yes.  Yes.

8        THE COURT:  And the figure you just used was?

9        THE WITNESS:  Was from the first sheet on the first

10 page, his own actual figures, 243,735.  But on the second page,

11 it's listed as $603,275.

12       THE COURT:  Thank you.

13                   (Pause)

14       MR. WARNER:  Your Honor, I have no other questions of

15 this witness at this time.

16       THE COURT:  Any cross?

17       MR. CHERNICOFF:  Yes, Your Honor.  Thank you.

18                   CROSS EXAMINATION

19 BY MR. CHERNICOFF:

20 BY MR. WARNER:

21 Q    What period of time did you conduct audits on these

22 dealerships, Three Arrows and Autohaus, aside from September of

23 2009?

24 A    Every three weeks.

25 Q    Going back to when?

1  A    June of this year.

2  Q    June of this year.

3  A    Yes.

4  Q    Did you ever see them -- any of these dealerships out of

5  trust at those times?

6  A    This particular dealership, no, not at that time.

7  Q    Did you ever see, other than September of 2009, this

8  dealership out of trust?

9  A    No.

10 Q    When a dealer buys a car, it usually shows a purchase

11 document for that vehicle, whether it be from a new car, from a

12 manufacturer, or a used car from the auctioneer or the

13 individual party, does it not?

14 A    Yes.

15 Q    Do you review those?

16 A    I personally do not.  I'm not involved in actual flooring

17 of the vehicles because I do the audit procedure.

18 Q    Do you ever look at the buyer sheet to show -- buyer

19 orders to review the price at which the vehicles are sold?

20 A    I do not.

21 Q    Isn't that a requirement when you do a floor plan audit?

22 A    No.

23 Q    It's not?

24 A    No, it is not, not our procedure.  We do not look at

25 buyers' orders.

1  Q    Have you ever done floor plan audits for anyone else?

2  A    Yes, I've been floor planning for 15 years.

3  Q    And no other lender requires that you look at the buyers'

4  orders?

5  A    I can only speak for Susquehanna.

6  Q    You said you've been doing it for 15 years for other

7  dealers -- for other lenders.

8  A    No, no.  15 years for Susquehanna.

9  Q    Oh, I said -- correct me if I'm wrong.  I don't mean to

10  argue with you, but my question was did you ever do floor plan

11  audits for any other lender?

12  A    Then I misunderstood your question and misspoke.

13  Q    Okay.  You did not?

14  A    No.

15  Q    Okay.  Now, if you look at Bank Exhibit Number 2.

16  A    Yes.

17  Q    If you look at how much under the -- let's take the

18  September 3, '09 audit in the Autohaus new, how many vehicles

19  would that be?

20  A    Autohaus new would have been six vehicles.

21  Q    Okay.  How about Autohaus used?

22  A    Eleven vehicles.

23  Q    Okay.  And how about Autohaus -- I'm sorry -- Three

24  Arrows?

25  A    Seven vehicles.

1 Q    Okay.  After you did the --

2          MR. CHERNICOFF:  Strike that.

3 BY MR. CHERNICOFF:

4 Q    Before you would do an audit, prior to September, 2009,

5 what notice did you give to these dealerships that the audit

6 was going to be conducted?

7 A    Actually -- generally we give no advanced warning that

8 we're going to do it.

9 Q    No one in the bank gives advanced warning?

10 A    No.

11 Q    Okay.  After the audit is conducted, are the results

12 discussed with the dealership?

13 A    No.  There's an internal memo that's sent to the loan

14 officer, and several other people.

15 Q    So, you didn't give any notice on -- following September 3

16 to the dealership that you're $985,000 out of trust?

17 A    I phoned John Eckberg on the 10th to let him know that

18 none of the sold vehicles were paid.

19 Q    You did?

20 A    Yes.

21 Q    When did that occur?

22 A    That would have been in the -- in the afternoon, probably

23 about two or 2:30.  I phoned him to find out if -- why the

24 vehicles hadn't been paid.

25 Q    And what -- did he have an explanation?

1  A    He said -- he told me he thought Pat was taking care of

2  that, and she was not in the office at that time.  That he

3  would call me back the following morning to let me know.

4  Q    Okay.  Prior to September, you never called subsequent to

5  an audit to tell the dealership it was a clean audit?

6  A    No.

7  Q    Really?

8  A    No.

9  Q    And you never called prior to the audit --

10  A    That was our general --

11  Q    -- to say you were coming out?

12  A    I had, in the case of Nick, periodically done that because

13  he had asked me to do that.

14  Q    Okay.  So, your answer is now different from your answer

15  before.

16  A    In the case of Nick, it was different.

17  Q    Okay.

18  A    He had asked me to call him on the morning of an audit,

19  and generally I would call him when I left the location -- our

20  location.

21  Q    And you never told him after the audit everything's good?

22  A    No.

23  Q    Okay.  The October 7th, 2009 audit, with respect to that,

24  these are the sales which occurred between the 20th -- the

25  additional amounts of the sales between the 20th of September

1  and October 7th?

2  A    They were the vehicles that we were notified that were

3  sold, I think, between October 2nd and 6th.

4  Q    So, you didn't actually do an audit?

5  A    No, that really was not an audit.

6  Q    Okay.

7  A    That was just an additional figure update.

8  Q    Were you here when Mr. Reinhart testified that those

9  dollars -- that the proceeds are sitting in a bank account?

10 A    Yes.

11 Q    And assuming those are paid over, then those additional

12 amounts are not out of trust, are they?

13 A    I have no knowledge that they were paid when I did this

14 update.

15 Q    Were you aware of the fact that there's a court order

16 directing him to pay it over?

17 A    I only found that out today.

18 Q    Okay.

19                        (Pause)

20        MR. CHERNICOFF:  Nothing -- excuse me, Your Honor.

21                        (Pause)

22        MR. CHERNICOFF:  Okay.  Nothing further, Your Honor.

23        MR. WARNER:  I have no further questions, Your Honor.

24        THE COURT:  You may step down.  Thank you.  I assume

25 you left the exhibits up there?

 1          MS. COLEMAN:  Yes, I did.

 2          THE COURT:  Thank you very much.

 3          MR. WARNER:  May I proceed, Your Honor?

 4          THE COURT:  Please.

 5          MR. WARNER:  Mr. Pat Cowan.

 6          THE COURT:  Good afternoon.  Raise your right hand.

 7        PATRICK COWAN, SUSQUEHANNA BANK'S WITNESS, SWORN

 8          THE COURT:  Please be seated.

 9                      DIRECT EXAMINATION

10  BY MR. WARNER:

11  Q    Sir, would you please state your full name and spell your

12  last name?

13  A    Patrick W. Cowan, C-O-W-A-N.

14  Q    And, Mr. Cowan, by whom are you employed?

15  A    Susquehanna Bank?

16  Q    And what's your title or position there, sir?

17  A    Vice President, Manager of Commercial Loan Workout and

18  Special Assets Recovery.

19  Q    Could you explain briefly your duties in that position?

20  A    Yes.  For the Pennsylvania Division, which is basically

21  between a -- I guess between Berks and Adams County, and going

22  up to the middle of the state, I manage a crew of people who

23  collect loans that have gone bad.  And we also do dispositions

24  of assets also.

25  Q    In the course of your professional employment at

1  Susquehanna, have you become involved with the loan

2  relationship involving Autohaus and/or Three Arrows?

3  A     Yes.

4  Q     When did you first become involved?

5  A     Actually from a historical standpoint, before I was in

6  this position, I had actually done work similar to Mr.

7  Caffrey's with Mr. Reinhart's account many years ago,

8  subsequently paid out.  And more recently, I've been involved

9  with the account from the loan recovery standpoint for the last

10 several weeks.

11 Q     Okay.  Can you describe generally what your involvement

12 has been and what you've been doing?

13 A     Yes.  When I was alerted by the Audit Department that the

14 account was out of trust, at that point in time, we got the

15 documents together, met with the loan officers, me with the

16 auditors, tried to summarize what the issues were, met with our

17 senior management groups.  And then, in this case, I hired

18 Barley Snyder to help us with the case.  And what we're trying

19 to do is understand our legal position, and where we are in

20 terms of our -- I guess financial situation in regard to this

21 account.  How we're collateralized, if we're collateralized,

22 that sort of thing.

23 Q     All right.  Now, we've heard some testimony about a

24 document identified as Debtors' Exhibit Number 4, and you

25 should have that up there, sir.

1          THE COURT:  Mr. Cowan, could I ask you to move just a
2    little bit closer to the microphone?

3          THE WITNESS:  Sure.  Excuse me.

4          THE COURT:  I think we're having a little trouble
5    picking you up.  Thank you.

6          THE WITNESS:  Sure.

7          THE COURT:  If you want to adjust that so you're more
8    comfortable.

9    A    This would be Exhibit 4, the personal financial statement
10   of Nicholas Reinhart and Denise Reinhart?

11   Q    Yes, sir.

12   A    Okay.

13   Q    First of all, have you seen that document before today?

14   A    No.

15   Q    Have you seen information that reports or lists the
16   various pieces of real estate owned by Mr. Reinhart?

17   A    I do have documents that I put together with -- lists with
18   Mr. Caffrey listing real estate that he owns, yes.

19   Q    Okay.  Did -- we heard some testimony from Mr. Caffrey on
20   this, but were you involved at all in an analysis of Mr.
21   Reinhart's assets in preparation for this hearing?

22   A    Yes.

23   Q    Can you describe for the Court what it is you did, and why
24   you were doing it?

25   A    I guess in banking parlance, we call it an NRV

1  calculation.  It's a calculation that we do for regulators.

2  It's a pretty standard type of thing.  We, list the loans, we

3  list the assets or -- we list the collateral.  We evaluate that

4  collateral in terms of lien positions.  What the appraisal

5  might be, what the -- what we might estimate as the current net

6  realizable value might be.  And then we try to come to some

7  sort of conclusion as to where the bank stands.

8          Often times determining how short we are, and then

9  actually setting aside that much on the books of the bank in

10  case we end up with a loss.

11 Q    And you performed this analysis with respect to the assets

12 of Mr. Reinhart in preparation for today's hearing?

13 A    Yes.

14 Q    Directing your attention to Debtors' Exhibit Number 4, did

15 you make certain conclusions or evaluations --

16          MR. CHERNICOFF:  Objection, Your Honor.  That's

17 asking for an opinion as to value.  He's not been certified as

18 an expert as to value of real estate.

19          THE COURT:  I don't think I heard the whole question.

20          MR. CHERNICOFF:  I'll let him ask it.

21          MR. WARNER:  I'm going to ask if he did a calculation

22 of net realizable value with respect to these assets identified

23 on Debtors' Exhibit Number 4.

24          MR. CHERNICOFF:  He can -- that question is fine.

25 BY MR. WARNER:

1  Q    Did you do such an evaluation?

2  A    Yes, I did.

3  Q    All right.  Can you report for the Court the evaluation

4  that you performed?

5           MR. CHERNICOFF:  Now I'll object, Your Honor.  He's

6  not been certified as an expert as to valuation of real

7  estate.

8           MR. WARNER:  Your Honor, he doesn't need to be an

9  expert in real estate.  He is an expert on the banking side of

10 this in terms of how the bankers and, as he said, this is a

11 calculation he does for regulators in terms of --

12          MR. CHERNICOFF:  I think under the Rules of Evidence,

13 Your Honor, only an expert or an owner may testify as to value

14 of assets.  It's a backhanded way of getting in here and trying

15 to ignore the appraisals.

16          THE COURT:  I have to say, Mr. Warner, there is a

17 concern that -- when we say it's, what, net realizable value,

18 that -- isn't that -- isn't that all derived from -- starting

19 out from a market valuation?  Is the witness going to use the

20 valuations that Mr. Reinhart used in his financial statement?

21          MR. WARNER:  Your Honor, what the witness, I believe,

22 will testify is starting with the valuations, there are

23 appraisals there, there are other things that need to be taken

24 into account to determine what a net realizable value is.  And

25 these are the same things that Mr. Reinhart testified to.

1 They're market conditions, they're things that are happening in

2 place.  These are all factors that are taken into account by

3 the bank when they're looking at these assets and what it means

4 to them to have these assets pledged to them.

5          MR. CHERNICOFF:  Your Honor, he's a -- Mr. Reinhart's

6 an owner, he's qualified to testify under the Federal Rules of

7 Evidence; Mr. Cowan is not.

8                         (Pause)

9          THE COURT:  I'm going to sustain the objection unless

10 you are able to qualify Mr. Cowan with respect to these

11 matters.

12          MR. WARNER:  Your Honor, I'll ask a few other

13 preliminary questions.

14 BY MR. WARNER:

15 Q    Mr. Cowan, do you, in the course of your professional

16 duties for the bank, determine on some type of basis net

17 realizable value with respect to assets that might be pledged

18 to the bank?

19 A    Quite often.

20 Q    Could you explain and describe for the Court your

21 experience in this area?

22 A    Well, I would have to say that, you know, this is -- this

23 is not a science.  It's based more upon the experience that

24 we've had as a department as to what we think we could get for

25 certain properties, the values of properties vary quite a bit,

1 particularly in Lancaster and Dauphin County, depending upon

2 whether it's the land, whether it's a car dealership.  And

3 we'll try to put some estimate as to what we think we might be

4 able to get from the value of the -- if they turned up and we

5 owned them, and we had to sell them.

6 Q    Okay.  And, again, not with reference to anything specific

7 of Mr. Reinhart, but just generally, can you describe for the

8 Court the process that you go through?  What kinds of facts do

9 you look at, what factors do you take into account?

10 A    Typically we'll look at the existing appraisal and how old

11 it is.  Very often, we try to get a current appraisal --

12          THE COURT:  Let me make a suggestion.  Mr.

13 Chernicoff, do you wish to cross examine on qualifications?

14          MR. CHERNICOFF:  I certainly do, Your Honor.

15          THE COURT:  Let's try that.  Because I'm not hearing

16 -- I'll -- I'm  not hearing anything about his expertise, his

17 education, his training, anything that would -- I know that a

18 lay witness on certain things, like familiarity with a

19 signature and stuff, you might allow opinions.  But I think it

20 does seem to me we're talking about valuation.

21          Why don't you see if you can satisfy yourself or see

22 if we --

23          MR. CHERNICOFF:  Thank you, Your Honor.

24                         VOIR DIRE

25 BY MR. CHERNICOFF:

1  Q    Take any courses on real estate appraisals?

2  A    Yes.

3  Q    You have?

4  A    Um-hum.

5  Q    Do you hold any certifications from the Commonwealth of

6  Pennsylvania as an appraiser?

7  A    No.

8  Q    Isn't it true that for an appraisal to occur, you need to

9  have a certification?

10  A    Yes.

11  Q    Okay.  And the bank, for purposes of the lending, can only

12  use a certified real estate appraiser under --

13  A    That's true, um-hum.

14  Q    Okay.  Have you ever testified before as to valuation of

15  real estate?

16  A    No.

17  Q    Okay.  How many course have you taken on real estate

18  appraisals?

19  A    One.

20  Q    And when was that taken?

21  A    Maybe 20 years ago.

22  Q    In determining net realizable value, isn't it really your

23  guestimate as to what you think it would bring?

24  A    Quite often, yes.  It's our -- our estimate based upon

25  what we've --

1  Q    Is it -- do you examine any comparables for the real

2  estate in question?

3  A    We'll try to estimate it based upon other properties that

4  we may have sold.

5  Q    Do you examine any comparables?

6  A    (No verbal response)

7  Q    Do you do an analysis of comparable real estate sales?

8  A    We'll -- we'll do an examination of -- let's say a current

9  appraisal.  If we -- if I ordered a current appraisal.

10 Q    So, you rely strictly on an appraiser's work product?

11 A    Not always.  I mean --

12 Q    Do you rely on your own gut feeling?

13 A    Well, what we're doing is when we're calculating a net

14 realizable value, we will normally initially rely upon our,

15 yes, gut value as to what we think we could get for the

16 property.  Quite often we'll -- in -- most often, we'll confirm

17 that value with a current appraisal.  The appraisal values

18 right now are changing very quickly.

19 Q    Well --

20 A    It's a big difference between --

21 Q    How do you --

22 A    -- last year and this year.

23 Q    How do you know that?

24         THE COURT:  Gentlemen -- gentlemen, hold.  Time out.

25 I think I've heard enough.  I'm going to sustain an objection

1 to Mr. Cowan's testimony as to net realizable value. I don't

2 think he qualifies as an expert.

3         And I think to the extent -- if he would be a lay

4 expert, but then relying upon an appraisal which, again, is a

5 type of expert testimony, I don't believe that's an appropriate

6 use of a lay witness either. So, I will sustain the objection.

7 And I'm not sure -- I'm not sure what we're going to

8 accomplish.

9         But if you have other questions for Mr. Cowan of a

10 different regard --

11         MR. WARNER: Your Honor, are there any additional

12 questions I could ask this witness on the NRV calculation, such

13 as how long he's been doing it, and who he does it for, and

14 where the results go?

15         THE COURT: It seems -- I mean ultimately, sir, I am

16 ruling that I'm not -- I'm not going to consider his valuation.

17 So, I'm not -- I'm not telling you how to try the case, but I

18 don't know what it -- I don't know that it advances the

19 position very much.

20         MR. WARNER: I understand, Your Honor. Just for

21 purposes of the record, I would make an offer of proof that at

22 this point what I would ask Mr. Cowan is questions about how

23 long he's been involved in doing this type of calculation, the

24 NRV calculation, and who he provides these results to, and for

25 what purposes, and who ultimately relies on these, all of which

1  I think would support our position that he is permitted to

2  testify as to the results of an NRV calculation he did in this

3  matter.

4          And I understand the Court's ruling is that the

5  objection to that is sustained.

6          THE COURT:  Yes, sir.

7          MR. WARNER:  Thank you, Your Honor.

8                  DIRECT EXAMINATION CONTINUED

9  BY MR. WARNER:

10 Q   Mr. Cowan, I'm going to change topics entirely.  You heard

11 some testimony earlier from Mr. Reinhart about -- I think it

12 was IFEX.

13 A   Yes.

14 Q   And a relationship that perhaps was ongoing between one of

15 Mr. Reinhart's entities and Mogalanski?

16 A   Yes.

17 Q   Were you in any way involved in -- from the bank's

18 perspective with respect to the relationship between the

19 Autohaus and Mogalanski?

20 A   Yes.  We had a workout loan with Mogalanski, it was an

21 auto dealership called Havertown Mitsubishi.  I think it was

22 RAP, Incorporated.  And we had had a floor plan with that

23 dealership.  Mogalanski owned a majority interest, Reinhart

24 owned a minority interest.  Mogalanski stopped operating the

25 business.  And, as a result, Mr. Reinhart helped close the

1 business.

2 Q    And, in fact, was Susquehanna -- did Susquehanna agree to

3 some type of floor planning of certain vehicles in that

4 instance?

5 A    Yes.  As we got towards the end of the -- I guess the wrap

6 up, there were some Mitsubishis that -- I think it was

7 Mitsubishis -- vehicles that were remaining in Havertown that

8 Reinhart bought and he wanted to move to his Lancaster County

9 location.  And subsequently, the bank increased his -- his

10 floor plan in order to accommodate that purchase.  So, he ended

11 up actually buying the last -- some of the last units off of

12 the Havertown Mitsubishi lot.

13 Q    All right.  Now, at least from your understanding, what

14 was the Mogalanski entity that was involved there?

15 A    That was RAP -- RAP, Incorporated Havertown Mitsubishi,

16 doing business as.

17 Q    All right.  Now, earlier you were present during my cross

18 examination of Mr. Reinhart, correct?

19 A    Yes, um-hum.

20 Q    And you heard me ask him questions about a lawsuit

21 involving IFEX.

22 A    Yes.

23 Q    Was Susquehanna involved at all in financing any type of

24 transaction between Mr. Reinhart's entity and IFEX?

25 A    No.

1  Q     To the best of your knowledge, was Susquehanna involved in

2  any floor planning of IFEX vehicles or vehicles that were owned

3  by IFEX?

4  A     No, not that I know of.

5  Q     Now, are you aware of a claim being made against

6  Susquehanna by IFEX?

7  A     Yes.  Last night, I got a -- from -- from my attorney, I

8  got a letter forwarded to us stating that IFEX is going to try

9  to make a claim against the bank for proceeds that we might

10 have taken that might have been paid to us.

11 Q     All right.  I show you a copy of a document that I'll have

12 marked as --

13        MR. CHERNICOFF:  Your Honor, I'm going to object.

14 I'm at a loss as to how this is relevant.

15        THE COURT:  Relevancy?  Yes --

16        MR. WARNER:  Well, Your Honor, this may be more

17 relevant to the question we were talking about earlier in terms

18 of the motion for lift stay.  But there are significant issues

19 that have been raised with respect to litigation that we

20 weren't aware of until last night, and it directly affects

21 what's going on in this matter --

22        MR. CHERNICOFF:  Your Honor --

23        MR. WARNER:  -- and a claim of constructive trust

24 against whatever assets we have, which I think goes to both the

25 debtors' ability to finance and run this operation.

1          MR. CHERNICOFF:  Your Honor, first of all, I'd be

2    shocked if there weren't claims against this debtor.  Most

3    debtors have claims against them.

4          Second of all, as Your Honor may be aware,

5    constructive trusts are not looked upon favorably in a

6    bankruptcy situation.

7          This party, IFEX, or whoever they are, can allege all

8    they want.  It's just one more claim against the debtor.

9          THE COURT:  But isn't --

10         MR. CHERNICOFF:  And as to whether the bank feels

11   secure or not --

12         THE COURT:  But isn't the question right now about

13   whether or not IFEX has lodged a claim against Susquehanna

14   Bank?  And I'm trying to understand the relevancy of that, Mr.

15   Warner, to the matters that I am hearing here today.

16         MR. WARNER:  Well, Your Honor, the allegation -- and

17   we're still trying to sort it out.  But the allegation is that

18   somehow we floor planned vehicles that are owned by IFEX.  And

19   that we gave money to Mr. Reinhart in return for vehicles that

20   IFEX gave to Mr. Reinhart.

21         So, the three come together basically, and it has to

22   do with -- for all we know, some of the vehicles that are on

23   the floor plan right now which he's claiming will satisfy us.

24   We don't know that because, in fact, there may be a claim that

25   IFEX has.

1       So, the picture isn't nearly as good as Mr. Reinhart
2  suggests it is.

3           MR. CHERNICOFF:  Your Honor --

4           MR. WARNER:  So, in other words, Your Honor, getting
5  to the point of whether they can sell a million dollars worth
6  of vehicles and whether we'll be paid from the floor plan and
7  whether there will be no further out of trust, we don't know
8  any of that because of the claim of IFEX.

9           MR. CHERNICOFF:  Your Honor, that's so speculative, I
10 don't know how this gentleman can even testify whether these
11 vehicles were obtained from IFEX or not.  And whether the
12 vehicles that are -- that the debtor claims that they own and
13 are floor planned for Susquehanna are any of those vehicles.

14          THE COURT:  I tend to agree.  But in the interest of
15 time and fairness, I'm going to overrule the objection.  Let's
16 see how much clarity can be shed in one or two questions.  I
17 think it will be opaque, but --

18          MR. WARNER:  Your Honor, I was just going to have the
19 letter marked as an exhibit to give the basis for the claim
20 that -- information that he reported.

21          THE COURT:  Thank you.

22                          (Pause)

23 BY MR. WARNER:

24 Q   Mr. Cowan, would you identify for the record what I've had
25 marked as Bank Exhibit Number 3?

1 A    Yes, this is the copy of the letter that was sent to me
2 from Mr. Shoop last night.

3            MR. CHERNICOFF:  Your Honor, it's hearsay.  I mean it
4 was sent to Mr. Shoop.  I'll take Mr. Shoop's word that he
5 received it.  But this witness isn't competent to testify about
6 this letter.

7            MR. WARNER:  I was just asking him to identify the
8 letter, and if this was the basis of the information that he
9 just provided.

10           MR. CHERNICOFF:  He didn't receive it, Your Honor.

11           THE COURT:  I don't think it's -- I don't know -- I
12 don't believe it's being offered -- the contents are being
13 offered for the truth of the matter asserted.  I think he's
14 just asking to identify an exhibit.

15           So, I'll overrule the objection.

16 BY MR. WARNER:

17 Q    Mr. Cowan, a few moments ago you were reporting your
18 understanding of certain claims or allegations being made by
19 IFEX.  Is this letter the basis of your information?

20 A    Yes.

21           MR. WARNER:  Thank you.  I have no other questions of
22 this witness, Your Honor.

23           THE COURT:  Any cross?

24           MR. CHERNICOFF:  Give me a second, Your Honor.

25                          CROSS EXAMINATION

1  BY MR. CHERNICOFF:

2  Q    One question in particular.  With respect to the audit,

3  when the floor plan audit in this particular case on September

4  3, 2009 turned up the out of trust -- alleged out of trust

5  amounts, was that reported to you?

6  A    Yes.

7  Q    Okay.  Did you call the debtor -- either of the

8  dealerships about the out of trust at that time?

9  A    No.

10 Q    So, you took no action to say -- to ask them about it.

11 When did you first notify the debtors about the out of trust?

12 A    I don't believe I notified the debtor.  It wasn't -- it

13 wasn't -- at this point in time, it wasn't up to me.  I think

14 Mr. Caffrey notified the debtor.

15 Q    Okay.  So, the bank notified the debtor?

16 A    The bank notified the debtor.

17 Q    Do you know when that occurred?

18 A    No.

19 Q    Okay.

20          MR. CHERNICOFF:  Nothing further, Your Honor.

21          MR. WARNER:  I have nothing further of this witness,

22 Your Honor.

23          THE COURT:  You may step down, sir.  Thank you.

24                         (Pause)

25          MR. WARNER:  Your Honor, we have no other witnesses.

1  But we would move for the admission of the bank exhibits.

2         MR. CHERNICOFF:  I have a question.  Is Bank Number 3

3  an exhibit?

4         MR. WARNER:  We've offered it for purposes of the

5  notice that Mr. Cowan has --

6         MR. CHERNICOFF:  I'd object --

7         MR. WARNER:  -- testified to.

8         MR. CHERNICOFF:  I'd object to that on the fact that

9  it was not authenticated by the witness.  He's not qualified to

10  do so, and it's hearsay.

11         THE COURT:  I'll admit Bank's 1 and 2, and I'll

12  sustain the objection to Bank 3 on hearsay grounds.

13         I don't know if there's any need for argument in this

14  matter.  Does the bank wish to make any closing remarks?

15                        (Pause)

16         MR. WARNER:  Your Honor, just a few points we'll

17  make.  Your Honor, this debtor has asked that basically that

18  bank money be used to keep his operation going for the next 30

19  days.  And I believe the evidence has established that he --

20  this particular individual, Mr. Reinhart, doesn't have any idea

21  what happened over the last 30 days.  And while he talks about

22  things he's going to accomplish, I think the history is a great

23  prologue of what to look forward to, and I don't believe that

24  there's any reasonable basis for believing that the bank can be

25  secured under these facts and circumstances given what's

1  happened.  We demonstrated the significant trend from September

2  3rd through September 28th, and a portion of that being after

3  the filing of the bankruptcy that even more vehicles

4  disappeared that we had under floor plan and we didn't get paid

5  for and -- to the tune of something in excess of $1.7 million

6  had disappeared.

7        With respect to the budget, that budget to succeed

8  doesn't require $100,000.  It requires some significantly

9  greater figure for sales.  It -- Mr. Reinhart doesn't

10 necessarily agree that he's got a 10 percent.  But whatever it

11 is, it's something greater than that.  A half million, a

12 million dollars worth of car sales that have to happen for this

13 to proceed.  And I don't think that's very realistic given the

14 economy.

15       That leads to the -- sort of our next step in terms

16 of the mortgage and the real estate there.  I mean Mr. Reinhart

17 himself agreed that some of the appraisals, for example, the

18 Louise Drive, Mechanicsburg appraisal of 250, the best he's

19 gotten is $150,000 offer.  These appraisals are appraisals,

20 they're opinion,  but they don't reflect what necessarily these

21 pieces of property could be sold for today in terms of

22 protecting the bank.

23       So, while they suggest that there's $10 million of

24 equity to protect the bank, I don't think that's realistic at

25 all given the reality of this market, given the reality of this

<br>

1  situation.  And several of these properties he's had for sale

2  and hasn't been able to move them for years.  So, these really

3  don't provide adequate protection for the bank.

4          Finally getting back to this issue of really what Mr.

5  Reinhart is able to do, we had the stipulation last week where

6  he was going to provide the accounting and he couldn't do it.

7  It's too big to do -- it was too big to do in a week, and I

8  don't know that 20 days is enough in terms of how do you find

9  $1.7 million that has just vanished.  I don't think that very

10 realistic.  I don't think there's security coming to the bank.

11         The debtor has the burden under Section 363 of the

12 Bankruptcy Code, and I don't believe that the debtor has met

13 that burden.

14         THE COURT:  Mr. Chernicoff?

15         MR. CHERNICOFF:  Thank you, Your Honor.  I will

16 attempt to be brief because the hour is late.  Thank you for

17 indulging us.

18         There's no doubt, Your Honor, that something's awry

19 with these debtors.  That's why they're debtors, most debtors

20 have problems.  This debtor has obviously had some accounting

21 issues.  This debtor desperately wants to find out -- the

22 principal of the debtor desperately wants to find out what the

23 problem is.  There's a lot at stake for himself and for his

24 businesses.  These are family businesses and he wants to

25 continue to operate.

1    That said, he bit off more than he -- he thought he

2 could by a week -- getting his explanation, he now has a better

3 picture of it.  He's going to do everything possible with the

4 outside accountants to find the mistakes.

5    The testimony unrefuted and, in fact, concurred in,

6 to a certain extent, as to the vehicles is there's a million

7 two in vehicles at these dealerships.  There's $140,000 sitting

8 in an escrow account, which may be for the benefit of the bank.

9 There's $10 million plus of real estate.

10    Even if we're worth 20 percent less and, therefore,

11 is worth only $8 million, or 30 percent and only worth $7

12 million, that all totals in excess of $8 million.  This bank is

13 owed approximately $3 million.  They have more than enough

14 collateral.  They may not like the collateral, that's the

15 benefit of the deal that they have made.  That's the collateral

16 that they chose to take when they took the loans, when they

17 made the loans.

18    As to whether or not he can produce and sustain this

19 business over the next period of time while we attempt to

20 reorganize and while the debtor attempts to find out where the

21 money went, there have been safeguards put into place.  When a

22 vehicle's sold, the sale -- the money has to go into the

23 account.  We've asked the bank to set up that account for the

24 debtors.  That money is going to go in, the debtor knows he has

25 to do that, he's not going to violate a Court order, if that's

TRANSCRIPTS PLUS, INC.
PHONE 215-862-1115 • FAX 215-862-6639 • E-MAIL CourtTranscripts@aol.com

1  what Your Honor continues to order.

2      There is certainly more than adequate safeguards in

3  effect subsequent to the October 2 entry of the order approving

4  the stipulation.

5      As to whether he can do enough sales to generate the

6  monies he needs to operate, his testimony was he can do it.

7  There's nothing to refute that, just as there's nothing to

8  refute the valuations that -- of the real estate and shows

9  adequate protection.

10      We believe most importantly with respect to Autohaus

11  Acquisition is a pending sale.  That's the best way to realize

12  value from this debtor.  As to where those funds go, we don't

13  know yet because that may be an issue to determine another day

14  as to the collateral position of the bank.  But that's

15  certainly a real sale.

16      Sales of auto dealerships are difficult in these

17  days, we will -- I'll concede that.  I'm involved with several

18  other dealerships.  But this is a good sale and it's a viable

19  buyer, and it's the best way to get a buyer.  And the best way

20  to get that buyer closed on this is to continue Autohaus in

21  operation at a minimal amount of cash needed.  The best way to

22  continue Autohaus also is because the only real employees, the

23  only real cash flow that's going to occur is through Three

24  Arrows.  So, the Three Arrows employees are going to do the

25  minimum amount of work needed to keep Autohaus going.  All of

1  that is going to be tied together.

2      We believe we've met our burden.  We believe that

3  this debtor has a chance to reorganize.  He's been in the car

4  business for 38 years, I believe he said, 20 years as an owner.

5  Knows the business, and is somehow surviving in the times that

6  we all know what happened with General Motors and Chrysler.

7  And we think that he should be permitted to use cash

8  collateral, at least on an interim basis.

9      THE COURT:  Very well.  I'm going to adjourn for

10  about 10 minutes.  When we come back and see where we're going

11  from there.

12      MR. CHERNICOFF:  Thank you, Your Honor.

13      MR. WARNER:  Thank you, Your Honor.

14          (Recess 4:39 P.M./Reconvene 4:50 P.M.)

15      THE COURT:  Please be seated.  This afternoon I've

16  been asked to consider two matters on an interim or a

17  preliminary basis: the motions of the two debtors, Autohaus and

18  Three Arrows, for use of cash collateral and the motion for

19  relief from stay by Susquehanna Bank.

20      First I want to appreciate counsel presenting

21  testimony on a very shortened basis.  And I know the -- I know

22  the -- I know the travise (phonetic) that can involve.  No

23  court ever has a perfect record, but I do understand that it is

24  difficult when these matters come up so rapidly.

25      At the first telephone conference, I think the --

1  it's fair to say the Court did engage in some arm twisting or

2  suggesting that generally it may be customary that parties

3  attempt to work out stipulated budgets in cash collateral

4  matters.  But I understand my role at some point is that I must

5  decide matters when the parties are unable to arrive at

6  mutually agreeable terms.

7         I listened with interest to the debtors' case, and it

8  was largely based upon the testimony of the principal, Mr.

9  Reinhart.  I found the witness generally to be -- I would say

10 forthcoming, I believe earnest.

11        I have to say, and I'll be somewhat critical, that I

12 think he was less informed about his businesses than the Court

13 would have wished.  Inability to indicate whether -- to -- I

14 think he had a -- he generally would agree with the proposition

15 that the dealership was out of trust, but was unable to

16 identify any figures, unable to estimate, as I recall, the

17 gross profit from the dealerships in the calendar year, 2008, I

18 think was inquired of.  And gives the Court some concern about

19 the debtors' abilities to comply with the many complex

20 requirements of Chapter 11 reorganizations.  Those are just a

21 general "by the way" comments.

22        I think it's important to say that in both -- all

23 three of the matters that I'm deciding, these are interim and

24 preliminary decisions.  None of them are going to have res

25 judicata effect for subsequent actions in this case.  And so I

1 guess -- I think it's important that when I give these

2 observations about witnesses or the parties in the case, that

3 they are done only in the context of very preliminary interim

4 decisions.

5         The -- I was concerned that Mr. Reinhart was unable

6 to indicate the present cash positions of either of the

7 debtors.  I am -- as a bankruptcy judge, I am always concerned

8 when I hear that a debtor appears to have employed

9 professionals, and those applications of employment have not

10 been filed with the Court.

11         MR. CHERNICOFF:  They have been, Your Honor, or they

12 are in process.

13         THE COURT:  And I was referring, I think, to -- poor

14 memory -- there was an accountant named Mr. Gibbs, and another

15 attorney perhaps Mattioli (sic/phonetic) or a similar name.

16 And they're not -- the lack of those applications being on the

17 docket is not pivotal to the Court's decision today.  I just am

18 one who -- I feel a duty to mention noncompliance if I think

19 it's significant in a case when I see it.  And so that's --

20 that was the only purpose of those remarks.

21         So, addressing the issue of the debtors' motions for

22 use of cash collateral, Section 363 places the burden of -- to

23 show adequate protection squarely on the debtors in these

24 cases.

25         I appreciate that, as I said earlier at the

1  preliminary stage, I may authorize the use of cash collateral

2  only if there is a reasonable likelihood that the trustee --

3  and we should -- we would read it debtor in a Chapter 11

4  context "will prevail at the final hearing under Subsection E

5  of this section."

6         361 of the Bankruptcy Code provides some examples of

7  adequate protection, including providing to such entity an

8  additional or replacement lien to the extent that such stay,

9  use, sale, lease, or grant results in a decrease in the value

10  of such entities' interest in such property.

11         Another example of adequate protection, as you know,

12  gentlemen, is making periodic cash payments or granting a lien

13  on other property.

14         I -- some evidence was -- evidence was introduced by

15  way of a personal financial statement for Mr. Reinhart, which

16  included certain real estate values.  And Mr. Reinhart

17  testified largely that the -- my recollection is that most of

18  the ascribed values were based upon appraisals, but then he had

19  made adjustments based upon his understanding as an owner of

20  market condition.

21         The one part of the record that leaves the Court

22  somewhat scratching its head is I never -- I don't have any

23  documents or indication that the Reinharts are personal

24  guarantors of the Susquehanna loans.  I'm sort of inferring

25  from the fact that I guess it is uncontested that Susquehanna

1 has -- and the term "blanket mortgages" was used on these
2 properties.  But it is difficult for me to make any definitive
3 finding with respect to whether or not there is a sufficient
4 equity cushion in the real estate, that that would provide
5 adequate protection to Susquehanna with respect to the relief
6 from stay.

7       It is difficult, I guess, to do this from the bench
8 in that I think we all understand that I'm looking at -- I'm
9 looking a different burdens.  I would say stiffer burdens that
10 the debtors have with respect to authority to use cash
11 collateral, which is a deviation from the status quo.  It's
12 giving the debtor some permission to use what is very fungible
13 collateral, typically a cash or cash equivalent versus the
14 debtor, yes, has the burden on adequate protection to stop a
15 motion for relief from stay.  But in my mind, in the relief
16 from stay context, it is the creditor who is asking for a
17 change in status quo.  Let's take back our collateral from the
18 debtor and realize upon that collateral ultimately.

19       So, I -- at the end of the day, I guess I wrestled
20 with myself.  What adequate protection, what assurances of
21 adequate protection have Three Arrows and Autohaus offered to
22 the bank -- the Susquehanna Bank with respect to use of cash
23 collateral.  And I didn't -- I didn't sense an actual -- I
24 didn't hear an actual proposal, an actual plan Mr. Reinhart's
25 agreeing to pay so much a month, or Mr. Reinhart is offering

138

1 additional liens on other unencumbered real estate, or we're

2 going to offer the guarantee of some third party. I did not --

3 I do not find, at least, again, without res judicata effect, at

4 this preliminary stage, I do not find that the debtor has

5 offered adequate protection to Susquehanna Bank with respect to

6 the use of cash collateral.

7      In the Autohaus matter, it does seem to the Court

8 that the operations there are so minimal there that -- I think

9 there was testimony that there is one salesman who sits at the

10 door or -- I don't want to say housekeeps, but does not appear

11 to be engaging in any significant activities. I appreciate

12 that the debtor has the hope or the plan to sell that and the

13 Court appreciates that there is the extended agreement of sale

14 for the assets to the Saturn dealership. But I do not find

15 that Autohaus has provided, at this stage, has offered adequate

16 protection to Susquehanna Bank with respect to the use of cash

17 collateral.

18      The situation of Three Arrows, the difficulty -- one

19 of the difficulties for the Court in this case, and I mentioned

20 this in our original telephone conference, is that there are no

21 schedules filed in the cases. And it is -- and I appreciate

22 the cases are jointly administered. And as we know, that means

23 that -- not that the cases have been substantively

24 consolidated. There are still two separate debtors, two

25 separate estates. But for administrative purposes, certain

1 notices can be sent out jointly, and they -- they are -- they

2 share docketing for certain administrative purposes.

3        But the difficulty for the Court is it's hard to

4 separate the operations of Three Arrows and Autohaus.  I

5 suppose it is the -- it arises from nothing more than, I guess,

6 the operations.  And the Court would never penalize Mr.

7 Reinhart for having the get up and go to operate multiple

8 entities, but it does confuse the landscape a bit for my

9 findings.

10        I do think in the end that it would be inconsistent

11 for me to find that Autohaus had not offered adequate

12 protection, but somehow Three Arrows has.  So, I do find that,

13 again, at this preliminary stage with respect to the use of

14 cash collateral that Three Arrows has not met its burden of

15 adequate protection with respect to the use of cash collateral.

16        There's a case -- an older case, Bankruptcy Court,

17 Eastern District of Pennsylvania, In Re: Grant Broadcasting,

18 Inc. reported at 75 B.R. 819.  And the judge in that case was

19 trying to differentiate the burdens that a debtor has.  As I

20 said earlier in obtaining authority to use cash collateral

21 versus defending against the movant's motion for relief from

22 stay.  And the Court noted that our conclusion that the burden

23 on the debtor is stiffer on a 363 motion than it is in

24 withstanding the motion of a creditor on a 362 motion.

25        Turning to Susquehanna's motions for relief from

1  stay.  And, again, at a preliminary stage, without res judicata

2  effect, initially 362(g) says "Initially the movant has the

3  burden of proof on equity in the debtor's property."

4          And then it goes on to say "The debtor has the burden

5  of proof on all other issues."

6          I do not find that the movant, Susquehanna Bank, at

7  the preliminary stage has met is burden with respect to relief

8  from stay.

9          I did not -- I did not hear evidence -- significant

10 evidence to me -- sufficient evidence to establish the lack of

11 equity.  I -- as far as did the debtor meet its burden on the

12 motions for relief from stay on adequate protection, close

13 question in the Court's mind.  But there was -- there was

14 significant evidence of values in the real estate which an

15 owner testified to.  I think it's important from -- for what it

16 is worth that the Court is faced with a non-expert owner

17 testifying as to opinions of value.  A non-accountant putting

18 together a budget.

19         Actually the bank's case, though, as well.  No

20 appraisal, no evidence -- no appraiser testimony was offered.

21 No independent accountants.  I do appreciate that it is done --

22 these are quick hearings, as I said at the outset, they're done

23 on a preliminary basis.  But it is -- I think to the extent one

24 is trying to meet significant burdens, it is always helpful if

25 we -- if the Court has some -- it doesn't always have to be

1 expert testimony, but it is -- I think it is helpful

2 particularly in business reorganization cases.  So, again, I

3 offer it as an observation along the way.

4          I will -- and so I will enter orders.  I have to

5 travel back to Wilkes-Barre this evening.  So, I will be candid

6 that I don't believe they're going to be docketed until

7 tomorrow.  I think -- I believe I stated it that I will be

8 continuing the automatic stay in effect until the final

9 hearings on the motions for relief from automatic stay.  But I

10 am denying the debtors' interim use of cash collateral.

11          In each instance, of course, it is -- these are open

12 questions for the final hearings.  And those -- unless the

13 parties can come to some sort of a resolution amongst

14 themselves before the final hearings, I'll decide these issues

15 anew at the time of the final hearings based upon the evidence

16 presented at that time.

17          I wish you all a good evening.

18          MULTIPLE SPEAKERS:  Thank you, Your Honor.

19      (Whereupon, at 5:07 P.M., the hearing was adjourned.)

20                    <u>CERTIFICATE</u>

21    I certify that the foregoing is a correct transcript from

22 the electronic sound recording of the proceedings in the

23 above-entitled matter.

24  _/s/ _Karen Hartmann____ AAERT CET**D0475 Date:  December 14, 2009

25 TRANSCRIPTS PLUS, INC.

**$**

**$1,240,000-** 26:25
**$1,440,000-** 35:17
**$1,510,145.34-** 25:21
**$1,514,000-** 101:4
**$1,514,257.03-** 101:5
**$1,720,462.03-** 102:2
**$1,768,375.03-** 98:9
**$1,780,360.03-** 102:14
**$1.5-** 62:2
**$1.7-** 130:5 131:9
**$10-** 37:21 130:23 132:9
**$100,000-** 18:16 22:12 45:3,5,15,24 73:9,15,18 74:14 130:8
**$110,000-** 72:11
**$123,628-** 44:24
**$124,000-** 23:24
**$13,599,000-** 27:15
**$140,000-** 48:11 132:7
**$143,045-** 99:13
**$150,000-** 40:2 68:13 130:19
**$167,085.63-** 96:11
**$19,000-** 30:12
**$2-** 33:13
**$2,100,000-** 39:14
**$2,622,893-** 33:24
**$2,900,000-** 40:16
**$200,000-** 102:6
**$233,000-** 32:16
**$243,000-** 60:25
**$243,735-** 25:11 60:6 105:25
**$250,000-** 54:22 68:8
**$3-** 132:13
**$3,000-** 18:19 73:22 74:4,5
**$3,500-** 49:1 71:1
**$3,500,000-** 38:12 39:3,5

**$30,000-** 73:22
**$4,400,000-** 31:15
**$4.3-** 68:21
**$400,000-** 32:6
**$411,880-** 100:2
**$430,375-** 99:15
**$453,000-** 63:2
**$453,434-** 62:19
**$453,434.78-** 25:19
**$5,000-** 72:22
**$500-** 72:22 73:23
**$555,000-** 62:7
**$555,608-** 61:8,17,21 104:24
**$558,608-** 25:14
**$573,420.63-** 99:17
**$6,900,000-** 33:20
**$600,000-** 48:21
**$603,275-** 60:11 106:11
**$603,275.78-** 105:25
**$620,000-** 58:17 63:2
**$620,520.41-** 105:15
**$656,264.40-** 95:24
**$695-** 80:2
**$7-** 132:11
**$700,000-** 48:20
**$73,996-** 42:6
**$8-** 132:11,12
**$8,000-** 27:21 46:22 48:25 79:22
**$8,400-** 46:17
**$899,999-** 60:21
**$899,999.40-** 104:13
**$900-** 46:17
**$900,000-** 39:18
**$909,097-** 97:14
**$985,000-** 109:16
**$999,000-** 61:1

**'**

**'07-** 40:25
**'08-** 23:25
**'09-** 68:17 99:10 101:3 108:18

**/**

**/S/-** 142:24

**1**

**1-** 13:12,19 14:19 51:3,7 52:12 59:25 60:1 61:5 95:14 129:11
**1,500,000-** 61:12 105:3
**1,574,000-** 29:13
**1,800,000-** 35:10
**1,980-** 36:24
**1.5-** 36:1 61:20 69:23
**1.7-** 106:3
**10-** 39:14 59:6 73:3,17 82:6 100:23 130:10 134:10
**10,000-** 18:18
**10/16-** 41:14
**10/30/2009-** 41:14
**100,000-** 49:12
**10TH-** 109:17
**11-** 85:10 135:20 137:3
**110,000-** 45:1 49:12
**12/31/08-** 22:7
**123,000-** 72:9
**124,000-** 24:2,3
**12-MONTH-** 24:3
**13-** 18:18 39:16
**13.9-** 32:20,22 68:19
**14-** 142:24
**14,000-** 71:6,7
**140,000-** 47:17
**14TH-** 94:18 100:9 101:3,8 102:4
**15-** 100:23 108:2,6,8
**16-** 5:10 75:12
**167-** 100:12
**167,058.63-** 97:9
**16TH-** 6:24 74:22,25 75:2,6 101:18
**18-** 58:2,9
**18TH-** 101:13
**19TH-** 29:4 33:19 34:20 80:20
**1ST-** 28:16

**2**

**2-** 13:16 14:12 51:20 57:21 60:9

61:5 72:8 76:14 104:22 108:15 129:11 133:3
**2,271,000-** 34:25
**2,475,000-** 36:6
**20-** 23:21 70:13 79:18 80:24 100:23 119:21 131:8 132:10 134:4
**200-** 56:12
**2003-** 83:8
**2006-** 86:10,12
**2007-** 84:4 86:6,15
**2008-** 5:2,12 6:25 29:4 33:19 34:20 72:25 84:4 87:2 135:17
**2009-** 5:8,16 7:1,2 14:6,10 28:17 55:7 74:23,25 75:3,6,13 80:20 101:13 106:23 107:7 109:4 110:23 128:4 142:24
**20TH-** 110:24,25
**22-** 5:16 7:1,2 36:14 86:17
**22,500,000-** 37:9
**243,735-** 60:17 104:8 106:10
**250-** 130:18
**250,000-** 30:9 36:22
**27-** 18:13
**27TH-** 86:10,12
**28,000-** 71:7
**28TH-** 94:18 101:14,15,16 102:1,5 130:2
**296,000-** 36:6
**29TH-** 14:6 94:19
**2:30-** 109:23
**2ND-** 5:11 111:3

**3**

**3-** 14:7 24:20 57:17,21 59:24 99:10 101:7 103:9 104:7 108:18 109:15 126:25 128:4 129:2,12
**3,500-** 71:4

**3,700,000-** 29:5
**3.1-** 51:23
**3.1.1-** 51:24
**3.1.2-** 76:21
**3.9-** 36:3
69:21,23
**30-** 41:17 42:1
45:20 70:19 71:6
72:11 74:13
129:18,21 132:11
**30DAY-** 46:11 72:9
74:8
**30TH-** 14:16
**31ST-** 14:10
**33-** 74:7,10,12,13
**36-** 19:6 59:3
**361-** 137:6
**362-** 140:24
**362G-** 141:2
**363-** 9:6 131:11
136:22 140:23
**38-** 23:19 134:4
**3:09-** 82:9
**3:20-** 82:7
**3:26-** 82:9
**3RD-** 94:17 130:2

**4**
**4-** 6:17 28:3,4
68:3 80:16 85:9
86:24 113:24
114:9 115:14,23
**4/16/08-** 6:22
**40-** 70:6
**4150-** 12:19
**448-** 35:19
**450-** 28:20 35:8
**450,000-** 14:20
**453-** 26:1
**453,434.78-**
105:10
**4902-** 29:6,15,22
40:1 68:6
**4:39-** 134:14
**4:50-** 134:14

**5**
**5-** 6:23 41:6,9
65:14,22 70:15,17
**5,000-** 46:21
**50-** 15:3
**50,000-** 49:15
**500,000-** 48:6,8,9
**501-** 48:10
**5018-** 34:4 69:11

**502,000-** 48:10
**515-** 12:5 15:23
18:7 29:3,16
30:16 86:24
**547-** 7:4 9:14
**555,000-** 25:15
**555,608-** 25:25
**5:07-** 142:19

**6**
**6-** 46:4,5,9
51:3,7
**6.45-** 30:24
**60-** 16:14 22:23
**60,000-** 15:7
**603,000-** 26:8
**610,000-** 62:24
**6475-** 30:24
40:6,25 86:8
**6625-** 31:21 40:6
**6629-** 32:11,20
40:6 86:24
**6924-** 35:22
**694,000-** 68:20
**6TH-** 111:3

**7**
**7-** 9:24 52:16
102:8
**7.1-** 52:18
**7.1.1-** 52:23
53:12
**7.1.5-** 53:23 57:4
**7.1.7-** 54:6
**7.1.9-** 52:23
**70,000-** 23:6
**700,000-** 23:10
**702-** 35:20
**75-** 16:14 140:18
**7TH-** 99:8 110:23
111:1

**8**
**8-** 5:10
**8,000-** 49:1 80:2
**819-** 140:18
**899-** 61:1

**9**
**9-** 5:11 103:15
**9/03/09-** 99:9
**9/14-** 100:15
**9/3-** 100:14
**900,000-** 41:1
**95-** 23:3
**950,000-** 62:10

**985-** 101:11

**A**
**A&—** 84:5
**ABILITIES-** 135:19
**ABILITY-** 69:16
93:5 124:25
**ABLE-** 6:11 60:5
62:19 78:25 79:16
105:13 117:10
118:4 131:2,5
**ABOVE-** 40:11 42:9
**ABSENT-** 8:12,13
**ABSOLUTELY-** 50:25
**ABUNDANCE-** 6:4,7
**ACCOMMODATE-**
123:10
**ACCOMPLISH-** 56:8
121:8 129:22
**ACCORD-** 63:16
**ACCORDING-** 27:18
**ACCOUNT-** 19:23
54:23 75:20,21,23
79:18 111:9
113:7,9,14,21
116:24 117:2
118:9 132:8,23
**ACCOUNTANT-**
21:13,15 23:24
43:11 71:11
79:12,13 80:11
81:14 136:14
**ACCOUNTANTS-**
44:25 132:4
141:21
**ACCOUNTING-**
65:16,22
66:16,19,24
71:22,24 79:9
131:6,20
**ACCURATE-**
28:8,10,25
**ACHIEVE-** 83:7
**ACKNOWLEDGE-** 7:25
**ACQUAINTED-** 16:17
**ACQUIRED-** 53:24
**ACQUISITION-** 3:11
5:1,15 7:13 8:16
11:9
12:10,12,15,20
13:4,22 14:3,15
15:13,17 22:5
24:22 38:1,3
46:11 57:18,24
58:14 61:5,11,24
62:17,23 104:22

105:9 133:11
**ACRE-** 32:3 40:25
68:20 69:8 70:7
**ACRES-** 30:24
32:20,22 33:17
68:19,20 70:6
**ACROSS-** 31:5 33:1
**ACT-** 81:13,17
**ACTION-** 9:14 10:6
55:12 64:15
128:10
**ACTIONS-** 54:3
135:25
**ACTIVITIES-**
139:11
**ACTUAL-** 58:13
106:10 107:16
138:23,24
**ACURA-** 33:1,2
**ADAMS-** 112:21
**ADD-** 25:22,25
**ADDED-** 63:7
102:11
**ADDITION-** 18:20
**ADDITIONAL-**
5:20,21 27:3,10
98:11 110:25
111:7,11 121:11
137:8 139:1
**ADDRESS-** 11:7
91:18
**ADDRESSING-**
136:21
**ADEQUATE-** 8:4
11:2,9 88:11,13
131:3 133:2,9
136:23 137:7,11
138:5,14,20,21
139:5,15
140:11,15 141:12
**ADJOURN-** 82:6
134:9
**ADJOURNED-** 142:19
**ADJUST-** 114:7
**ADJUSTMENT-**
102:12
**ADJUSTMENTS-**
137:19
**ADMINISTERED-**
139:22
**ADMINISTRATIVE-**
139:25 140:2
**ADMISSION-** 51:3
129:1
**ADMIT-** 129:11
**ADMITTED-** 51:7

ADP- 79:21
ADVANCED- 94:4
109:7,9
ADVANCES- 121:18
ADVERSARY- 9:16
10:6
ADVERTISING-
42:8,9,18 43:2
AFFECTING- 77:6
AFFECTS- 124:20
AFTERNOON-
3:1,7,10,14
11:19,24 65:14,22
82:16,21 85:8
86:3 109:22 112:6
134:15
AGAINST- 53:24
54:7,8,11,24
55:2,5,12 56:19
57:7 124:5,9,24
125:2,3,8,13
140:21
AGREE- 39:11,20
52:18 59:20 63:5
70:8 79:9 123:2
126:14 130:10
135:14
AGREEABLE- 91:3
135:6
AGREED- 55:25
78:22 80:5 130:17
AGREEING- 138:25
AGREEMENT- 3:24
6:22
14:5,9,14,16,18,2
4
13:5,12,15,21,24
16:11 33:16 40:20
51:21 52:12
57:5,6 59:22
68:17,18 76:15
96:21 103:5
139:13
AGREEMENTS- 97:2
AGREES- 104:17
105:19
AHEAD- 10:9 52:19
ALAMO- 84:6
ALERTED- 113:13
ALLEGATION-
125:16,17
ALLEGATIONS-
55:12,14 67:6,14
127:18
ALLEGE- 125:7
ALLEGED- 21:22

79:10 128:4
ALLOW- 10:25
53:18 118:19
ALLOWS- 48:24
AMENDMENT- 13:15
14:14 51:20 76:14
AMERICA- 14:1
AMONG- 85:8 91:19
AMONGST- 142:13
AMOUNT- 19:23
21:8,23 23:4,8
24:8 37:22,25
39:2,11,13 44:23
45:10 58:10,14,17
61:15 63:7,20
64:2,6,10 78:11
86:21 95:19,24
97:23 98:25 101:9
104:11
105:13,16,17
133:21,25
AMOUNT/- 25:10
AMOUNTS- 50:7
78:16 110:25
111:12 128:5
ANALYSES- 88:24
89:3
ANALYSIS- 28:15
88:18,20 89:6
90:18 103:24
114:20 115:11
120:7
AND/OR- 89:12
113:2
ANDREW- 43:11
55:8 77:20
ANEW- 142:15
ANSWER- 44:10
75:14 110:14
ANSWERED- 59:14
ANSWERING- 53:7
ANSWERS- 53:3
ANTICIPATE- 16:24
45:23 58:5
ANTICIPATED-
48:19 80:21
ANTICIPATING-
57:11
ANYMORE- 47:4
ANYWAY- 6:4
ANYWHERE- 91:6
APOLOGIZE- 4:1,3
5:5 61:23 62:14
APPARENT- 94:13
100:3 101:6
APPARENTLY- 98:5

APPEAR- 21:11
139:10
APPEARANCE- 3:9
APPEARS- 136:8
APPLICABLE-
102:21
APPLICATION-
42:20
APPLICATIONS-
54:20 136:9,16
APPRAISAL- 29:3
34:18 35:11 37:1
70:1,3
86:7,10,15,19,20
115:4 118:10,11
119:8 120:9,17
121:4 130:18
141:20
APPRAISALS- 28:10
80:19 86:3
87:2,5,12,14,19
89:17 116:15,23
119:1,18
130:17,19 137:18
APPRAISED- 31:14
33:19 35:10
36:3,24 40:3
69:19
APPRAISER-
119:6,12 141:20
APPRAISER'S-
120:10
APPRECIATE- 4:21
62:11 72:24 91:5
134:20 136:25
139:11,21 141:21
APPRECIATES-
139:13
APPRECIATING-
75:15
APPROACH- 13:8
24:16 27:24 41:3
70:5
APPROPRIATE-
121:5
APPROPRIATELY-
102:24
APPROVAL- 14:17
52:6,24 53:9
APPROVE- 16:12
APPROVED- 16:25
17:5,6,16,19
81:13,17 84:18
APPROVING- 133:3
APPROXIMATELY-
5:2 12:21 14:8

16:22 18:3 19:5
20:21 23:6 25:23
29:12,13 31:14
32:16 33:17,24
34:19 35:12 37:11
40:23 45:1 46:22
47:17 48:20 68:16
79:22 84:2 85:1
102:6 132:13
APRIL- 5:2,10
6:24
AREA- 31:8 34:7
117:21
AREAS- 3:24
AREN'T- 45:17
ARGUE- 108:10
ARGUMENT- 129:13
ARISES- 140:5
ARM- 135:1
ARRANGEMENTS-
96:21
ARRIVE- 135:5
ARROWS- 3:12
7:14,15,17 12:5,7
17:23,25
18:2,8,11,23
19:14 21:8 22:4
23:11 24:21
25:7,9 26:12,13
27:2,4,20 29:19
37:23 39:18
41:12,20 42:25
49:23,24,25
50:2,19
60:3,16,17,18
65:15,21 67:2
70:22 75:2,12,25
76:
ASCRIBED- 137:18
ASSERT- 10:9
ASSERTED- 127:13
ASSET-
13:11,15,21 14:14
51:20 52:12
ASSETS- 13:4
14:1,19,25 15:3
53:24 57:7,11
76:25 77:6,15
112:18,24 114:21
115:3,11,22
116:14 117:3,4,17
124:24 139:14
ASSIGNED- 43:21
ASSIST- 42:24,25
ASSOCIATE- 83:25
ASSUME- 111:24

**ASSUMED-** 9:19
**ASSUMES-** 53:11
**ASSUMING-** 49:8
111:11
**ASSURANCES-**
138:20
**ATTACH-** 4:25
**ATTACHED-** 39:12
**ATTAINABLE-** 89:9
90:1
**ATTEMPT-** 7:2
131:16 132:19
135:3
**ATTEMPTING-** 39:23
**ATTEMPTS-** 132:20
**ATTENTION-** 70:14
72:8 99:4 103:6
115:14
**ATTORNEY-**
43:10,11 53:22
54:5 72:10 81:17
124:7 136:15
**ATTORNEYS-** 44:25
48:12
**AUCTION-** 18:25
**AUCTIONEER-**
107:12
**AUDI-** 33:1,14
**AUDIS-** 23:1
**AUDIT-** 63:21
99:9,12,24
101:3,7,8,13,16,2
1,25
100:7,8,14,17
107:17,21 108:18
109:4,5,11
110:5,9,18,21,23
111:4,5 113:13
128:2,3
**AUDITED-** 99:11
**AUDITORS-** 113:16
**AUDITS-** 63:17
94:16,21 95:16
103:1 106:21
108:1,11
**AUGUST-** 86:10,11
**AUTHENTICATED-**
129:9
**AUTHORITY-**
8:12,14 9:11,21
10:21 138:10
140:20
**AUTHORIZE-** 10:23
137:1
**AUTO-** 18:25 42:18
80:1,3 122:21

133:16
**AUTOHAUS-** 3:11
5:1,15,23 7:13
8:16 10:15 11:9
12:10,12,15,20,25
13:4,21 14:2,15
15:13,17 22:4,17
23:23 24:21
25:7,17,23,25
26:1 38:1,3,23
39:2,5 46:11,23
47:7 49:20 50:12
55:3,6,9,12,15,16
,18
52:19 54:8,11,25
5
**AUTOMATIC-**
92:11,14,18,23
142:8,9
**AUTOMOBILE-** 23:17
**AUTOMOBILES-**
57:15,16
**AUTOS-** 57:14
98:16
**AVERAGE-** 23:4
72:25 74:4
**AVERS-** 7:2
**AWARE-** 21:22 22:1
54:11,14 55:2,4
56:14,18 63:12,20
64:14,18
65:4,8,13 67:6
81:4 88:9,24
101:17 105:1
111:15 124:5,20
125:4
**AWARENESS-** 67:14
**AWRY-** 131:18

---
B
---
**BACK-** 16:1
29:2,16 30:16
51:19 52:11 57:4
58:20 59:1 60:16
67:5 91:19 99:18
106:25 110:3
131:4 134:10
138:17 142:5
**BACKED-** 68:24
**BACKHANDED-**
116:14
**BACKWARDS-** 22:12
**BALANCES-**
28:11,12,13 37:10
**BALLPARK-** 26:3
38:11 88:1

**BANK-** 3:15,16
4:6,16,23 5:15,19
6:5,19,25
7:8,19,24 10:14
19:18,22
20:14,22,23 21:19
23:8 24:7 29:4
30:1,15,17
31:14,16 32:14
34:18,21
35:1,14,19 36:5,7
37:18,23 38:1,4
39:12 42:12 43:22
44:4,5,9
45:6,8,10
**BANK'S-** 5:10
11:3,4 33:25
39:17 84:13 85:2
92:10 93:10,15
112:7 122:17
129:11 141:19
**BANKERS-** 116:10
**BANKING-** 30:2
114:25 116:9
**BANKRUPTCY-** 7:4
48:15,18 65:5
74:22 76:23 82:24
101:17,21 125:6
130:3 131:12
136:7 137:6
140:16
**BANKS-** 96:6
**BARLEY-** 3:15
113:18
**BASE-** 36:23
**BASED-** 37:14
80:18 85:13
117:23 119:24
120:3 135:8
137:18,19 142:15
**BASIC-** 52:12
**BASIN-** 32:23
**BASIS-** 58:18
117:16 126:19
127:8,19 129:24
134:8,17,21
141:23
**BEAR-** 76:17
**BEAT-** 84:5
**BECOME-** 5:6 21:22
22:1 83:22 84:16
105:1 113:1,4
**BEDROOM-** 36:16
**BEGINNING-** 9:19
21:24 52:23 63:21
64:3,7,11

66:17,21
**BELIEVED-** 79:11
**BELIEVES-** 7:1
**BELIEVING-** 129:24
**BELLCO-** 54:16,18
**BELOW-** 32:8
**BENCH-** 138:7
**BENEFIT-** 10:3
132:8,15
**BENZ-** 23:1 32:25
**BERKS-** 112:21
**BETWEEN-** 13:21
19:8 56:20
60:13,25 61:20
63:2 64:20 100:13
101:7 102:4
104:14 105:4,16
110:24,25 111:3
112:21 120:20
122:14,18 123:24
**BIBLE-** 13:2
**BIG-** 120:20 131:7
**BIT-** 49:2 72:13
87:24,25 89:15
91:22 114:2
117:25 132:1
140:8
**BLACK-** 12:5
26:8,12 29:21
49:22 60:3,10
67:11,13 72:18
105:24 106:6
**BLANKET-**
30:13,14,19,21
31:18 33:25 35:1
36:7,10 37:4,18
138:1
**BLANKETED-** 89:11
**BLASS-** 46:14,24
**BLOCK-** 57:23 61:4
62:16 97:12
**BMW-** 33:1
**BMWS-** 23:1
**BOARD-** 17:14
**BOB-** 39:1 44:10
**BOBBY-** 33:1,2
**BOOK-** 15:2
**BOOKKEEPER-** 46:14
**BOOKS-** 22:5 41:24
71:16,23
79:12,19,20
80:1,7 115:9
**BORROW-** 38:20
**BORROWED-**
38:22,23 39:5
45:10 61:20

**BOTH-** 3:11 38:15 84:18 89:22 99:11 100:5 124:24 135:22
**BOTHER-** 33:15
**BOTTOM-** 7:18 60:9 105:23
**BOUGHT-** 30:1 32:10 123:8
**BOWL-** 84:6
**BPC-** 30:4,5 31:11 32:20 47:10 84:23,25
**BR-** 140:18
**BREAK-** 8:12
**BREAKING-** 95:17
**BRIEF-** 131:16
**BRINGS-** 19:11
**BROADCASTING-** 140:17
**BROADVIEW-** 43:24
**BROKE-** 44:21
**BROKER-** 71:14
**BROUGHT-** 54:24 55:16 71:20,22,24 77:19 95:5,7
**BUDGET-** 41:10,25 43:13 45:23 46:11 50:2 70:15,20 72:9 81:21 130:7 141:18
**BUDGETS-** 135:3
**BUILD-** 33:14
**BUILDING-** 30:1 33:14 43:16 47:21
**BURDEN-** 8:2 10:7 11:1,8 131:11,13 134:2 136:22 138:14 140:14,22 141:3,4,7,11
**BURDENS-** 10:14 138:9 140:19 141:24
**BUSINESS-** 12:15,20 18:2,4,8,12 23:17 30:2 45:21 83:11 84:22 122:25 123:1,16 132:19 134:4,5 142:2
**BUSINESSES-** 131:24 135:12
**BUY-** 19:20 42:22 44:22 49:2
**BUYER-** 80:24 107:18 133:19,20

**BUYER'S-** 81:1
**BUYERS'-** 107:25 108:3
**BUYING-** 123:11
**BUYS-** 18:25 44:20 50:1 107:10
**BYPASS-** 10:13

---
C
---
**C'S-** 17:14
**CAFFREY-** 4:16 55:20,23 56:12 77:24,25 82:15,17 83:2 84:10 85:1 88:3,8,24 91:1,3 114:18,19 128:14
**CAFFREY'S-** 113:7
**CALCULATE-** 104:11 106:3
**CALCULATED-** 70:9 104:7,23 105:22
**CALCULATING-** 98:25 120:13
**CALCULATION-** 61:6 98:3,10 105:10,21 115:1,21 116:11 121:12,23,24 122:2
**CALCULATIONS-** 38:9 68:8 99:2 103:16
**CALCULATOR-** 38:7
**CALENDAR-** 72:24 86:15 91:13 135:17
**CALL-** 4:18 11:17 42:22 81:5 82:14 110:3,18,19 114:25 128:7
**CALLED-** 19:14 79:21 98:20 110:4,9 122:21
**CALLING-** 77:8 93:13
**CALLS-** 88:12
**CAN-** 3:24 12:2 13:19 15:22 24:20 25:24 28:4 29:1 38:2 45:3 46:10,25 50:6,9,21,23 51:12 53:4,20,22 72:3,8 73:22,23 76:6,19 81:24 82:4 94:20 100:11 102:23 108:5

113:11 114:23 115:24 116:3 118:7,21 119:11 125
**CAN'T-** 4:1,9 15:20,21 27:20 39:19,20 44:10 75:14
**CANADOCHLY-** 36:14 86:17
**CANCELED-** 68:18
**CANDID-** 142:5
**CAPABLE-** 53:7
**CAPACITIES-** 90:17
**CAPACITY-** 67:13 94:10
**CAR-** 18:18 19:11,13 27:20 33:6 42:23 44:20 45:12 62:2 68:23 72:22,23 73:22,23,24,25 74:1,4,5,6 75:7 107:10,11,12 118:2 130:12 134:3
**CARDS-** 9:20
**CARE-** 57:8 91:18 110:1
**CARFAX-** 68:22,23 69:15
**CARLISLE-** 30:24 31:21 32:20 40:6,10,19,20,25 68:15 86:8,25 87:22
**CARMAX-** 40:22 68:18
**CAROL-** 46:14,24
**CARRIES-** 61:5
**CARRYING-** 79:25
**CARS-** 12:5 15:8,10,12,23,24 16:5 18:5,13 19:1,2 32:25 48:24 49:2,22 50:1 55:24,25 56:11 60:3 61:1 62:8,18 63:2 66:8,10,11 67:20 73:13 74:2,10,13 80:14 97:21 100:23 104:8,16,17,24 105:10
**CARVE-** 9:10

**CASE-** 8:19 10:1,25 12:7 20:14,16 21:6 67:21 91:22 92:21 93:6 98:19 110:12,16 113:17,18 115:10 121:17 128:3 135:7,25 136:2,19 139:19 140:16,18 141:19
**CASES-** 136:24 139:21,22,23 142:2
**CASH-** 3:18 4:25 5:23,25 6:6,8 7:6 8:3,5,21,24 9:6,18,19 10:3,9,11,22 16:6 17:13 35:5 41:10,17 46:11 48:19,22 49:2,5 50:6 65:9 70:12,19 71:6,8 75:2,5,8,10,12,16 ,18 72:9 74:8,25 92:10 133:21,23 134:7,18 135:3
**CATCH-** 91:17
**CATEGORY-** 102:24
**CAUSE-** 11:14 102:9
**CAUSED-** 48:14,17
**CAUTION-** 6:5,7
**CENTRAL-** 16:23 92:16 115:15 117:25 118:18 123:3 127:18 132:6 137:16 139:25 140:2
**CERTAINLY-** 118:14 133:2,15
**CERTIFICATE-** 142:20
**CERTIFICATION-** 119:9
**CERTIFICATIONS-** 119:5
**CERTIFIED-** 115:17 116:6 119:12
**CERTIFY-** 142:21
**CETERA-** 9:17 42:4
**CHAMBERS-** 12:19
**CHANCE-** 134:3

CHANGE- 122:10
138:17
CHANGED- 44:10
CHANGING- 120:18
CHAPTER- 9:24
135:20 137:3
CHARACTER- 17:13
CHARACTERIZE-
104:14
CHARACTERIZING-
105:20
CHARGE- 17:17
43:25 90:13
CHARGED- 55:14
CHART- 102:3,9
CHEAPER- 73:24,25
CHECK- 20:25
58:12 103:20
CHECKING- 79:18
CHERNICOFF-
4:5,10,12,13,14,2
0,22
3:5,7,10,11,20,25
6:2 8:5,11,17,19
9:3,7,13 10:17
11:11,16,23
13:8,11,14,17
17:4,11 22:16
24:4,12,16,18
26:18,21,23 27:24
28:1 33:9 38:19
39:10,21 41:3,5,7
43:11 46:6,7
51:2,9 53
CHEVROLET- 16:23
31:6 41:1
CHIEF- 93:6
CHILI'S- 31:9
CHOSE- 132:16
CHOSEN- 10:9
CHRISTMAS- 45:22
CHRYSLER- 134:6
CHURCH- 13:2
47:19
CIRCLE- 35:22
36:14 86:17
CIRCUMSTANCES-
129:25
CLAIM- 124:5,9,23
125:8,13,24
126:8,19
CLAIMING- 125:23
CLAIMS- 77:3
125:2,3 126:12
127:18
CLARIFIED- 11:14

CLARITY- 126:16
CLEAN- 110:5
CLEAR- 9:21,22,23
48:11 77:3 88:17
CLEARS- 20:21,23
CLOSE- 16:11
46:25 67:20 69:1
87:21 122:25
141:12
CLOSED- 41:24
55:13 84:20
133:20
CLOSER- 45:21
114:2
CLOSING- 5:2 14:7
51:24
52:1,2,16,20
53:5,13 57:2,8
129:14
CLUNKERS- 16:7
CODE- 7:4 131:12
137:6
COLEMAN-
93:13,15,21,22
95:13 112:1
COLLATERAL- 3:18
5:25 6:6,9
7:7,10,11
8:3,5,21,24
9:2,4,6,18,19
10:3,10,11,22
35:5 50:6 65:9
85:3 89:8 92:10
115:3,4 132:14,15
133:14 134:8,18
135:3 136:22
138:11,13,17,18,2
3
137:1 139:6,17
140:14,15,20
142:10
COLLATERALIZED-
113:21
COLLECT- 112:23
COLLECTING- 58:11
COLUMN- 102:21
COMBINATION- 25:7
77:23
COMBINED- 68:15
92:9
COME- 21:13 42:22
48:13 57:2 58:20
71:15 78:25 95:24
98:3 104:2 115:6
125:21 134:10,24
142:13

COMES- 44:20
COMFORTABLE-
114:8
COMING- 79:12
110:11 131:10
COMMENTS- 135:21
COMMERCE- 36:5
COMMERCIAL- 78:1
83:11 112:17
COMMINGLED-
100:20,21
COMMON- 55:6
COMMONWEALTH-
119:5
COMP- 42:4
COMPANY- 43:24
COMPANY'S- 54:21
COMPARABLE- 120:7
COMPARABLES-
120:1,5
COMPETENT- 127:5
COMPLAINT-
67:18,19
COMPLETE- 21:18
65:16
COMPLEX- 135:19
COMPLY- 135:19
COMPONENT- 14:21
16:4
COMPUTER- 6:13
20:1 42:20,21
43:8 79:21,24
94:22
CONAWAY- 46:14,25
CONCEDE- 133:17
CONCERN- 116:17
135:18
CONCERNED- 52:8
53:8 136:5,7
CONCERNING-
86:7,16
CONCERNS- 86:3
87:12
CONCLUDE- 91:20
CONCLUSION- 53:17
77:9 88:12,13
115:7 140:22
CONCLUSIONS-
115:15
CONCUR- 92:12
93:8
CONCURRED- 132:5
CONDITION- 77:5
137:20
CONDITIONS-

53:4 76:23 117:1
CONDUCT- 106:21
CONDUCTED- 94:21
109:6,11
CONFERENCE-
134:25 139:20
CONFERENCES-
64:15,20,23
CONFIRM- 120:16
CONFIRMED- 7:9,25
CONFUSE- 140:8
CONNECTION- 12:11
17:24 64:15 86:4
CONSENT- 93:4
CONSEQUENTLY-
78:19
CONSIDER- 121:16
134:16
CONSIDERABLE-
23:8 24:8
CONSIDERATION-
5:21
CONSIDERATIONS-
7:20
CONSIDERED- 17:14
CONSIDERING- 54:1
CONSIGNED- 67:8
CONSIGNMENT-
19:1,3,9
20:10,16,19 21:4
22:24 55:19
58:22,24 59:5,21
67:16
CONSIGNOR- 23:5
CONSISTENT- 87:19
CONSOLIDATED-
3:19 139:24
CONSTRUCTED- 22:6
CONSTRUCTIVE-
124:23 125:5
CONSULTANT- 71:10
CONSULTANTS-
43:10 81:20
CONSULTING- 72:10
CONTAINED- 87:18
89:17
CONTENTS- 85:14
87:13 127:12
CONTEXT- 136:3
137:4 138:16
CONTIGUOUS- 32:8
CONTINUE- 10:9
50:5 131:25
133:20,22
CONTINUED- 122:8

133:1
CONTINUING- 142:8
CONTRACTED- 68:25
CONTROLLED- 17:15
CONTROLLER- 22:2
CONVENIENCE- 6:10
CONVERSATION-
66:7
CONVEYANCE- 7:22
COPIES- 5:12
COPY- 95:10
124:11 127:1
CORNER- 31:7
CORPORATE- 22:2
CORPORATION-
13:23
CORRECT- 12:9
16:9 19:16 20:6
21:2,5,9 24:6,9
25:8,15 28:18
30:18 31:17,19,25
32:12,15 34:14,23
37:19 39:3 42:2
44:7 45:2,4,7,12
47:8 49:7 50:4,17
51:25 52:3,4
53:12 54:8,9
56:2,4,22 58:3,7
59:22 60:3,7,11
61:
CORRECTLY- 44:10
57:25
COST- 18:21 73:13
COSTS- 42:5
COULDN'T- 97:19
131:6
COUNSEL- 63:17
64:22 65:6 77:12
78:13 82:24
91:21,24 95:11
134:20
COUNTY- 13:2 34:8
55:6 67:6
85:20,21
86:8,16,25 87:1,8
112:21 118:1
123:8
COUPLE- 4:15
COURSE- 94:7
112:25 117:15
119:17 142:11
COURSES- 119:1
COURT'S- 122:4
136:17 141:13
COURT/- 76:25
COURTROOM- 91:4

COVERING- 30:13
COWAN- 77:23
90:14,15
112:5,7,13,14
114:1 117:7,10,15
121:9,22 122:10
126:24 127:17
129:5
COWAN'S- 121:1
CREATE- 57:1
CREDIT- 17:13
54:16,18,20 60:18
61:2,10,16
78:14,15 85:3
94:9 104:4,12,15
105:2,14
CREDITOR- 8:15,23
10:2 138:16
140:24
CREDITORS- 9:25
10:1,4 50:16,24
CREW- 112:22
CRITICAL- 135:11
CROSS- 4:18
51:11,17 53:18
80:22 83:13
88:4,6 106:16,18
118:13 123:17
127:23,25
CUMBERLAND- 85:20
86:8,25
CUNNINGHAM- 82:24
CURB- 10:15
CURRENT- 15:2,3
28:5,11,24
29:4,11 30:7
33:19 36:1
37:8,14 68:8 70:9
83:5 115:5 118:11
120:8,9,17
CURRENTLY- 12:4
15:13 38:22
CUSHION- 138:4
CUSTOMARY- 135:2
CUSTOMER-
19:11,12 21:3
83:24 103:4
CUT- 45:20

                D

D&E- 43:24
DATE- 5:8,16 7:12
14:5,7,8 28:8,15
48:4 51:24 52:2
53:5,13 65:19
66:13 74:23 76:7

86:10 95:20,21
99:9,13 142:24
DATED- 5:9 6:22
DATES- 5:2 41:15
63:21 95:3 96:19
DAUPHIN- 118:1
DAY- 21:16,17
41:17 79:17 100:6
133:13 138:19
DAYS- 14:17 16:14
20:21 42:1 45:20
70:19 72:11 74:13
79:18 97:7
129:19,21 131:8
133:17
DAYS'- 71:6
DB&E- 29:8,9
84:25
DEAL- 11:6 57:12
58:5 132:15
DEALER- 16:23
17:7,16 33:13
43:16 107:10
DEALERS- 108:7
DEALERSHIP- 15:14
29:20 33:6 34:6
50:13 77:19 78:6
94:5 107:6,8
109:12,16 110:5
118:2 122:21,23
135:15 139:14
DEALERSHIPS-
16:17 33:12 49:8
106:22 107:4
109:5 128:8 132:7
133:16,18 135:17
DEBT- 34:24 38:10
DEBTOR- 5:15 6:18
7:1,7
9:1,14,17,24
10:5,16,24 11:1,8
12:10,11 13:19
14:11,18 24:19
28:3,4 41:6,8
46:4,9 49:17,19
51:4 65:14 80:15
82:10 91:9
125:2,8 126:12
128:7,12,14,15,16
131:11,12,20,21,2
2
129:17 132:20
DEBTOR'S- 141:3
DEBTORS- 3:11,13
12:7 91:11 125:3
128:11 131:19

132:24 134:17
136:7,23 138:10
139:24
DEBTORS'- 5:24
6:17 10:21 11:20
13:12,16 50:10
51:19 52:11
57:17,20 59:24
68:3 70:14,17
76:14 82:17 85:9
86:23 92:10
103:6,9 104:6
113:24 115:14,23
124:25 135:7,19
136:21 142:10
DECEMBER- 84:3,4
142:24
DECIDE- 88:14
135:5 142:14
DECIDED- 33:14
DECIDING- 135:23
DECISION- 136:17
DECISIONS- 135:24
136:4
DECREASE- 137:9
DEEMED- 8:3 92:16
DEFENDING- 140:21
DEFINITELY- 10:1
81:1
DEFINITION-
9:6,10 89:15
DEFINITIVE- 138:2
DEGREE- 92:1
DELAWARE- 34:8
85:20 87:1
DEMOLISHED- 47:21
DEMONSTRATED-
130:1
DENISE- 28:22
30:6 35:24 114:10
DENVER- 36:10
DENYING- 142:10
DEPARTMENT-
113:13 117:24
DEPENDING- 80:24
81:4 92:21 118:1
DEPOSIT- 19:23
47:21
DERIVE- 69:12
DERIVED- 116:18
DESCRIBE- 83:9
94:1,20 95:11,14
99:5 113:11
114:23 117:20
118:7
DESCRIPTION-

95:19
DESPERATELY- 131:21,22
DETECT- 93:2,4
DETERMINATION- 7:18,22 90:5
DETERMINE- 105:13 116:24 117:16 133:13
DETERMINES- 9:15
DETERMINING- 88:10 115:8 119:22
DEVELOPED- 32:22
DEVELOPERS- 70:5
DEVELOPING- 83:11
DEVIATION- 138:11
DIDN'T- 5:25 28:11 33:15 48:2 49:5 59:16 70:18 79:1 93:3 99:1 109:15 111:4 127:10 130:4 138:23,24
DIFFERENCE- 60:25 120:20
DIFFERENT- 67:21 84:24 87:22,23 90:17 103:21 110:14,16 121:10 138:9
DIFFERENTIAL- 60:13,24 61:19 63:1,6 101:11 104:14 105:4,16
DIFFERENTIATE- 140:19
DIFFERENTLY- 88:22
DIFFICULT- 133:16 134:24 138:2,7
DIFFICULTIES- 139:19
DIFFICULTY- 139:18 140:3
DIG- 80:12
DIRE- 118:24
DIRECTED- 4:17 91:4
DIRECTING- 111:16 115:14
DIRECTION- 24:23
DIRECTLY- 44:13 124:20
DISAGREE- 58:18 60:22 67:19

DISAPPEARED- 130:4,6
DISBURSEMENT- 41:15
DISCREPANCIES- 103:24
DISCUSS- 84:1
DISCUSSED- 109:12
DISCUSSION- 10:12 104:21
DISCUSSIONS- 71:25 89:4
DISPOSITIONS- 112:23
DISPUTE- 5:13 7:12,14 9:22 39:19 87:13
DISPUTED- 7:16
DISTANCE- 43:25
DISTINGUISHABLE- 92:1
DISTRICT- 140:17
DIVISION- 112:20
DOCKET- 136:17
DOCKETED- 142:6
DOCKETING- 140:2
DOCUMENT- 4:25 95:13,14,15 99:6 103:11 107:11 113:24 114:13 124:11
DOCUMENTS- 5:4,13 6:24 103:3 113:15 114:17 137:23
DOESN'T- 8:20 116:8 129:20 130:8,9 141:25
DOLLAR- 56:23 86:21
DOLLARS- 18:15 26:6 42:14 56:13 61:2 62:25 73:18 111:9 126:5 130:12
DOOR- 31:6 139:10
DOUBT- 11:5 131:18
DOZEN- 95:23
DRAINS- 32:23
DRAW- 36:24 104:15
DRAWDOWN- 105:1,5,13
DRAWN- 62:6,7,23 63:2 104:3,11 105:16

DRAWS- 49:13
DREXEL- 34:4,7
DRILL- 62:17
DRIVE- 29:15,22 40:1 68:7 130:18
DROPPED- 69:23
DUPLICATED- 92:25
DUTIES- 83:9,11 94:2,7 96:20 112:19 117:16
DUTY- 136:18

_____
E
_____

EACH- 63:6 96:23 104:4 142:11
EARLIER- 47:6 62:24 66:23 122:11 123:17 124:17 136:25 140:20
EARLY- 92:17
EARNEST- 135:10
EASIER- 100:24
EASTERN- 140:17
EASY- 5:4 79:11
ECKBERG- 22:2,8 109:17
ECONOMIC- 69:15
ECONOMY- 130:14
EDUCATION- 118:17
EFFECT- 133:3 135:25 139:3 141:2 142:8
EFFECTUATE- 79:16
EIGHT- 37:12 85:10
ELECTRONIC- 142:22
ELECTRONICALLY- 42:21
ELEVEN- 108:22
EMAILED- 66:2
EMERGENCY- 10:6
EMPLOYED- 12:4 49:17,20,21 83:3 93:22 112:14 136:8
EMPLOYEE- 17:24 41:19 70:24
EMPLOYEES- 41:19 133:22,24
EMPLOYMENT- 42:4 46:15 112:25 136:9
EMPLOYS- 49:19
ENCUMBERING-

85:24
ENCUMBRANCES- 53:24 57:7
ENDS- 93:20
ENGAGE- 135:1
ENGAGED- 21:16 72:5
ENGAGING- 139:11
ENTER- 142:4
ENTERED- 65:9 78:22,23 80:6 102:9
ENTERPRISES- 17:23 27:3 29:8,9 60:3 70:22 84:25
ENTIRE- 12:22 23:20
ENTIRELY- 5:18 23:18 122:10
ENTITIES- 20:5 38:16 44:9,15 48:14,17 63:8 84:18,22,24 85:4 94:15 104:2 122:15 140:8
ENTITIES'- 137:10
ENTITLED- 14:7 76:22
ENTITY- 38:17 41:11 54:25 72:17,18 84:11,14 123:14,24 137:7
ENTRIES- 3:8 80:3
ENTRY- 6:21 106:5 133:3
EPHRATA- 12:6 18:7 29:16 60:12 86:24
EQUITY- 37:15,20 130:24 138:4 141:3,11
EQUIVALENT- 138:13
ERROR- 105:23
ESCROW- 47:14,18,19 132:8
ESTABLISH- 10:7 141:10
ESTABLISHED- 8:2 129:19
ESTATE- 12:24 13:1 28:5 39:22 48:21 69:16 80:16 85:17 88:10,25 89:12 114:16,18 115:18 116:7,9

119:1,12,15,17
120:2,7 130:16
132:9 133:8
137:16 138:4
139:1 141:14
**ESTATES-** 139:25
**ESTIMATE-** 76:6
115:5 118:3
119:24 120:3
135:16
**ET-** 9:17 42:4
**EVALUATE-** 115:3
**EVALUATION-**
116:1,3
**EVALUATIONS-**
115:15
**EVENING-** 142:5,17
**EVERYONE-** 3:1
**EVERYTHING-** 80:4
132:3
**EVERYTHING'S-**
73:23 110:21
**EVIDENCE-** 116:12
117:7 129:19
137:14
141:9,10,14,20
142:15
**EVIDENT-** 90:7
**EXACT-** 78:16
**EXACTLY-** 15:12
19:25 21:12 37:24
47:5 56:13 69:2
75:14,15 79:2
92:5
**EXAMINATION-**
11:22 51:17 53:18
76:11 80:22 81:10
82:19 88:6 93:16
106:18 112:9
120:8 122:8
123:18 127:25
**EXAMINE-** 51:11
118:13 120:1,5
**EXAMINED-** 88:9
**EXAMPLE-** 23:7
53:12 69:14
130:17 137:11
**EXAMPLES-** 137:6
**EXCEPT-** 69:8
**EXCEPTION-**
9:11,12
**EXCESS-** 39:14
44:8 130:5 132:12
**EXCUSE-** 16:10
24:12 111:20
114:3

**EXECUTE-** 14:2
**EXHAUST-** 98:20
**EXHIBIT-**
13:12,16,19
14:12,18 24:20
26:16 28:3,4
41:6,9 46:4,9
51:19 52:11
57:17,20 59:24
68:3,7
70:14,16,17 72:9
76:14 80:15
85:9,14,15,16,19
86:23 103:7,9
104:6 108:15
113:24 114:9
115:14,23
126:19,25 127:14
**EXHIBITS-** 51:3
82:1,3 85:7
111:25 129:1
**EXISTING-** 118:10
**EXISTS-** 7:8 8:6
53:23
**EXPAND-** 83:13
**EXPECTING-** 6:5
**EXPENDITURES-**
43:3
**EXPENSE-** 42:10
79:25
**EXPENSES-** 44:23
46:13 50:10,11
**EXPENSIVE-** 74:1
**EXPERIENCE-**
117:21,23
**EXPERT-** 88:16
115:18 116:6,9,13
121:2,4,5 142:1
**EXPERTISE-** 118:16
**EXPIRATION-** 99:22
**EXPLAIN-** 14:12
18:23 19:9,19
89:5 98:11
100:4,11 102:23
112:19 117:20
**EXPLAINED-** 72:13
**EXPLANATION-**
21:18 60:13,24
61:19 63:1 78:25
109:25 132:2
**EXPRESSION-** 87:14
**EXTENDED-**
56:11,12 78:9,11
84:18 94:9 139:13
**EXTENSION-** 13:5
14:16

**EXTENT-** 7:8,11,24
8:6 80:18 91:23
105:1 121:3 132:6
137:8 141:23

――――――――――――
F
――――――――――――
**FACE-** 9:9
**FACED-** 141:16
**FACILITIES-** 85:3
**FACTORS-** 117:2
118:9
**FAIR-** 37:17 87:18
135:1
**FAIRLY-** 16:6
79:3,11 97:3
105:23
**FAIRNESS-** 126:15
**FAMILIARITY-**
118:18
**FAMILY-** 71:8
131:24
**FAR-** 4:1 46:16
52:8,10 53:7,22
60:17 61:10 62:22
65:21 101:20
141:11
**FAVOR-** 30:14
**FAVORABLY-** 125:5
**FEBRUARY-** 40:21
68:17
**FEDERAL-** 117:6
**FEEL-** 92:18,24
136:18
**FEELING-** 120:12
**FEELS-** 125:10
**FEES-** 71:10 72:10
**FELONY-** 17:17
**FELT-** 89:9
**FIFTY-** 37:12
48:21
**FIGURE-** 24:2
38:15 60:9 71:15
73:21 96:2,12
97:13,15 98:8
101:25 106:1,8
111:7 130:9
**FIGURES-** 99:1
106:10 135:16
**FILE-** 9:14
48:14,17 76:24
**FILED-** 4:23 5:14
6:4,6,25 8:23
9:22 10:6 39:12
74:22 101:18,21
136:10 139:21
**FILES-** 9:14

**FILING-** 5:7,16
7:2,12,15,19
130:3
**FILL-** 42:20
**FINAL-** 10:24
16:14 102:8 137:4
142:8,12,14,15
**FINALLY-** 131:4
**FINANCE-** 124:25
**FINANCIAL-** 68:2
85:18 113:20
114:9 116:20
137:15
**FINANCING-** 6:25
19:15,19 20:4
30:10 62:3 71:17
72:6 123:23
**FIND-** 8:19 11:1,8
44:20 94:25 97:19
103:23 109:23
131:8,21,22
132:4,20
139:3,4,14
140:11,12 141:6
**FINDER-** 62:1
**FINDING-** 8:13
99:12 138:3
**FINDINGS-** 140:9
**FINE-** 4:10,12
11:11,15 38:11
115:24
**FIRST-** 3:25
13:11,14 14:14
24:25 25:9 26:11
30:1,2,17 31:16
33:21 34:21 35:14
36:5 51:20 71:24
84:2 85:15 93:11
94:17 95:18 98:20
103:14 106:1,9
113:4 114:13
125:1 128:11
134:20,25
**FIVE-** 14:8,16
16:22 20:21 29:5
48:21 61:16 82:4
87:5 97:7 101:11
**FIXED-** 13:25
14:25 15:2 44:21
**FLATFOOTED-** 91:17
**FLOOR-** 6:22
19:14,19
20:4,11,18 21:7,8
26:8 27:17,18,20
30:21 37:5
38:7,8,21 42:10

45:9 46:16 48:24,25 50:7 55:20,21,23,24 56:3,7,9,10,11 58:10,14 59:7,20,22 60:2,6,10,18 61:7,16 62:2,18 78:9,15 84:1 89:12 9
**FLOORING-** 107:16
**FLORIDA-** 35:22 36:2 37:14 40:9,14 69:18,24
**FLOW-** 133:23
**FOLKS-** 58:23
**FOLLOWING-** 65:2 109:15 110:3
**FOLLOW-UP-** 94:25
**FOREGOING-** 142:21
**FORENSIC-** 71:22,24
**FORM-** 53:3 67:9
**FORMAL-** 10:13
**FORTH-** 7:3 39:17
**FORTHCOMING-** 135:10
**FORTY-** 49:15
**FORWARD-** 10:13 50:5 68:24 129:23
**FORWARDED-** 65:24 97:25 124:8
**FOUND-** 100:14 111:17 135:9
**FOUNDATION-** 17:2,10,11 63:24
**FOUR-** 66:10 85:1 87:7,11,12,18
**FRAME-** 16:15
**FRANCHISE-** 13:5,25 14:22 15:16 48:21 57:13
**FRANKLY-** 53:4
**FRAUD-** 93:25
**FRAUDULENT-** 7:22,23 54:20
**FRONT-** 68:4 70:15 76:13
**FUEL-** 44:17
**FULL-** 11:24 22:17 53:25 79:18 83:1 93:18,20 112:11
**FULLY-** 23:23 32:22 56:18 62:5,6,7
**FUMBLING-** 24:12

**FUNCTION-** 69:15
**FUNDS-** 133:12
**FUNGIBLE-** 138:12
**FURTHER-** 51:9 81:3 82:10 88:2 91:9 93:7 111:22,23 126:7 128:20,21

## G

**GARAGEMAN'S-** 43:16
**GAVE-** 27:6 86:3 125:19,20
**GENERAL-** 16:18 99:3 110:10 134:6 135:21
**GENERALLY-** 16:20 17:5 22:25 42:24 84:13 86:2 94:2,14 99:5 109:7 110:19 113:11 118:7 135:2,9,14
**GENERATE-** 73:18 74:8,14 133:5
**GENERATED-** 23:16 42:21 75:5,8,12,15
**GENERATORS-** 42:16,19
**GENTLEMAN-** 4:15 83:20 126:10
**GENTLEMEN-** 3:18 10:19 91:18 120:24 137:12
**GEORGE-** 3:14,16
**GERMANE-** 91:15 92:14,18
**GET-** 4:1 8:8,23 10:3 16:2,5 20:13,14,24 26:21 42:11 44:21 45:11,22 48:1,9,11 55:15 79:6 91:22 94:22 106:2 117:24 118:4,11 120:15 130:4 133:19,20 140:7
**GETS-** 79:24
**GIBBS-** 43:11 71:10 80:4,10 81:13 136:14
**GIVE-** 6:12 9:24 20:24 33:13 53:16

109:5,7,15 126:19 127:24 136:1
**GIVEN-** 7:22 11:16 40:12 59:4 67:15 86:21 96:19 129:25 130:13,25
**GIVES-** 109:9 135:18
**GLOBAL-** 67:14
**GO-** 3:25 10:9 28:19 42:1,20 43:12 51:19 52:11,15,19 57:4,8 59:1 61:24 62:18 68:24 80:12 84:7 92:20 94:3,23 95:23 96:8,21 97:12 100:8,16,25 104:22 118:8 121:14 132:22,24 133:12 140:7
**GOING-** 10:12,25 13:3 28:2 30:16 33:13 41:5 42:1 44:13 48:22 50:5 53:15,16 57:1,12 58:5 60:16 67:5 71:7 73:12,17 74:2 89:23 90:14 91:6 92:3 95:9 106:25 109:6,8 112:21 115:21 116:19 117:9 120:25 121:7,16 122:1
**GONE-** 112:23
**GOOD-** 3:1,5,6,10,14 11:19,24 36:2 43:3 82:16,21 110:21 112:6 126:1 133:18 142:17
**GOT-** 48:10 84:18 113:14 123:5 124:7,8 130:10
**GOTZI'S-** 98:21
**GRABBED-** 26:19
**GRAND-** 100:4,5 101:2,4 102:13,21,24
**GRANT-** 137:9 140:17
**GRANTED-** 6:19 7:9,10,24 8:7

35:4
**GRANTING-** 6:23 137:12
**GREATER-** 130:9,11
**GROSS-** 18:16,17,19,20 22:12,18,19,20 23:16 45:16 70:9 72:14,25 73:10,15,18 74:14,15 135:17
**GROUND-** 32:3,10,22 33:16 38:9 60:10 106:6
**GROUNDS-** 129:12
**GROUP-** 25:12,17
**GROUPS-** 113:17
**GUARANTEE-** 139:2
**GUARANTORS-** 137:24
**GUESS-** 6:20 8:12 88:15 92:20 112:21 113:20 114:25 123:5 136:1 137:25 138:7,19 140:5
**GUESTIMATE-** 119:23
**GUT-** 120:12,15

## H

**HADN'T-** 109:24
**HALF-** 32:3 35:12 36:3 69:19,22 70:1 85:10 130:11
**HALFWAY-** 45:20
**HAND-** 5:4 11:19 41:5 93:14 112:6
**HANDED-** 13:18 14:11 24:13 26:16 28:2 46:3,8
**HANDLE-** 45:19
**HANDLED-** 10:16
**HANDY-** 85:11
**HAPPEN-** 15:24 53:8 54:1 71:15 130:12
**HAPPENED-** 19:9 27:6 59:11 79:1,10 80:12,13,14 99:10 102:4,9 129:21 130:1 134:6
**HAPPENING-** 101:7 117:1
**HAPPENS-** 15:8

47:24
HARBOR- 35:22
HARD- 140:3
HARRISBURG- 12:19
13:6 46:12 49:20
100:22
HASN'T- 131:2
HAVEN'T- 4:5 6:14
40:3 44:11
66:18,22 97:3
HAVERTOWN- 122:21
123:7,12,15
HE'S- 88:15 91:6
115:17 116:5
117:5,6 121:13,23
125:23 127:13
129:9,22
130:10,18 131:1
132:3,25 134:3
HEAD- 137:22
HEADED- 70:19
HEAR- 92:6 136:8
138:24 141:9
HEARD- 92:4
113:23 114:19
115:19 120:25
122:10 123:20
HEARING- 7:17 8:1
10:14,21,22,24
64:24,25 78:24
88:8 89:1 114:21
115:12 118:15,16
125:15 137:4
142:19
HEARINGS- 3:17
91:14 141:22
142:9,12,14,15
HEARSAY- 127:3
129:10,12
HELD- 30:17 32:13
47:14 75:22
HELP- 113:18
HELPED- 122:25
HELPFUL- 141:24
142:1
HELPS- 84:9
HERE'S- 10:18
HERZOG- 28:20
35:8 69:25 70:3
HESITATE- 82:4
HI- 82:22
HIGH- 31:8
HIGHER- 73:7
87:25
HILL- 12:19
34:4,7

HIRE- 79:13
HIRED- 21:13
71:15 80:4 83:8
113:17
HISTORICAL- 113:5
HISTORY- 6:9
129:22
HOLD- 12:13 119:5
120:24
HOLDS- 31:16
33:21 34:21 35:13
36:4 37:3
HOME- 79:17
HOPE- 139:12
HOUR- 131:16
HOURS- 78:15
HOUSE- 9:20 32:3
35:8 40:9
HOUSEKEEPING-
4:15
HOUSEKEEPS-
139:10
HUNDRED- 37:12
42:14
HYPOTHETICAL-
73:17

### I

IDEA- 15:5 18:14
26:9 37:22 38:10
48:22 56:23 58:13
129:20
IDENTIFICATION-
13:19 14:12 28:3
46:9 85:9
IDENTIFIED- 41:6
52:23 57:4,17
58:2 68:6 71:11
81:20 86:8 95:23
96:9 113:24
115:22
IDENTIFY- 24:20
28:4 41:8 46:10
60:1 126:24
127:7,14 135:16
IFEX- 56:9,21
67:7,14,16 122:12
123:21,24
124:2,3,6,8
125:7,13,18,20,25
126:8,11 127:19
ILLUSTRATION-
10:20
IMMEDIATELY- 49:5
IMPACTING- 69:16
IMPORTANT- 11:14

16:4 135:22 136:1
141:15
IMPORTANTLY-
133:10
IMPROPER- 10:15
INABILITY- 135:13
INC- 12:10 13:23
56:20 57:24 61:24
70:22 94:9 140:18
142:25
INCIDENTALLY-
96:15
INCOME- 69:12
INCONSISTENT-
140:10
INCORPORATED-
122:22 123:15
INCREASE- 101:10
INCREASED- 63:21
64:3,7,11 123:9
INCREASES- 101:9
INDEPENDENT-
141:21
INDICATED- 68:7
87:14 90:11
INDICATES- 52:18
57:23
INDICATION-
137:23
INDICATIONS-
87:18
INDIVIDUAL-
107:13 129:20
INDIVIDUALLY-
28:20
INDIVIDUALS-
58:23
INDULGING- 131:17
INDUSTRIAL- 33:5
INDUSTRIES- 56:9
INDUSTRY- 68:23
INFERRING- 137:24
INFORMATION-
98:11,12 99:3
114:15 126:20
127:8,19
INFORMED- 135:12
INFUSION- 48:22
INITIAL- 41:18
91:25 93:21
INITIALLY- 71:13
120:14 141:2
INITIATED- 10:16
55:5
INQUIRED- 135:18

INSPECTIONS-
95:3,6
INSTALLED- 32:23
INSTANCE- 9:1
55:18 58:21 75:24
123:4 142:11
INSTANCES- 58:21
INSTRUCTED- 48:12
INSTRUCTIONS-
40:13
INSURANCE- 42:4
43:14,15,16,20
54:21,22
INTEND- 5:6 33:10
50:18
INTENDED- 33:11
INTENDING- 50:12
INTENTION- 45:13
58:9 76:24
INTENTIONS- 50:13
INTEREST- 6:19,24
7:10 11:5 32:18
42:10 44:11 45:9
46:16 122:23,24
126:14 135:7
137:10
INTERIM- 7:6 8:5
10:10 35:5 41:25
64:19 65:9 78:23
134:8,16 135:23
136:3 142:10
INTERNAL- 109:13
INTERNET- 42:16
INTERRUPTION-
62:12
INTERTWINED- 92:7
INTRODUCED- 83:25
137:14
INVENTORY- 24:21
25:10 44:20
103:12,17
105:5,17
INVENTORY'S- 16:6
INVESTIGATED-
54:21
INVESTMENT- 73:25
INVOICE- 15:12
16:3
INVOLVE- 54:19
55:9 134:22
INVOLVEMENT-
113:11
ISN'T- 107:21
116:18 119:8,22
125:9,12 126:1
127:5

**ISSUE-** 7:16 54:6 57:5 131:4 133:13 136:21
**ISSUES-** 91:16 92:13 113:16 124:18 131:21 141:5 142:14
**IT'S-** 5:17,18 7:16 8:1 9:15,21,22,23 11:4,13 13:21,25 14:14 17:14 18:24 20:1 23:13 24:21 25:4 28:8,10 30:1 31:3,6 32:3,8 39:14 40:2,3 41:10 42:1 45:13,21 46:11,16,17 48:11 49:1 52:16 53:12,17 62:7,12 68:3 6
**ITEM-** 42:7 44:2
**ITEMS-** 4:15 41:18 42:15 43:6,7,9,13,23 44:17 53:12 92:16

___

J

**JACKET-** 4:1
**JANUARY-** 19:8 40:21 84:3,4
**JOANNE-** 93:13,15,20
**JOB-** 83:9
**JOHN-** 22:2 43:10 109:17
**JOINTLY-** 139:22 140:1
**JUDGE-** 27:6 38:17 136:7 140:18
**JUDGMENTS-** 77:13
**JUDICATA-** 135:25 139:3 141:1
**JULY-** 5:8 14:10 55:7
**JUNE-** 5:16 7:1,2 14:6 19:8 107:1,2

___

K

**KEVIN-** 46:14,24
**KINDS-** 118:8
**KNOWLEDGE-** 59:8,10 80:6 81:12,16 111:13 124:1

**KNOWN-** 10:19
**KNOWS-** 132:24 134:5
**KOHL'S-** 31:5

___

L

**LACK-** 136:16 141:10
**LANCASTER-** 13:2 85:20 118:1 123:8
**LAND-** 69:10 118:2
**LANDSCAPE-** 140:8
**LARGE-** 80:18
**LARGELY-** 135:8 137:17
**LARGER-** 83:12
**LARGEST-** 16:23
**LATCH-** 84:9
**LATE-** 9:22 131:16
**LATER-** 5:20 71:25 72:4
**LAUGHTER-** 24:15 84:8
**LAWRENCE-** 31:6 41:1
**LAWSUIT-** 54:16,18 123:20
**LCBC-** 13:1
**LEAD-** 42:16,19 79:5 90:12
**LEADING-** 79:3
**LEADS-** 23:14 34:17 130:15
**LEARNED-** 62:12
**LEASE-** 82:1 137:9
**LEAVE-** 47:20,22,24 82:3
**LEAVES-** 137:21
**LEAVING-** 41:23
**LED-** 24:5
**LEFT-** 30:2 83:20 110:19 111:25
**LEGAL-** 53:17 77:9 88:13 113:19
**LENDER-** 108:3,11
**LENDERS-** 20:5 108:7
**LENDING-** 78:1 84:1 119:11
**LET'S-** 9:13 11:6 28:19 29:2,7,16 57:4 59:1,24,25 61:24 62:16 66:17 68:2 72:24 100:16 103:23 108:17 118:15 120:8

126:15 138:17
**LETTER-** 124:8 126:19 127:1,6,8,19
**LIABILITY-** 43:16
**LIBERTY-** 35:10,14,18,20
**LIEN-** 6:19 7:3,9,10,24 8:6,7,8,9,21,25 36:7,10 37:18 48:5 89:10 115:4 137:8,12
**LIENS-** 53:23 57:6 77:3,15 89:10 139:1
**LIFT-** 39:12,14,16,17 93:6 124:18
**LIGHT-** 31:7
**LIKED-** 91:21
**LIKELIHOOD-** 10:24 137:2
**LIMIT-** 27:20
**LINE-** 7:18 34:4 39:2 56:11 57:24 61:1,10,11,12,13, 15,16 60:18 62:17,22,23 63:2 69:11 78:9 86:25 102:8,9 104:3,4,12,15,22 105:2,9,14
**LINES-** 78:14,15
**LIST-** 4:6 26:12 27:16 66:2 80:16 94:22,24 102:11 103:17,20 104:17 105:19,21 115:2,3
**LISTED-** 40:11,12,15,17,19 94:4 105:24 106:11
**LISTENED-** 135:7
**LISTING-** 114:18
**LISTS-** 63:17 95:19 114:15,17 54:3,7,11,14,15,2 4
**LITIGATION-** 55:2,5,9 56:19,24 57:2 67:5 77:6,12 124:19
**LOAN-** 4:25 5:13 6:22 7:2 78:10,11 86:19 96:21

109:13 112:17 113:1,9,15 122:20
**LOANS-** 5:21 6:18 84:18,19 89:11,12 104:4 112:23 115:2 132:16,17 137:24
**LOCATED-** 12:18,25 16:20 18:6 29:18,22 30:25 31:2 47:7 85:23 98:19,24
**LOCATION-** 94:6 95:1 100:23,24 101:1 110:19,20 123:9
**LOCATIONS-** 94:23 99:11 100:5,20
**LODGED-** 125:13
**LONG-** 12:20 16:13 18:2,8 21:14 40:17,19 43:25 121:13,23
**LONGER-** 43:1
**LOOK-** 26:7,11 51:23 57:20 59:24 61:4 68:15 69:18,25 72:5 96:16 107:18,24 108:3,15,17 118:9,10 129:23
**LOOKED-** 44:11 71:10 89:7,8,10 97:18 125:5
**LOOKING-** 5:3 9:11 65:15 90:4 117:3 138:8,9
**LOOSE-** 26:17,18
**LOSS-** 45:16,19 115:10 124:14
**LOST-** 62:1,2
**LOT-** 4:8 15:9,20 25:4 31:3 61:1,17,21 63:3 70:11 74:9 92:24 94:6 98:17 103:20,21 104:16 105:5,10,17 123:12 131:23
**LOTS-** 70:7
**LOUISE-** 29:15,22 40:1 68:6 130:18
**LOWER-** 46:22 80:23 87:24
**LP-** 84:23
**LUXURY-** 23:2,3

**M**

MAGAZINE- 42:18
MAINTAIN- 15:15
MAINTENANCE-
44:18,19
MAJOR- 79:21
MAJORITY- 122:23
MAKING- 56:16
86:20 137:12
MANAGE- 112:22
MANAGEMENT-
113:17
MANAGER- 83:6,10
84:19,21 112:17
MANAGING- 83:12
MANDATED- 16:15
MANHEIM- 18:25
MANUFACTURER-
16:1 17:6 33:12
107:12
MANY- 5:19 15:17
19:5 22:9,22
23:17 59:1,5 76:6
89:11 92:13
108:18 113:7
119:17 135:19
MARC- 3:12
MARGIN- 73:1
74:14
MARK- 28:2 69:22
82:23 95:11
MARKED- 13:18
14:11 24:19 41:8
46:9 85:8 95:14
124:12 126:19,25
MARKET- 28:24
29:5 33:19 36:1,2
37:8,14 40:2 68:8
69:24 70:10 81:2
87:14,18
89:16,17,21 90:10
116:19 117:1
130:25 137:20
MARKETING- 42:16
MARKETPLACE-
48:25 70:10
MATERIAL- 77:5
MATERIALLY- 87:23
MATTER- 8:16 11:4
13:24 65:5
81:14,18 122:3
124:21 127:13
129:14 139:7
142:23
MATTERS- 3:18,19

84:10,13,17
117:11 125:15
134:16,24
135:4,5,23
MATTIOLI- 136:15
MATTIONE- 43:10
MATTIONE'S- 81:17
MAXED- 61:13
MAXIMIZE- 50:15
MAXIMUM- 38:20
39:2
MEANS- 102:19
117:3 139:22
MEANT- 67:10
MECHANICSBURG-
29:15,24 130:18
MEDICATION- 82:5
MEET- 141:11,24
MEMO- 109:13
MEMORY- 136:14
MERCEDES- 23:1
32:25
MERELY- 11:12
MET- 11:1,8
52:19,24 82:23
83:18,22
113:15,16 131:12
134:2 140:14
141:7
MICHAEL- 4:16
77:24,25 82:17
83:2
MICROPHONE- 114:2
MIDWAY- 57:23
MIKE- 55:20,23
56:12 82:14
MILLION- 26:6
33:13 34:16
36:1,3 37:12,21
61:16 62:2 68:21
69:21 73:18 98:14
101:11 105:22
126:5
130:5,11,12,23
131:9
132:6,9,11,12,13
MINDFUL- 91:12
MINIMAL- 133:21
139:8
MINIMUM- 26:24
91:23 133:25
MINORITY- 122:24
MINUS- 38:8
MISCELLANEOUS-
43:6
MISQUOTED- 46:16

MISSING- 62:10
96:17 98:4,16
100:6,13,14
MISSPOKE- 108:12
MISTAKES- 132:4
MISUNDERSTOOD-
108:12
MITSUBISHI- 13:22
55:13 67:20
122:21 123:12,15
MITSUBISHIS-
12:17 55:16
123:6,7
MOGALANSKI- 55:8
56:1,21 59:1
122:15,19,20,23,2
4
77:20,23 123:14
MOMENTS- 58:21
127:17
MONEY- 19:12,23
20:14,21,23 22:3
24:8 30:10 33:13
47:14,24 48:1,3
49:3,9 54:2 55:14
66:8 67:7,19
73:24 79:1,10
80:14 94:4 125:19
129:18
132:21,22,24
MONEY'S- 48:13
MONIES- 49:13
MONTH- 18:13
22:14,21 36:24
45:17,24 46:21,23
79:22 80:2 94:16
138:25
MONTHLY- 44:9
MONTHS- 5:20
MORNING- 3:5,6
99:8 103:15
110:3,18
MORTGAGE- 28:13
30:12,13,14,17,19
,21
29:11 31:16,18
32:13 33:21
34:1,21,24
35:2,14 36:5,6
37:3,4,5,10 44:5
130:16
MORTGAGES- 30:10
35:13,16 36:4
85:24 86:1 138:1
MOTION- 5:10,24

6:5,8,14,18 11:15
39:12,15,17 76:24
92:8,9,10,19,23
124:18 134:18
138:15
140:21,23,24
MOTIONS- 10:21
91:14 92:10 93:6
134:17 136:21
140:25 141:12
142:9
MOTOR- 6:20,21
12:5 17:15 32:25
49:22 60:3
MOTORS- 29:21
67:11,13 134:6
MOVANT- 141:2,6
MOVANT'S- 140:21
MOVE- 33:6 51:3
62:16 68:2 69:16
114:1 123:8 129:1
131:2
MOVED- 15:23
MOVING- 97:8
MUCH- 22:17
25:10,13,17,23
26:1 27:12,14
33:23,25 34:15,24
35:9,16,18,25
37:20 38:3 41:24
42:13 47:16 49:11
53:16 55:14 69:20
75:8 77:18
78:14,19 80:2
92:4,6 104:3
108:17 112:2
115:9 121:19
126:16 138:25
MULTIPLE- 3:3
140:7 142:18
MUTUALLY- 135:6

**N**

NAMED- 5:15
136:14
NAMES- 42:22
NATURES- 55:11
NECESSARILY-
39:11,20 49:5
73:20 100:11
130:10,20
NECESSARY- 43:5
NEEDED- 133:21,25
NET- 115:5,22
116:17,24 117:16
119:22 120:13

121:1
**NEVER-**
19:21,24,25 91:21
110:4,9,21 137:22
140:6
**NEW-** 12:16
15:8,10,22,24
16:5 25:17,22
26:1 55:16,24
57:18 58:15
62:17,23 78:10
95:18 96:9,10,23
99:12 100:16,17
102:9 105:9
107:11 108:18,20
**NEWS-** 96:9
**NEWSPAPER-** 43:1
**NICHOLAS-**
11:17,20 12:1
30:6 34:12 35:24
36:20 83:16,23
114:10
**NICK-** 36:20 83:21
110:12,16
**NIGHT-** 124:7,20
127:2
**NINE-** 12:21
**NISSAN-** 34:6
69:12
**NONACCOUNTANT-**
141:17
**NONCOMPLIANCE-**
136:18
**NONETHELESS-** 24:7
**NONEXPERT-** 141:16
**NORMALLY-** 120:14
**NORTH-** 12:5 14:1
15:23 18:7
29:3,16 30:16
86:24
**NOTE-** 5:7 94:24
**NOTED-** 140:22
**NOTICE-** 5:7 54:22
109:5,15 129:5
**NOTICES-** 140:1
**NOTIFIED-** 102:10
111:2
128:12,14,15,16
**NOTIFY-** 128:11
**NOTWITHSTANDING-**
6:23
**NOVEMBER-** 14:16
29:4 33:19 34:20
80:20 87:2
**NR-** 36:18,19
**NRV-** 114:25

121:12,24 122:2
**NUMBERS-** 60:14
90:14 100:12

―――――――――
O
―――――――――
**OBJECT-** 5:23 8:21
53:3 116:5 124:13
129:6,8
**OBJECTED-** 92:17
**OBJECTING-** 10:3
**OBJECTION-**
3:18,22 4:19,24
17:2,9,20 39:11
53:15 59:14 63:23
67:9,23 77:8 78:7
88:12,16 89:20
115:16 117:9
120:25 121:6
122:5 126:15
127:15 129:12
**OBJECTIONS-**
51:5,6
**OBLIGATION-** 91:3
**OBLIGATIONS-**
53:23 65:13 97:4
**OBSERVATION-** 92:4
142:3
**OBSERVATIONS-**
136:2
**OBTAIN-** 20:19
**OBTAINED-** 126:11
**OBTAINING-** 42:25
72:5 140:20
**OBVIOUSLY-** 91:8
131:20
**OCCASIONALLY-**
58:25 59:4
**OCCASIONS-** 59:7
**OCCUR-** 8:22 19:7
52:3 53:5 109:21
119:8 133:23
**OCCURRED-** 12:24
20:16 21:11 63:14
65:17,23 84:2
110:24 128:17
**OCTOBER-** 28:16
99:8 102:8 110:23
111:1,3 133:3
**OFFER-** 40:1 68:13
93:5 121:21
130:19 139:2
142:3
**OFFERED-**
127:12,13 129:4
138:21 139:5,15
140:11 141:20

**OFFERING-** 138:25
**OFFERS-** 40:13
69:7,9
**OFFICE-** 21:17
43:8 110:2
**OFFICER-** 109:14
**OFFICERS-** 113:15
**OFFICES-** 12:13
**OFTEN-** 115:8
117:19 118:11
119:24 120:16
**OLD-** 70:1 118:10
**OLDER-** 140:16
**ONE-** 5:4,9 6:12
7:20 8:20,21 12:7
13:14 15:15 17:15
18:3,10 21:16
22:14 24:13
26:18,22
29:1,2,7,14 31:18
32:10 35:4
38:17,18 40:18,25
44:10 46:13 49:15
50:1 51:12
52:6,8,22 58:21
59:9,17,18 65:13
67:5 69:8
**ONES-** 39:25 43:5
**ONGOING-** 79:25
95:16 122:14
**OPAQUE-** 126:17
**OPEN-** 100:22
142:11
**OPENED-** 55:23
**OPERATE-** 50:21
131:25 133:6
140:7
**OPERATING-** 15:14
23:23 122:24
**OPERATION-** 67:22
124:25 129:18
133:21
**OPERATIONS-** 22:17
43:4 139:8
140:4,6
**OPINION-** 88:19
115:17 130:20
**OPINIONS-** 118:19
141:17
**OPPORTUNITY-** 85:2
**OPPOSED-** 80:2
**OPTION-** 40:22
**ORAL-** 92:8
**ORDER-** 6:18 7:7
8:13 10:10 15:15
16:10 32:10 35:5

49:2 78:23 79:23
84:1 111:15
123:10 132:25
133:1,3
**ORDERED-** 120:9
**ORDERS-** 107:19,25
108:4 142:4
**ORIGINAL-** 39:2
139:20
**ORIGINALLY-** 47:9
**OTHERWISE-** 8:1
**OUTCOME-** 92:21
**OUTSET-** 141:22
**OUTSTANDING-** 39:7
58:13,17
**OVERHEAD-** 23:15
43:6
**OVERRULE-** 53:15
126:15 127:15
**OVERRULED-**
17:12,21 59:15
78:8 89:24
**OVERSIMPLIFYING-**
10:19
**OWE-** 24:8 37:22
46:20 54:1 67:7
78:14,16
**OWED-** 28:12 33:23
37:23,25 39:13,18
44:8 46:18 61:15
132:13
**OWES-** 38:3
**OWN-** 28:5,19,22
56:5,6 59:21
63:16 64:2,6,10
106:1,10 120:12
126:12
**OWNED-** 12:22 27:3
32:20 47:9,11
56:1,7,15 77:19
88:10,25 114:16
118:5 122:23,24
124:2 125:18
**OWNER-** 12:12
20:20 23:20
116:13 117:6
134:4 137:19
141:15,16
**OWNERSHIP-** 56:8
**OWNS-** 29:7,9
30:3,5 31:10,22
34:9,11 35:23
36:17,19 114:18

―――――――――
P
―――――――――
**PA-** 12:6,19 29:24

36:14
**PACKAGE-** 16:14
**PAGE-** 80:12
**PAID-** 14:23
15:1,12 21:7,8,19
23:7 42:11 44:3
49:11 56:11 67:16
99:1,13,15,19,21,
23
96:6 97:9 98:5
102:7,11,19
109:18,24
111:11,13 113:8
124:10 126:6
130:4
**PAPERS-** 35:6 48:3
95:7
**PARCEL-** 30:23,25
31:20 32:18 33:10
34:3,5,9,22
35:2,7 36:13 44:6
46:18,20 48:5
**PARCELS-** 37:8
39:22 40:5,10
68:15
**PARLANCE-** 114:25
**PARTICULAR-** 107:6
128:2,3 129:20
**PARTICULARLY-**
91:21 118:1 142:2
**PARTIES-** 77:13
135:2,5 136:2
142:13
**PARTNER-** 3:16
**PARTNERS-** 30:4,5
31:11 32:20 47:10
84:23
**PARTS-** 8:13 12:16
13:25 14:25
15:1,2,5 57:13
**PARTY-** 5:16
107:13 125:7
139:2
**PAST-** 18:24 55:7
66:14,15
**PAT-** 90:14 110:1
112:5
**PATRICK-** 77:23
112:7,13
**PAUSE-** 6:16 13:10
24:11 27:7,23
46:2 51:15 53:21
54:10 74:19 76:18
95:12 106:13
111:19,21 117:8
126:22 128:24

129:15
**PAY-** 19:12,20
20:20 21:4 23:4
47:3 50:6,11,24
58:9 79:23 80:25
81:1 111:16
138:25
**PAYING-** 45:6,8
56:9
**PAYMENT-** 80:18
94:6,25 96:25
97:4 99:19
**PAYMENTS-** 44:11
96:7 97:5,7 103:3
137:12
**PAYROLL-** 41:15,18
42:3 43:8
**PAYS-** 44:5
**PC-** 82:24
**PENALIZE-** 140:6
**PENDING-** 54:2
56:19 57:2 133:11
**PENN-**
35:10,14,18,19
84:5
**PENNSYLVANIA-**
13:23 16:23 36:11
85:21,23,25
86:4,9,23 112:20
119:6 140:17
**PEOPLE-** 41:19,23
42:20,22 44:22
45:20,22 109:14
112:22
**PERCENT-** 15:3
23:3 70:13
73:3,17 80:24
130:10 132:10,11
**PERCENTAGE-**
72:15,25 73:16
**PERFECT-** 7:3
134:23
**PERFECTED-** 5:19
7:8
**PERFECTION-** 11:4
**PERFORM-** 12:13
100:8
**PERFORMANCE-**
84:21
**PERFORMED-** 63:17
101:20 115:11
116:4
**PERFORMING-** 104:1
**PERHAPS-** 10:18
88:22 94:13
122:14 136:15

**PERIOD-** 5:18,20
7:3 9:23 22:13
24:3 41:13 68:11
74:8 99:19,22
106:21 132:19
**PERIODIC-** 137:12
**PERIODICALLY-**
110:12
**PERMISSION-**
138:12
**PERMITS-** 50:5
**PERMITTED-** 122:1
134:7
**PERSON-** 80:24
**PERSONAL-** 28:21
68:2 85:18 114:9
137:15,23
**PERSONALLY-** 49:9
67:12 89:3 95:2
107:16
**PERSPECTIVE-** 57:1
122:18
**PETITION-** 10:6
74:22 76:7 101:17
**PHENOMENA-** 84:9
**PHILADELPHIA-**
34:7 55:6 67:6
**PHONE-** 43:24
64:24 78:24 98:22
**PHONED-** 109:17,23
**PHRASE-** 90:1,2,8
104:19
**PHYSICALLY-** 20:2
25:1 60:2 104:8
**PICK-** 42:21
**PICKING-** 48:20
114:5
**PICTURE-** 126:1
132:3
**PIECE-** 31:3
32:8,9,10,11 68:6
**PIECES-** 85:19
114:16 130:21
**PIKE-** 30:24 31:21
32:20
40:6,10,19,25
68:16 86:8,25
87:22
**PIVOTAL-** 136:17
**PLACE-** 14:8 33:7
97:2 117:2 132:21
**PLACED-** 80:15
**PLACES-** 136:22
**PLAN-** 6:22
19:14,19 20:4
21:8 26:8

27:18,21 30:21
37:5 38:8,21
42:10 45:9 46:16
48:24 50:7,23
55:21,23,24
56:3,7,10,11
58:10,15 59:7,22
60:2,6,10,18
61:7,16 62:3,18
78:9,15 84:1
89:12 94:4,10
95:21 96:21,24
**PLANNED-** 20:11,18
21:7 27:17 48:25
56:10 95:20 97:23
125:18 126:13
**PLANNING-** 59:20
108:2 123:3 124:2
**PLANS-** 93:25
96:4,14 97:17
100:17 101:23
**PLEADINGS-** 4:23
5:1
**PLEAS-** 55:6
**PLEDGED-** 89:7
117:4,17
**PLUG-** 106:2
**PM-** 82:9 134:14
142:19
**PM/RECONVENE-**
82:9 134:14
**POINTED-** 72:10
**POINTS-** 129:16
**POLICY-** 43:21
**POOR-** 136:13
**PORSCHE-** 33:1
**PORTION-** 85:17
130:2
**PORTIONS-** 69:8
**POSITION-** 6:1
7:19 9:9 52:22
83:5,7 93:24 94:2
112:16,19
113:6,19 121:19
122:1 133:14
**POSITIONS-** 89:10
115:4 136:6
**POSITIVE-** 34:20
**POSSIBILITY-** 72:5
**POTENTIAL-**
71:13,17
**PP&L-** 43:24
**PRECEDENT-** 52:1
**PREFERENCE-**
5:17,20 7:3,20,23
8:2,14 9:15,23

10:8,14
PRELIMINARILY-
4:14,22
PRELIMINARY-
3:17,23
10:12,20,22 91:13
117:13 134:17
135:24 136:3
137:1 139:4
140:13 141:1,7,23
PREPARATION- 88:8
89:1 114:21
115:12
PREPARED- 4:7
5:14 23:24 24:23
28:6 103:17
PREPETITION- 7:9
8:6,8
PRESENT- 5:14
83:15 104:8
123:17 136:6
PRESENTATION-
4:24
PRESENTED- 142:16
PRESENTING-
134:20
PRESIDENT- 12:14
18:1 22:4
67:11,13 78:1
83:6,10 112:17
PRESUPPOSE- 9:13
PRESUPPOSES- 8:20
PREVAIL- 10:24
137:4
PREVENTION- 93:25
PREVIOUS- 97:17
PREVIOUSLY- 91:4
PRICE- 14:19
15:11 18:21 73:23
107:19
PRIMARILY-
90:13,18
PRINCIPAL- 44:11
131:22 135:8
PRIOR- 66:6 85:17
109:4 110:4,9
PRIVATELY- 18:25
PROBABLY- 6:3
18:13,16 37:21
45:20 46:17 70:13
85:14 109:22
PROBLEM- 22:3
57:1 131:23
PROBLEMS- 131:20
PROCEDURE- 10:17
107:17,24

PROCEDURES- 10:16
PROCEED- 4:13 9:2
10:25 93:10 112:3
130:13
PROCEEDINGS-
142:22
PROCEEDS- 6:21
48:7 66:4,5,20,25
96:5 97:9,25 98:5
111:9 124:9
PROCESS- 16:13
90:12,13 104:1
118:8 136:12
PRODUCE- 132:18
PRODUCT- 120:10
PRODUCTS- 83:14
PROFESSIONAL-
79:12 112:25
117:15
PROFESSIONALS-
136:9
PROFIT-
18:16,17,19,20
19:13 22:20
23:16,25 45:16
72:14,25
73:10,15,19
74:3,14,15 135:17
PROFITABILITY-
23:12,22
PROFITABLE- 23:13
PROFITABLY- 50:21
PROFITS- 22:19
PROGRAM- 15:4
PROHIBIT- 6:5
PROLOGUE- 129:23
PROMPTED- 96:17
PROOF- 121:21
141:3,5
PROPERTIES-
31:4,24 37:17,20
40:19 70:11
85:23,25 86:4,22
87:3 89:7,11
90:5,9 117:25
120:3 131:1 138:2
PROPERTY-
28:19,20
29:7,12,25
30:3,8,11,19
31:3,10,13
32:2,4,8 33:3
34:15 35:13,21,23
36:8,15,21 37:15
40:14,20,25
47:7,9 68:6

69:18,25 70:4
71:18 80:25 85:20
86:7,16 87:21
120:16 130:21
137:10,13 141:3
PROPOSAL- 138:24
PROPOSE- 50:23
PROPOSITION-
135:14
PROTECT- 130:24
PROTECTING-
130:22
PROTECTION- 8:4
11:2,9 131:3
133:9 136:23
137:7,11
138:5,14,20,21
139:5,16
140:12,15 141:12
PROVEN- 8:1
PROVIDE- 14:19
65:15,21 79:9
95:10 131:3,6
138:4
PROVIDED- 4:6
10:10 63:16
66:16,19,24 68:3
88:11 94:8 127:9
139:15
PROVIDES- 121:24
137:6
PROVIDING- 137:7
PURCHASE-
13:11,15,21
14:14,19 18:18
30:10 51:20 52:12
69:7,9 107:10
123:10
PURCHASED- 18:24
19:2 33:11
57:7,15
PURCHASER- 17:5
71:14
PURCHASES- 15:10
18:23 49:6
PURPORTED- 6:18
9:4
PURPOSE- 47:18
136:20
PURPOSES- 8:3
28:3 39:19 68:7
73:17 85:9 88:10
90:15,18 119:11
121:21,25 129:4
139:25 140:2
PUTTING- 33:15

141:17
PUZZLE- 32:9

Q
QUALIFICATIONS-
118:13
QUALIFIED- 88:15
117:6 129:9
QUALIFIES- 121:2
QUALIFY- 117:10
QUESTIONS- 76:5
78:13 81:9,23
85:13 87:6 88:2,5
90:21 105:8
106:14 111:23
117:13
121:9,12,22
123:20 126:16
127:21 142:12
QUICK- 141:22
QUICKLY- 6:15
23:8 120:18
QUO- 138:11,17

R
RADIO- 43:1
RAHAL- 33:2
RAISE- 11:19
93:14 112:6
RAISED- 124:19
RAISES- 54:6
RANCH- 32:3
RANCHER- 36:16
RAP- 56:9 122:22
123:15
RAPIDLY- 134:24
RATHER- 10:8
18:21 25:9
RE- 140:17
REACH- 11:2,5
READING- 12:5
15:23 18:7
29:3,16 30:16
86:24 87:21
READY- 47:23
REALISTIC-
130:13,24 131:10
REALITY- 130:25
REALIZABLE-
89:8,21 90:5,8
115:6,22
116:17,24 117:17
119:22 120:14
121:1
REALIZE- 133:11
138:18

**REALTOR-** 40:12
**REALTY-** 36:18,19
**REASON-** 5:17
60:22
**REASONABLE-** 10:23
129:24 137:2
**REASONABLY-** 17:16
**REBUTTAL-** 81:6
**RECALLED-** 90:1
**RECAP-** 95:16 99:7
**RECAPS-** 95:7
**RECEIVE-** 9:24
48:7 49:9 97:7
127:10
**RECEIVED-**
86:7,15,18 87:2
94:5 96:7 127:5
**RECENT-** 18:24
70:3
**RECENTLY-** 12:24
19:7 35:4 97:3
113:8
**RECITALS-** 87:19
**RECITE-** 6:8
**RECITED-** 6:2
**RECITES-** 85:19
**RECOGNIZE-** 54:6
57:5 69:14
**RECOLLECTION-**
11:15 87:22
137:17
**RECONCILE-** 79:11
**RECORDED-**
85:24,25
**RECORDING-** 142:22
**RECORDS-** 22:5,6,8
85:2 92:1,6 95:5
**RECOVERY-** 112:18
113:9
**RECREATE-** 80:4
**RECROSS-** 81:7,10
**RED-** 31:7 98:20
**REDIRECT-** 76:9,11
81:4 90:23
**REFERENCED-** 7:13
77:12 86:16,23
**REFERENCING-** 7:8
**REFERRED-**
84:11,14 89:21,22
**REFERRING-** 89:16
104:6 136:13
**REFINANCING-** 72:2
**REFLECT-** 74:21
96:12 99:21 100:4
101:6 102:4

**REFLECTED-** 50:2
105:4
**REFLECTS-** 96:13
97:21 99:6,23
**REFUNDED-** 47:25
**REFUTE-** 133:7,8
**REGARDLESS-** 10:17
**REGARDS-** 92:13
**REGULATORS-** 115:1
116:11
**REHABBING-** 4:4
**REINHART-**
11:18,20,24
12:1,3 13:18
22:11 24:19 28:2
30:6 31:24 34:12
35:24 36:20
46:3,8 51:19
64:14 70:9 74:21
76:13 81:12,25
83:16,23,24
84:22,23 85:4
86:2 87:20
88:10,25
103:11,18
104:7,23 111:8
114:10,16 115
**REINHART'S-** 85:17
105:9,21 113:7
114:21 117:5
122:15 123:24
138:24
**REINHARTS-** 137:23
**REJECT-** 87:13
**RELATE-** 105:21
**RELATIONSHIP-**
83:6 84:19,21
113:2 122:14,18
**RELATIONSHIPS-**
83:10,12,13
**RELATIVE-** 73:23
**RELATIVES-** 49:17
**RELAXED-** 40:22
**RELEASED-** 91:3
**RELEVANCY-** 124:15
125:14
**RELIEF-** 5:10 10:7
91:14,16 92:11
134:19 138:5,15
140:21,25
141:7,12 142:9
**RELIES-** 121:25
**RELY-**
120:10,12,14
**RELYING-** 121:4
**REMAIN-** 4:17

91:4,8
**REMAINING-** 13:4
44:17 123:7
**REMARKS-** 129:14
136:20
**REMITTED-** 99:8
103:3
**REMOVAL-** 44:1
**REMOVED-** 57:8
**RENDER-** 70:11
**RENEGED-** 33:12
**RENT-** 23:15 36:25
44:2 46:18,20
47:3 69:13
**REORGANIZATION-**
50:23 142:2
**REORGANIZATIONS-**
135:20
**REORGANIZE-**
132:20 134:3
**REPAID-** 45:11
**REPAIR-** 44:19
**REPEATED-** 53:20
**REPEATING-** 24:14
**REPLACEMENT-**
7:10,24 8:7,8
137:8
**REPORT-** 91:19
116:3
**REPORTED-** 126:20
128:5 140:18
**REPORTING-** 127:17
**REPORTS-** 114:15
**REPRESENTATION-**
53:13
**REPRESENTED-**
58:15
**REQUESTING-** 48:3
**REQUIRE-** 74:7,9
130:8
**REQUIRED-** 52:19
**REQUIREMENT-** 91:7
107:21
**REQUIREMENTS-**
135:20
**REQUIRES-** 108:3
130:8
**RES-** 135:24 139:3
141:1
**RESELL-** 49:3
**RESERVATION-** 93:5
**RESERVE-** 54:23
81:5 92:22
**RESIDENCE-** 28:21
36:10

142:13
**RESPECT-** 4:24
5:12 11:1,9 12:24
13:3 15:8 20:10
23:11 28:24 39:22
50:9,12,18 53:23
54:7 58:14
63:8,10,13 66:11
67:2,3 93:7
94:11,15 96:5
97:1 103:16
104:2,21 105:8
110:23 115:11,22
117:10,17 122:18
124:19 128:
**RESPOND-** 6:11
**RESPONSE-** 29:17
53:17 63:9 120:6
**RESULT-** 47:13
56:20 78:24
101:25 122:25
**RESULTS-** 95:6
109:11 121:14,24
122:2 137:9
**RETAIL-** 21:3
**RETENTION-** 32:22
**RETURN-** 50:16
73:13,24 125:19
**REVEAL-** 6:13
**REVIEWED-** 67:18
97:3
**REVIEWING-** 102:3
**REVISIT-** 11:10
**RIGHTS-** 9:2
**RIVERSIDE-** 36:5
**ROAD-** 12:6,19
15:23 18:7 28:20
29:3,16 30:16
34:4 35:8
69:12,25 70:4
86:24,25 87:21,23
**ROBERT-** 3:10
43:11
**ROLE-** 135:4
**RULES-** 116:12
117:6
**RULING-** 121:16
122:4
**RUN-** 23:8 98:20
124:25
**RUNNING-** 50:20

---
S
---
**SAFEGUARDS-**
132:21 133:2
**SAILFISH-** 35:22

**SALE-** 6:21 12:16 13:25 22:18 40:5,7,9,23 47:13 48:4,7,19 67:8 68:11,16,21 75:8 76:15 131:1 132:22 133:11,15,18 137:9 139:13
**SALEABLE-** 90:6
**SALES-** 22:19 42:25 65:16,23 66:6,16,24 73:18 96:6 102:10 103:2 110:24,25 120:7 130:9,12 133:5,16
**SALESMAN-** 15:15 46:15 50:1 139:9
**SATISFIED-** 52:2 53:25
**SATISFY-** 77:5 118:21 125:23
**SATURN-** 13:6,23 14:15 16:22 32:25 139:14
**SAVE-** 4:8
**SAW-** 60:1,9
**SCHEDULES-** 96:25 139:21
**SCIENCE-** 117:23
**SCOPE-** 67:24 92:17
**SCRATCHING-** 137:22
**SCREW-** 77:20
**SEASON-** 45:21
**SEASONAL-** 45:21
**SEATED-** 3:2 11:21 82:18 83:20 112:8 134:15
**SECOND-** 6:12 25:6 26:7 35:15 36:6 43:12 68:6 76:19 94:17 95:18 98:13 106:10 125:4 127:24
**SECURE-** 6:18 30:21 125:11
**SECURED-** 5:16,19 6:1,3 8:3,15,23 10:2 129:25
**SECURITY-** 6:19,22,24 7:9 11:5 47:21 88:11,13 131:10
**SEE-** 6:17 9:5

11:2 17:13 27:8 43:12 48:2 51:24 61:7 62:19 87:8 95:25 98:24 100:12 103:14,20 104:7,9,23,24 105:9,11 107:4,7 118:21 126:16 134:10 136:19
**SEEN-** 63:16 85:15,16 87:5,7 103:2,12 114:13,15
**SEGMENT-** 96:8
**SELL-** 15:20,21,22,24 18:18 19:12 21:1,3 39:23 45:3,6,11,12 50:14 58:23 68:25 70:7 74:7,13 76:24 78:3,5 83:13 118:5 126:5 139:12
**SELLER-** 21:6
**SELLING-** 15:17 18:5,21 55:18 70:10
**SELLS-** 14:15 50:1
**SENIOR-** 83:6,8,10 90:15 113:17
**SENOR-** 78:1
**SENT-** 65:24 66:1 109:13 127:1,4 140:1
**SEPARATE-** 27:16 92:9 139:24,25 140:4
**SEPTEMBER-** 21:24 63:21,22 64:3,4,7,8,11,12 66:17,21,23 74:22,25 75:2,5,12 94:16,17,18 96:4 101:3,7,8,13,14,1 5,16,18 99:10 100:9 102:1,4 106:22 107:7 108:18 109:4,15 110:4,25 128:3 130:1,2
**SERIES-** 78:13
**SERVICE-** 12:16 43:8,25
**SERVICES-** 12:13

**SET-** 7:3 105:8 132:23
**SETS-** 39:17
**SETTING-** 115:9
**SETTLEMENT-** 58:11
**SEVEN-** 68:20 98:14 105:22 108:25
**SEVERAL-** 7:20 52:15 109:14 113:10 131:1 133:17
**SEWER-** 32:23 43:25
**SHALL-** 17:15 52:2 53:24
**SHARE-** 140:2
**SHED-** 126:16
**SHEET-** 28:11 85:10 103:17 106:9 107:18
**SHOCKED-** 125:2
**SHOOP-** 3:14,21,22 4:9,19 6:10 7:5,6 10:5 92:12 93:9 127:2,4
**SHOOP'S-** 127:4
**SHOPS-** 98:19
**SHORTENED-** 134:21
**SHOULDER-** 4:2
**SHOW-** 10:8 107:18 124:11 136:23
**SHOWED-** 23:24
**SHOWING-** 5:16 45:16
**SHOWN-** 25:10
**SHOWROOM-** 19:11,12
**SHOWS-** 26:8 107:10 133:8
**SHUFFLING-** 5:4
**SHUT-** 79:24
**SIC/PHONETIC-** 136:15
**SIDE-** 7:17 10:15 92:5 116:9
**SIGNATURE-** 118:19
**SIGNED-** 35:6
**SIGNIFICANT-** 124:18 130:1 136:19 139:11 141:9,14,24
**SIGNIFICANTLY-** 130:8
**SIGNS-** 57:13

113:6 136:15
**SIMILARITIES-** 92:13
**SIMILARLY-** 39:16
**SIMPLER-** 80:2
**SIMPLY-** 99:21
**SIMULTANEOUSLY-** 72:7
**SITES-** 42:18
**SITS-** 139:9
**SITTING-** 15:5,9,15 46:15 62:8 66:5,8 111:9 132:7
**SITUATION-** 22:3 63:13 69:15 113:20 125:6 131:1 139:18
**SITUATIONS-** 8:22
**SIX-** 16:22 33:17 62:25 68:19 76:8 108:20
**SIXTY-** 49:15
**SIZE-** 85:10
**SLIGHT-** 45:16
**SLIGHTLY-** 39:13 87:21
**SLOW-** 6:13
**SMALLER-** 86:21
**SNL-** 34:10,11 84:25
**SNYDER-** 3:15 113:18
**SOFT-** 80:1,3
**SOFTWARE-** 79:23
**SOLD-** 13:1 14:16 41:1 47:7,19 55:17 66:3,8,10,12,20 67:15,16 68:18,19,22 69:9 75:7 76:7 90:9 94:5,25 95:17,20 96:4,14,18 97:6,17 98:5,18 99:7,13,15 102:6,11,19 103:2 104:18 107:19 109:18 111:3 120:4 130:21
**SOMETHING'S-** 131:18
**SOMEWHAT-** 135:11 137:22
**SON-** 28:7 71:7
**SONS-** 29:10 49:18

70:25
SOPHISTRY- 53:11
SOUND- 73:3 74:23
142:22
SOUTH- 35:22
SOVEREIGN-
35:14,18,19 76:3
SPAN- 69:22
SPEAKERS- 3:3
142:18
SPECIAL- 15:4
112:18
SPECIALIST- 93:25
SPECIFIC- 118:6
SPECIFICALLY- 4:5
86:24 87:14 94:14
SPECULATIVE-
126:9
SPELL- 12:2 93:18
112:11
SPENT- 79:17
SPREADSHEET-
85:11
SQUARELY- 136:23
STAGE- 137:1
139:4,15 140:13
141:1,7
STAKE- 131:23
STAND- 82:14 85:7
STANDARD- 10:22
53:13 115:2
STANDING- 5:22
52:6,9
STANDPOINT-
113:5,9
STANDS- 13:2
115:7
STAPLES- 26:16
START- 29:1,2
80:4 95:22 99:9
103:23
STARTING- 91:14
116:18,22
STARTS- 61:5
STATE- 5:1 11:24
13:19 16:15 17:15
39:10 80:7 83:1
84:5 93:18
112:11,22
STATEMENT- 6:25
23:24 68:2 85:18
114:9 116:20
137:15
STATEMENTS- 22:7
STATING- 124:8

STAY- 5:11
39:13,14,16,17
59:25 62:13
91:14,16
92:11,15,19,23
93:6 124:18
134:19 137:8
138:6,15,16
140:22 141:1,8,12
142:8,9
STEP- 22:12 81:24
90:25 111:24
128:23 130:15
STIFFER- 138:9
140:23
STIPULATE- 4:7,9
STIPULATED- 80:5
135:3
STIPULATION- 7:7
64:19
65:8,11,15,19,23
66:6 78:23 80:6
131:5 133:4
STIPULATIONS-
3:24
STOP- 72:4 138:14
STOPPED- 122:24
STORE- 21:16 33:1
41:23 46:25 48:20
55:13,17 67:20
69:12 79:22,24
STORES- 16:22
STORMS- 32:23
STREET- 31:5,6
33:1
STRICTLY- 48:22
120:10
STRIKE- 109:2
STUART- 35:22
37:14 40:14 69:18
SUBDIVIDE- 70:6
SUBMITTING- 81:21
SUBPOENA- 4:16
SUBSECTION- 137:4
SUBSEQUENT- 110:4
133:3 135:25
SUBSEQUENTLY-
113:8 123:9
SUBSTANTIAL- 23:2
SUBSTANTIVELY-
139:23
SUBTRACT- 38:7
SUCCEED- 130:7
SUFFICIENT- 138:3
141:10
SUGGESTION-

118:12
SUGGESTS- 126:2
SUMMARIZE- 113:16
SUMMER- 55:7
SUMS- 14:23
SUN- 32:25
SUPERIOR- 90:15
SUPPLIES- 43:8
SUPPORT- 79:23
103:3 122:1
SUPPORTED- 106:1
SUPPOSE- 91:22
140:5
SURELY- 51:14
74:18
SURPRISED- 91:22
SURPRISES- 91:21
SURROUNDING- 31:4
54:3
SURVIVING- 134:5
SUSQUEHANNA-
3:15,16
5:15,19,25 8:15
16:21 19:18 20:14
29:4 30:15,17
31:14,16 32:13
33:22,25 34:18,21
35:1 36:7
37:4,18,23 38:1,4
39:12,17 42:12
43:21 44:4,5,8
45:6,8,10 48:3,5
54:12,15 55:23
56:10 59:22 61:2
63:1
SUSQUEHANNA'S-
9:9 27:18 48:24
56:3 140:25
SUSTAIN- 88:16
117:9 120:25
121:6 129:12
132:18
SUSTAINED- 17:3
63:25 67:25 77:10
79:5 92:18 122:5
SUTLIFF- 13:5,23
14:15 15:10,21,25
16:4,11,17,24
17:18 32:25 50:14
52:19 57:6,12
58:6,9
SWITCHED- 55:20
80:1
SWORN- 11:20
82:17 93:15 112:7
SYSTEM- 79:21,24

80:1,2,3 94:23

———————— T ————————
TAGS- 43:16
TAKERS- 40:4
TAKING- 110:1
TASK- 90:19
TAX- 23:24
TAXES- 42:3 46:15
TELEPHONE- 134:25
139:20
TELEPHONIC- 10:11
TELLING- 121:17
TERM- 88:13
102:15,18,21,24
138:1
TERMINATE- 14:9
TERMINOLOGY- 90:2
TERMS- 17:10
70:10 71:6,8
72:14 73:9 89:14
97:4 105:20
113:20 115:4
116:10,11 124:17
130:15,21 131:8
135:6
TESTIMONY- 68:11
80:22 83:15 86:2
87:20 92:13,14
113:23 114:19
121:1,5 122:11
132:5 133:6
134:21 135:8
139:9 141:20
142:1
TEXAS- 84:5
THANKS- 22:15
33:8
THAT'D- 68:22
THEORY- 10:13
THEREFORE-
5:18,22 6:6
7:1,16 8:23
132:10
THEY'LL- 48:11
80:25
THIRD- 62:16
74:10,12,13 95:18
101:16 139:2
THOUSAND- 37:13
56:12
THREATENED- 54:3
THREE- 3:11
7:14,15,17 12:5,7
17:14,23,25
18:2,8,11,23

19:14 21:8 22:4
23:11 24:21
25:7,9 26:12,13
27:2,3,20 29:5,19
33:11 36:16 37:23
39:18 40:2,23
41:12,20 42:25
49:23,24,25
50:2,18
60:3,16,17,18
63:6,8,21
**THROW-** 10:14
**THURSDAY-** 21:25
**TIE-** 12:5 26:8,12
29:21 49:22
60:3,10 67:11,13
72:19 105:24
106:6
**TIED-** 69:4 134:1
**TIGHT-** 16:6
**TIL-** 66:7
**TIME-** 4:8 7:25
9:16,17,20 12:22
16:14,15 22:13
23:20 29:7 41:13
53:19 56:5 57:2
58:8 66:7 67:22
68:11 72:3 76:5
80:5 83:25 85:15
91:6,22 93:13
95:9 96:23
99:19,22,23
100:22 101:2
106:15,21 107:6
110:2 113:1
**TIMES-** 22:9 69:15
107:5 115:8 134:5
**TIMING-** 7:15,20
97:5
**TITLE-** 93:24,25
98:24 112:16
**TODAY-** 3:12 49:1
70:11 83:15,18
84:11,14 87:19
88:14 90:9 91:20
92:4,21,25 95:5
102:8 103:12
111:17 114:13
125:15 130:21
136:17
**TODAY'S-** 36:1
39:19 88:8 89:1
115:12
**TOGETHER-** 79:19
100:19,25 113:15
114:17 125:21

134:1 141:18
**TOLLED-** 37:7
**TOMORROW-** 70:11
91:13 92:6 142:7
**TOOK-** 55:16 66:23
72:10 128:10
132:16
**TOOL-** 15:4
**TOP-** 29:1,2 41:16
45:5 52:15 60:1
70:19 104:22
**TOPICS-** 92:9
122:10
**TOTAL-** 25:20 26:1
27:12 37:7,22
38:10 39:7,13
42:3,4 44:23
49:15 68:19
71:1,3 72:9 95:24
96:9 97:13
98:3,8,14 99:16
100:4,5,6
101:2,4,25
102:13,21,25
**TOTALED-** 27:14
**TOTALS-** 99:7
132:12
**TOUCH-** 60:6
61:6,7 62:19
**TOUCHED-** 25:3
**TOWARDS-** 123:5
**TOWN-** 29:23
**TOWNSHIP-** 34:4
69:11 86:25 87:23
**TOYOTA-** 33:2
**TOYOTAS-** 23:1
**TRACTS-** 69:10
**TRADED-** 27:17
**TRADER-** 42:18
**TRADING-** 13:22
34:10,11 84:25
**TRADITIONALLY-**
97:7
**TRAINING-** 118:17
**TRANSACTION-**
19:25 56:17,20
59:2 123:24
**TRANSCRIPT-**
142:21
**TRANSCRIPTS-**
142:25
**TRANSFER-** 20:24
**TRANSFERRED-**
57:12 58:5
**TRANSFERS-** 58:8
**TRASH-** 43:25

**TRAVEL-** 142:5
**TRAVISE-** 134:22
**TREAT-** 8:15
**TREND-** 63:12
130:1
**TRIED-** 113:16
**TROUBLE-** 16:24
17:18 114:4
**TRUST-** 21:23
48:23 49:8
63:8,13,20
64:3,7,11
65:16,23 66:6
73:12 78:20
79:1,10 102:16
103:4 104:19
105:6,18,22
107:5,8 109:16
111:12 113:14
124:23 126:7
128:4,8,11 135:15
**TRUSTED-** 78:5
**TRUSTEE-** 137:2
**TRUSTS-** 125:5
**TRUTH-** 127:13
**TUNE-** 130:5
**TURN-** 14:7 21:1
76:19 91:12
**TURNED-** 68:24
79:15 118:4 128:4
**TURNING-** 25:6
140:25
**TURNS-** 9:18
**TWELVE-** 37:12
42:14
**TWENTY-** 62:25
**TWISTING-** 135:1
**TWO-** 3:19 5:13
26:16,17,19 29:10
31:14 37:2 48:14
49:18 60:14 66:14
68:16 70:6,25
87:24 89:14 92:9
94:15 99:5 104:2
109:23 126:16
132:7 134:16,17
139:24
**TWO-PAGE-** 95:13
**TYPICALLY-**
20:11,13,20 83:12
118:10 138:13

U

**UCC-** 5:7,14
7:2,13,15
**UCC1S-** 5:14

**UCCS-** 8:22
**UGI-** 43:24
**ULTIMATELY-** 45:23
121:15,25 138:18
**UNABLE-**
135:5,15,16 136:5
**UNCONTESTED-**
137:25
**UNDERSTANDING-**
20:7 61:13
64:2,6,10 77:2
123:13 127:18
137:19
**UNDERSTOOD-**
101:20
**UNDERWRITERS-**
43:17
**UNENCUMBERED-**
139:1
**UNFORTUNATELY-**
48:25 80:3
**UNION-** 54:16,18
**UNITS-** 6:20,21
22:22 74:7 123:11
**UNIVERSAL-** 43:17
**UNLESS-** 17:16
117:9 142:12
**UNPAID-** 101:9
102:2 104:18
**UNRAVEL-** 9:20
**UNREFUTED-** 132:5
**UNSECURED-** 9:25
10:1,4
**UPDATE-** 111:7,14
**UPDATED-** 85:16
**USAGE-** 66:4 79:23
**USED-** 12:16 15:23
18:5 25:12,22,25
61:11 62:2 67:20
89:14 90:1 95:18
97:12 99:14
100:16,18 102:24
104:13,22 105:2
106:8 107:12
108:21 116:20
129:18 138:1
**USING-** 9:18 10:11
**UTILITY-** 43:24
**UTILIZED-** 85:7

V

**VACANT-** 31:3
**VALLEY-** 16:21
28:20 35:8 69:25
70:4
**VALUATION-**

116:6,19 118:20
119:14 121:16
**VALUATIONS-**
116:20,22 133:8
**VALUE-** 15:2 26:8
27:18,19 29:5
30:7 31:13 32:1,4
33:19 36:24 37:8
40:11,12 56:23
60:6,10 61:7
62:18 68:8 69:22
70:10 87:15,18,22
89:9,16,17,21
90:1,3,5,8 97:21
104:7,16,23
105:10,24 106:2,5
115:6,17,18,22 11
**VALUES-** 28:24,25
80:15,22 117:25
120:17 137:16,18
141:14
**VANISHED-** 131:9
**VARIANCE-** 33:6
**VARIES-** 72:16,20
**VARIOUS-** 4:25
24:25 85:19 89:10
114:16
**VARY-** 117:25
**VEHICLE-** 4:6
6:20,21 19:20
20:19,20 21:1
23:5 27:18 45:5
59:20 94:24
95:1,19 97:5
102:19 107:11
**VEHICLE'S-** 132:22
**VEHICLES-** 4:8
15:18,20 16:8
17:15 18:24
20:10,16 21:6,20
22:24,25 23:2,3,7
24:25 25:12,20
26:11,12,25
27:3,10 43:18
44:18 55:19
58:2,4,8,9,15,22,
24
56:5,15,16
59:1,5,7 60:1,5
61:6,11,17
66:2,20 67:8,15
76:7 77:
**VEHICLES'-** 44:19
**VERBAL-** 29:17
63:9 120:6
**VERIFICATION-**

103:21
**VERIFIED-** 7:25
98:19,21
103:19,22
**VERIFY-**
94:3,5,6,23,25
98:20 101:1
**VERSION-** 85:16
**VERSIONS-** 85:17
**VERSUS-** 138:13
140:21
**VIABLE-** 133:18
**VICE-** 78:1
83:6,10 112:17
**VICTORY-** 13:22
57:24
**VIN-** 94:23
**VIOLATE-** 132:25
**VIOLATION-** 59:21
**VIRTUE-** 6:24
**VOIDABLE-** 7:20,23
8:2,14 9:15
10:8,14
**VOIR-** 118:24
**VOLKSWAGEN-** 13:22
14:1,17 15:3
16:12,25 17:6,19
25:22 41:23 48:19
52:6,24 53:8
79:22
**VOLKSWAGENS-**
12:16 15:9,22
**VOLUME-** 18:11
31:8
**VP-** 83:8
**VW-** 25:12 57:24

W

**WANTS-** 80:25
131:21,22,24
**WARNER-** 3:16
17:2,9,20
51:6,12,16,18
53:6 59:19
62:14,15
64:1,22,25 65:3
68:1 69:6 72:18
74:16,20 76:4
77:8 78:7 79:3
81:7,8,11,23
88:5,7,17,23
89:22,25 90:21
91:5 93:12,17
106:14,20 111:23
112:3,5,10

115:21,
**WARNING-** 109:7,9
**WARRANTY-** 53:14
**WASN'T-** 5:24 9:19
35:4 128:12,13
**WATER-** 43:25
**WE'RE-** 4:6 28:2
46:3 54:12 82:24
88:14 93:13 96:24
109:8 113:18,21
114:4 118:20
120:13 121:7
125:17 132:10
134:10 139:1
**WEB-** 42:18
**WEDNESDAY-** 21:25
**WEEK-** 21:16 46:24
64:15 65:5
66:14,15 71:1,4
131:5,7 132:2
**WEEKS-** 66:14 85:1
106:24 113:10
**WEGMAN'S-** 31:5,9
**WEIGHT-** 53:16
**WELCOME-** 91:8
**WEREN'T-** 21:12
23:7 124:20 125:2
**WHEREUPON-** 142:19
**WHO'S-** 9:18 36:19
77:25 80:10
**WHOLE-** 32:10
56:20 67:21
115:19
**WIFE-** 28:22
47:12,13
**WILKES-BARRE-**
91:13 142:5
**WILL-** 5:6 6:13
9:16,23 10:24
13:12,15 17:18
28:11 41:6,23
44:22 45:23 46:24
57:15 74:21 77:2
82:13 116:22
120:14 121:6
125:23 126:7,17
131:15 133:17
137:4 142:4,5,7
**WILLING-** 4:7
**WIRE-** 20:24
**WISH-** 11:12 91:2
118:13 129:14
142:17
**WISHED-** 135:13
**WITHHELD-** 17:16
**WITHSTANDING-**

140:24
**WITNESS-** 11:17,20
22:14 24:3 26:5
33:5 38:17 53:6
59:16,18
62:4,7,10 69:2,4
76:8 82:17 85:7
90:22 93:11,15
106:7,9,15 112:7
114:3,6 116:19,21
118:18 121:6,12
127:5,22 128:21
129:9 135:9
**WITNESSES-** 81:5
82:11 91:9 128:25
136:2
**WITZIG-** 3:12
82:12,14,20,23
88:2 89:20 90:24
91:2 92:8 93:2,4
**WON'T-** 8:19
**WORD-** 90:7 127:4
**WORDED-** 8:9
**WORDING-** 11:15
**WORDS-** 20:13
126:4
**WORK-** 20:8 42:19
90:17 95:7 104:1
113:6 120:10
133:25 135:3
**WORKED-** 90:14
**WORKER'S-** 42:4
**WORKING-** 21:15
**WORKOUT-** 112:17
122:20
**WORKS-** 19:10
**WORTH-** 34:15
35:9,25 36:21
45:3 60:25 62:8
99:13,15 102:6
126:5 130:12
132:10,11 141:16
**WOULDN'T-** 9:1,5
20:13 45:1 74:9
77:6
**WRAP-** 123:5
**WRESTLED-** 138:19
**WRITE-** 70:18

Y

**YEAR-** 18:3,10
19:8 22:6 23:25
35:12 36:3
40:18,21 46:17
49:12,16 59:4
69:4,19,22 70:1

```
72:24 74:22 86:15
107:1,2 120:22
135:17
YEARS- 12:21
23:17 31:15 37:2
40:2,23 68:12,16
108:2,6,8 113:7
119:21 131:2
134:4
YESTERDAY-
65:14,22
YORK- 36:14 85:21
86:16 87:8
YOU'D- 47:1 51:23
52:11,15 74:13
YOU'LL- 104:23
105:9
YOU'RE- 4:4 9:10
17:24 38:13
45:6,16 49:4 52:8
55:2,25 59:12
62:5,6 66:11
68:25 71:3
73:12,15,17 91:8
101:17 109:16
114:7
YOU'VE- 17:23
19:24 20:4 31:12
47:11 68:13 72:13
84:16 85:15 92:4
94:14 104:2 108:6
113:12
YOURSELVES- 91:19
```

Z

```
ZONE- 33:3
ZONED- 33:5
```